UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MICHAEL P. KEARNS, in his official capacity as
Clerk of the County of Erie, New York,

                    Plaintiff,                    No. 19-cv-902 (EAW)

          v.

ANDREW M. CUOMO, in his official capacity as
Governor of the State of New York,
LETITIA A. JAMES, in her official capacity as
Attorney General of the State of New York, and
MARK J. F. SCHROEDER, in his official capacity as
Commissioner of the New York State Department of
Motor Vehicles,

                    Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

LETITIA JAMES
*Attorney General*
*State of New York*
28 Liberty Street
New York, New York 10005

BARBARA D. UNDERWOOD
  *Solicitor General*
JEFFREY W. LANG
  *Deputy Solicitor General*
VICTOR PALADINO
  *Senior Assistant Solicitor General*
LINDA FANG
  *Assistant Solicitor General*

JOEL J. TERRAGNOLI
  *Assistant Attorney General*
      *of Counsel*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. iii

PRELIMINARY STATEMENT ............................................................................1

STATEMENT OF THE CASE...............................................................................3

I.   STATUTORY AND REGULATORY FRAMEWORK .................................3

    A.   The Issuance of Driver's Licenses in New York ...............................3

    B.   The Federal REAL ID Act .................................................................4

    C.   The Driver's License Access and Privacy Act ...................................5

II.  PROCEDURAL HISTORY............................................................................8

STANDARD OF REVIEW ...................................................................................9

ARGUMENT .......................................................................................................10

    POINT I

    THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER
    JURISDICTION AND FAILURE TO STATE A CLAIM......................................10

    A.   Kearns Lacks Capacity to Bring His Claims....................................10

    B.   Kearns Lacks Standing to Bring His Claims.....................................12

        1.   Kearns does not allege injury to his office. ....................................13

        2.   Kearns does not face a credible threat of prosecution for unlawful
            harboring...........................................................................................14

        3.   Kearns lacks standing based upon his prospective removal from
            office. ...............................................................................................20

    C.   Alternatively, Kearns Does Not Have a Viable Claim Under the Supremacy
        Clause. ...............................................................................................20

    D.   Alternatively, Kearns' Preemption Claims Uniformly Fail on the Merits...............22

**Page**

1.   The Act is presumed valid because it regulates on matters of
      traditional state interest.................................................................................22

2.   The Act is not subject to field preemption because it does not regulate
      immigration or the "harboring" of undocumented persons. ..........................25

3.   The Act does not conflict with either 8 U.S.C. § 1324a (employment)
      or 8 U.S.C. § 1324 (harboring). ....................................................................28

4.   The Act's restrictions on information-sharing with federal
      immigration authorities do not conflict with federal law. .............................31

POINT II

PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION IN ANY
EVENT ...............................................................................................................................36

CONCLUSION....................................................................................................................38

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*Arizona Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017) ...........................................................................23

*Arizona v. United States*,
    567 U.S. 387 (2012)..............................................................................25, 29

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015)..........................................................................21

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................9

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979)..............................................................................14

*Balbuena v. IDR Realty LLC*,
    6 N.Y.3d 338 (2006) ...........................................................................23, 27

*Baur v. Veneman*,
    352 F.3d 625 (2d Cir. 2003).................................................................14

*Cayuga Nation v. Tanner*,
    824 F.3d 321 (2d Cir. 2016).................................................................14, 18

*Chambers v. Time Warner, Inc.*,
    282 F.3d 147 (2d Cir. 2002).................................................................10

*Chavez v. Freshpict Foods, Inc.*,
    456 F.2d 890 (10th Cir. 1972) ...........................................................21

*Citizens United v. Schneiderman*,
    115 F. Supp. 3d 457 (S.D.N.Y. 2015)..................................................20

*City and County of San Francisco v. Sessions*,
    349 F. Supp. 3d 924 (N.D. Cal. 2018) ..............................................34-35

*City of Chicago v. Sessions*,
    321 F. Supp. 3d 855 (N.D. Ill. 2018) ................................................35

*City of Chicago v. Sessions*,
    888 F.3d 272 (7th Cir. 2018) .............................................................33

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983)..............................................................................14

**Cases** **Page(s)**

*City of New York v. State of New York*,
    86 N.Y.2d 286 (1995) ................................................................. 11-12

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999)......................................................... 34-36

*City of Philadelphia v. Sessions*,
    309 F. Supp. 3d 289 (E.D. Pa. 2018) ......................................... 34-35

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013)........................................................................14

*Community Bd. 7 of Borough of Manhattan v. Schaffer*,
    84 N.Y.2d 148 (1994) ................................................................. 10-11

*Crosby v. National Foreign Trade Council*,
    530 U.S. 363 (2000)........................................................................28

*Cubas v. Martinez*,
    8 N.Y.3d 611 (2007) .......................................................... 3, 15-16, 30

*DeCanas v. Bica*,
    424 U.S. 351 (1976)................................................................. 23, 26

*DelRio-Mocci v. Connolly Props. Inc.*,
    672 F.3d 241 (3d Cir. 2012).............................................................17

*English v. General Elec. Co.*,
    496 U.S. 72 (1990)..........................................................................25

*Flores v. George Braun Packing Co., Div. of Leonard & Harral Packing Co.*,
    482 F.2d 279 (5th Cir. 1973) ..........................................................21

*Georgia Latino All. for Human Rights v. Governor of Georgia*,
    691 F.3d 1250 (11th Cir. 2012) .......................................................27

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)..........................................................................28

*Hollingsworth v. Perry*,
    570 U.S. 693 (2013)........................................................................12

*In re Livent, Inc. Noteholders Sec. Litig.*,
    151 F. Supp. 2d 371 (S.D.N.Y. 2001)...............................................9

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*,
    725 F.3d 65 (2d Cir. 2013)........................................................28, 30

**Cases**                                                                     **Page(s)**

*Klebanow v. New York Produce Exch.*,
   344 F.2d 294 (2d Cir. 1965)........................................................................10

*Mackey v. Montrym*,
   443 U.S. 1 (1979)....................................................................................25

*Madeira v. Affordable Housing Found., Inc.*,
   469 F.3d 219 (2d Cir. 2006)....................................................... 26, 30-31

*Makarova v. United States*,
   201 F.3d 110 (2d Cir. 2000).........................................................................9

*Marsh v. Rosenbloom*,
   499 F.3d 165 (2d Cir. 2007)...................................................................28, 30

*Maryland v. King*,
   567 U.S. 1301 (2012)..............................................................................37

*Matter of Beaudoin v. Toia*,
   45 N.Y.2d 343 (1978) .............................................................................13

*Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*,
   30 N.Y.3d 377 (2017) ....................................................................... 11-12

*Metropolitan Life Ins. Co. v. Massachusetts*,
   471 U.S. 724 (1985)................................................................................25

*Murphy v. National Collegiate Athletic Ass'n*,
   138 S. Ct. 1461 (2018) ............................................................................35

*Mutual Pharms. Co. v. Bartlett*,
   570 U.S. 472 (2013)................................................................................28

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995)................................................................................22

*New York State Rest. Ass'n v. New York City Bd. of Health*,
   545 F. Supp. 2d 363 (S.D.N.Y. 2008)........................................................36

*New York v. Department of Justice*,
   343 F. Supp. 3d 213 (S.D.N.Y. 2018).....................................................33, 35

*People ex rel. Wogan v. Rafferty*,
   208 N.Y. 451 (1913) ..............................................................................12

**Cases**                                                                    **Page(s)**

*PeTA, People for the Ethical Treatment of Animals v. Rasmussen,*
    298 F.3d 1198 (10th Cir. 2002) ............................................................19

*Piscitelli v. Classic Residence by Hyatt,*
    973 A.2d 948 (N.J. App. Div. 2009).....................................................21

*Plyler v. Doe,*
    457 U.S. 202 (1982)...............................................................................23

*Poe v. Ullman,*
    367 U.S. 497 (1961)...............................................................................20

*Pope v. County of Albany,*
    687 F.3d 565 (2d Cir. 2012)...................................................................36

*Printz v. United States,*
    521 U.S. 898 (1997)...............................................................................33

*Return Mail, Inc. v. United States Postal Serv.,*
    139 S. Ct. 1853 (2019)...........................................................................13

*Shipping Fin. Servs. Corp. v. Drakos,*
    140 F.3d 129 (2d Cir. 1998).....................................................................9

*Silver v. Pataki,*
    96 N.Y.2d 532 (2001) ...........................................................................10

*Steinle v. City and County of San Francisco,*
    919 F.3d 1154 (9th Cir. 2019) ...............................................................34

*Sweet v. Sheahan,*
    235 F.3d 80 (2d Cir. 2000).......................................................................9

*Tweed-New Haven Airport Auth. v. Tong,*
    930 F.3d 65 (2d Cir. 2019).....................................................................19

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) .......................................................... passim

*United States v. Costello,*
    666 F.3d 1040 (7th Cir. 2012) ...............................................15, 17, 30

*United States v. Herrera,*
    584 F.2d 1137 (2d Cir. 1978)..................................................................31

*United States v. South Carolina,*
    720 F.3d 518 (4th Cir. 2013) ...................................................................28

**Cases**                                                                                    **Page(s)**

*United States v. Vargas-Cordon,*
    733 F.3d 366 (2d Cir. 2013) ..........................................................16, 31

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) .........................................................27

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens,*
    529 U.S. 765 (2000)..........................................................................13

*Warth v. Seldin,*
    422 U.S. 490 (1975)..........................................................................13

*Winter v. Natural Res. Def. Council, Inc.,*
    555 U.S. 7 (2008)..............................................................................36

*Wright v. Ernst & Young LLP,*
    152 F.3d 169 (2d Cir. 1998)............................................................33

*Wyeth v. Levine,*
    555 U.S. 555 (2009)..........................................................................29

**Federal Laws**

Pub. L. No. 82-414, Ch. 477, 66 Stat. 228 (1952) ................................15, 30

Pub. L. No. 103-322, 108 Stat. 2099 (1994)..........................................32

Pub. L. No. 104-208, 110 Stat. 3009-671 (1996) ................................23, 32

REAL ID Act, Pub. L. 110–177 § 508, 121 Stat. 2543 .........................4
    (codified at 49 U.S.C. § 30301 n.)...................................................4
    § 201.................................................................................................4
    § 202.............................................................................................5, 33

8 U.S.C.
    § 1324................................................................................15, 17, 22 31
    § 1324a ....................................................................... 21, 28-29
    § 1324c............................................................................................29
    § 1373..............................................................................................34
    § 1644..............................................................................................34

Drivers Privacy Protection Act, 18 U.S.C. § 2721 *et seq.* ..........................32

6 C.F.R. § 37.71 .............................................................................................33

Fed. R. Civ. P. 17(b)(3).................................................................................10

**State Laws**                                                                      **Page(s)**

Ch. 37, 2019 N.Y. Laws ...................................................................................5-7

Ch. 81, 1995 N.Y. Laws 2282 ...........................................................................3

County Law § 525..............................................................................................11

Vehicle & Traffic Law
    § 201...........................................................................................5, 7, 32, 35
    § 205.................................................................................................4, 11
    § 501........................................................................................................3
    § 502.................................................................................................. passim
    § 508........................................................................................................3

15 N.Y.C.R.R. § 3.9.....................................................................................6, 16

**Miscellaneous Authorities**

H.R. Conf. Rep. No. 104-725 (1995-1996) ......................................................34

35 N.Y. Reg. 106 (Feb. 13, 2013), at
    https://docs.dos.ny.gov/info/register/2013/feb13/pdf/misc.pdf ......................4

N.Y. Assembly Debates on Bill A3675B (June 12, 2019) ................................24

N.Y. Assembly, Sponsor's Mem. in Support of Legislation for Ch. 37 (2019), at
    https://nyassembly.gov/leg/?default_fld=&leg_video=&bn=3675&term=2019
    &Summary=Y&Memo=Y ...............................................................................23

National Immigration Law Center, *State Laws Providing Access to Driver's
    Licenses or Cards, Regardless of Immigration Status* (updated Aug. 2019), *at*
    https://www.nilc.org/wp-content/uploads /2015/11/drivers-license-access-
    table.pdf ............................................................................................................18

New York State Senate, *Senate Passes Driver's License Access and Privacy Act
    (Green Light NY)* (June 17, 2019), *at*
    https://www.nysenate.gov/newsroom/press-releases/senate-passes-drivers-
    license-access-and-privacy-act-green-light-ny .................................................24

## PRELIMINARY STATEMENT

In June 2019, the New York State Legislature enacted the Driver's License Access and Privacy Act (the Act), which expands the types of proof of identity and age that the Department of Motor Vehicles (DMV) must accept for licensing of drivers in the State. The purpose of the Act is to permit every state resident, irrespective of immigration status, to obtain a driver's license, provided he or she demonstrate fitness to drive and pay a fee. The Act additionally protects the confidentiality of a license applicant's personal information by restricting its disclosure by DMV to third parties for purposes unrelated to licensing. The law takes effect on December 14, 2019.

As Erie County Clerk, plaintiff Michael Kearns is charged by statute to issue driver's licenses as directed by the DMV Commissioner. He brought this action, purportedly in his official capacity, against the Governor, the Attorney General, and the DMV Commissioner to enjoin them from implementing the Act, and to restrain the Governor and the Attorney General from removing him from office based on his refusal to comply with the Act. His primary claim is that complying with the Act would expose him to federal criminal liability for knowingly harboring unlawfully present immigrants. Kearns also argues that certain provisions of the Act are preempted by federal immigration laws merely because they benefit undocumented individuals. He asks for a preliminary injunction granting the same relief as sought in his complaint.

This Court should dismiss the complaint in its entirety for lack of subject matter jurisdiction and failure to state a claim, or alternatively, deny Kearns' request for a preliminary injunction. As a threshold matter, Kearns lacks capacity to bring this action in his official capacity as Erie County Clerk because, under New York's law of capacity, political subdivisions and their officials cannot challenge state laws. He also lacks standing to bring this action in his official capacity because he has alleged no injury to the Eric County Clerk's Office as a result of his compliance with the Act.

Nor can he manufacture Article III standing by relying on a threat of prosecution against him personally: he faces no credible threat of prosecution for harboring undocumented persons because the licensing scheme does not contemplate that he will learn the immigration status of applicants, and because he has identified no history of comparable prosecutions.

Aside from Kearns' lack of capacity and standing, his preemption claims asserted under the Supremacy Clause must be dismissed. The Supremacy Clause cannot provide a vehicle for raising preemption challenges based on federal immigration laws prohibiting the employment and harboring of undocumented persons because those underlying federal immigration laws were not intended to be enforced by private parties or local officials.

Lastly, Kearns' preemption claims fail on the merits. The Act does not regulate immigration, or the harboring of those unlawfully present in the country, and accordingly does not conflict with Congress's regulation in these areas. Congress's exclusive power to establish uniform rules for the naturalization, entry, and removal of noncitizens does not displace the broad authority of the States to enact laws governing the treatment of all persons found within their borders—even if those laws may have some effect on immigration. And the Act's concerns for public safety and economic growth fall within the heartland of the States' traditional police powers.

In particular, that the Act may ease the daily lives of the many undocumented individuals already in the State does not pose an irreconcilable conflict with congressional prohibitions on the employment of unlawfully present immigrants, and the harboring and shielding of such persons from federal detection. And the Legislature's choice to restrict DMV information-sharing with federal immigration officials is a permissible exercise of the State's Tenth Amendment prerogative to decline to participate in federal immigration enforcement, and does not conflict with any valid federal information-sharing laws.

Accordingly, this Court should dismiss the complaint in its entirety. For similar reasons, it should reject Kearns' request for a preliminary injunction.

## STATEMENT OF THE CASE

### I.   STATUTORY AND REGULATORY FRAMEWORK

#### A.   The Issuance of Driver's Licenses in New York

New York Vehicle and Traffic Law (VTL) mandates that DMV issue driver's licenses to all persons who meet the statutory eligibility criteria—that is, all persons who are able to "furnish such proof of identity, age, and fitness," VTL § 502(1). *See id.* § 501(1). License applicants must provide such proof as the Commissioner may require in order to prove identity, age, and fitness, *id.* § 502(1), and "such other information as the commissioner shall deem appropriate," *id.* § 508(2).

Neither the New York's Legislature nor the DMV Commissioner has ever conditioned the issuance of a license on an applicant's immigration status, though the types of proof of identity adopted over time have had the practical effect of precluding undocumented immigrants from obtaining licenses. *See Cubas v. Martinez*, 8 N.Y.3d 611, 617-20 (2007). Specifically, in 1995, the Legislature amended the VTL to require that individuals provide a social security number when applying for or renewing a driver's license. *See* Ch. 81, §§ 209-210, 1995 N.Y. Laws 2282, 2368. Subsequently, DMV promulgated 15 N.Y.C.R.R. § 3.9(a), which requires individuals applying for a license or renewal to provide either a social security number or "proof that [the applicant] is not eligible for a social security number." In practice, such proof typically consists of letters of ineligibility from the U.S. Social Security Administration (SSA), which are issued to certain noncitizens who are legally present in the U.S. but not authorized to work. *See Cubas*, 8 N.Y.3d at 617-18.

3

While driver's licenses are issued by DMV employees in certain counties in the State, those functions are performed by county clerks in a number of upstate counties (including Erie County), pursuant to a statute that makes the clerks agents of the DMV Commissioner in carrying out certain DMV functions. VTL § 205(1). Such county clerks and their staff are responsible for accepting and processing applications for driver's licenses to residents in those counties, and are provided access to DMV systems in order to perform these DMV functions. *See* Aff. of Ann Scott in Support of Defs. Mot. to Dismiss (Scott Aff.) ¶¶ 4-5. County clerks and their staff in these counties may enter and retrieve information from DMV's records on a transaction-by-transaction basis as required to conduct DMV business. *Id.* ¶ 6.

When acting as agents of DMV, county clerks and their staff are bound by applicable DMV policies and rules in performing DMV functions. *Id.* ¶ 7. DMV employees and agents are not permitted to access or use DMV records or information except when necessary for official DMV business. *See* DMV, *Protection of Department Records* 1, 3 (rev. Jan. 2019) (annexed as Ex. A to Scott Aff.). And county clerks are not authorized to accept subpoenas, court orders, and other legal documents requesting DMV information and records; those requests may only be accepted at DMV's headquarters in Albany. *See* DMV, *Requests for Information from External Entities* 4 (rev. July 2016) (annexed as Ex. B to Scott Aff.); *see also* 35 N.Y. Reg. 106 (Feb. 13, 2013).

## B.     The Federal REAL ID Act

In 2005, Congress enacted the REAL ID Act, Pub. L. 110–177, § 508, 121 Stat. 2543, codified at 49 U.S.C. § 30301 note. The REAL ID Act sets forth minimum federal requirements for state-issued driver's licenses and identification cards required to gain entry to federal facilities and board federally regulated commercial aircrafts. *See* REAL ID Act, § 201(3). To issue a REAL ID-compliant license or identification, a State must, among other things, verify an applicant's

4

lawful presence with federal databases, and maintain copies of the proofs of eligibility for a REAL ID license submitted by the applicant. *Id.* § 202(b)-(d). However, the REAL ID Act also permits States to issue licenses that are exempt from federal REAL ID requirements, which in New York are referred to as standard licenses. *Id.* § 202(d)(11). Anyone can opt for a standard license, although beginning in October 2020, such non-REAL ID-compliant licenses will not be accepted as valid identification at airports.

### C.   The Driver's License Access and Privacy Act

On June 17, 2019, the Legislature enacted the Act to amend the VTL's provisions pertaining to the issuance of standard driver's licenses. *See* Ch. 37, 2019 N.Y. Laws. The Act is scheduled to take effect on December 14, 2019. *See id.* § 8, p.6. Based on the Legislature's view that an individual's citizenship or immigration status is irrelevant to the decision of whether to license him or her, the Act instructs DMV to issue standard driver's licenses to all eligible state residents without regard to citizenship or immigration status. The Act also strengthens the confidentiality protections for the personal information maintained by DMV about all license holders and applicants.[1]

In particular, the Act expands the types of acceptable proof of identity and age for standard licenses by directing DMV to accept, as primary proof of identification and/or age, various foreign documents, including, but not limited to, unexpired foreign passports, foreign consular documents, and foreign driver's licenses. *See id.* § 3, p.3 (amending VTL § 502(1)). The Act also amends the social security number requirement by providing that, in lieu of a social security number, or proof

---

[1] The provisions of the Act challenged in this action do not implicate federal REAL ID licenses or standards: every provision of the Act relevant here expressly applies only to standard licenses, or contains an express exception to accord with REAL ID Act requirements. *See, e.g.*, VTL §§ 201(8)(b), 201(9)(b), 201(10)(b), 201(12)(a), 502(1), 502(8)(a)-(e) (as amended).

of ineligibility for a social security number, *see* 15 N.Y.C.R.R. § 3.9(a), applicants for a standard license may submit an affidavit attesting that they have "not been issued a social security number." *See* Ch. 37, § 3, p.3 (amending VTL § 502(1)).

The Act expressly states that proof of lawful presence in the U.S. is not required in order to obtain a standard license, *see id.* § 5, p.5 (amending VTL § 502(8)(b)), and prohibits DMV from inquiring about an applicant's citizenship or immigration status for such licenses, *see id.* § 5 (amending VTL § 502(8)(e)(ii)). The Act restricts the collection and retention of information pertaining to "citizenship or immigration status," social security number eligibility, and the type of documents used by applicants to prove age or identity in connection with applications for standard licenses. *See id.* (amending VTL § 502(8)(c)(i)-(iii)). The Act further prohibits DMV from retaining the originals or copies of the documents used by a standard license applicant to prove age or identity, "except for a limited period necessary to ensure the validity and authenticity of such documents." *See id.* (amending VTL § 502(8)(d)).

Additionally, the Act makes certain categories of personal information and records collected from all license applicants confidential by prohibiting their disclosure except (a) to the subject of the information, (b) where disclosure is "expressly required" by the REAL ID Act, or (c) as mandated by a court order, judicial warrant, or a state criminal or civil subpoena. *See id.* § 2, pp.1-2 (amending VTL § 201(8)(a)-(c), (9)(a)-(c), and (10)(a)-(c)). Such protected information includes records and information maintained by the DMV containing "the social security number, telephone number, place of birth, country of origin, place of employment, school or educational institution attended, source of income, status as a recipient of public benefits, the customer identification number associated with a public utilities account, medical information or disability information" of the license applicant. *Id.* (amending VTL § 201(8)); *see also id.* § 6, p.6 (amending

VTL § 508(3)). The Act also shields DMV records that would reveal whether a particular license is a standard license or one that meets federal standards. *See id.* § 2, p.2 (amending VTL § 201(10)); *see also id.* § 6, p.6 (amending VTL § 508(3)). The Act protects both the underlying information collected from standard license applicants as well as the "original documents and copies of documents" collected to prove "identity, age, or fitness." *See id.* § 2, p.2 (amending VTL § 201(9)).

The Act further prohibits DMV from disclosing or making accessible "in any manner records or information" it "maintains" for standard license applicants and holders specifically to federal immigration authorities (including the U.S. Immigration and Customs Enforcement and the U.S. Customs and Border Protection), absent a court order, judicial warrant, or criminal or civil subpoena. *See id.* (amending VTL § 201(12)(a), (c)). Prior to providing such requested information, the Act mandates the DMV to "require any person or entity that receives or has access to records or information from the [DMV]" to certify that the recipient of the information will not, among other things, use the information for civil immigration purposes.[2] *See id.* (amending VTL § 201(12)(b)). Within three days of receiving a request for records and information from federal immigration authorities, the Act requires DMV to provide written notification to the subject of the records request about the request, and inform him or her of the identity of the requesting agency. *See id.* (amending VTL § 201(12)(a)).

---

[2] Kearns misreads this provision when he suggests (Pl. Mem. of Law (Mem.) at 10) that this certification requirement applies not only to the third parties who are provided access and disclosure to DMV records referenced in VTL § 201(12)(a) but also to county clerk employees. It makes little sense that the Legislature would refer to agents or employees of DMV who must access DMV records as a necessary part of their daily duties as receiving or being provided access to records *"from the* [DMV]," *see* VTL § 201(12)(b) (emphasis added), nor would it be necessary for such individuals to certify that they will not use the information for non-DMV-related purposes since DMV rules already proscribe such conduct, *see* Ex. A to Scott Aff. at 1, 3.

## II.    PROCEDURAL HISTORY

On July 10, 2019, Michael Kearns commenced this action in his capacity as Erie County Clerk against Governor Andrew Cuomo, Attorney General Letitia James, and DMV Commissioner Mark Schroeder to enjoin implementation of the Act.

In his complaint, Kearns alleges that the Act is preempted by federal law because it regulates in areas of Congress's exclusive domain. He contends that the removal of the social security number requirement "allow[s] individuals illegally in the United States to obtain a driver's license," which conflicts with federal immigration law. Compl. ¶ 66(a). He also claims that provisions of the Act which prohibit the disclosure of standard license applicant records and information (including records as to whether a license is a standard license or a REAL ID compliant license), absent a court order, judicial warrant, or criminal or civil subpoena, amount to the "concealment" of such records and information in contravention of federal law. Compl. ¶ 66(b), (c), (e). Kearns additionally objects to the provision of the Act which requires DMV to notify an individual upon receiving a request for the individual's records from federal immigration authorities. Compl. ¶ 66(d). Kearns alleges that complying with the Act's provisions to issue driver's licenses and protect DMV records and information exposes him to an imminent risk of criminal prosecution for harboring and concealing unlawfully present individuals from detection by federal authorities.

For relief, Kearns seeks a declaration that provisions of the Act which restrict information-sharing with federal immigration authorities, require notifying the subject of a request for information from an immigration enforcement agency made pursuant to a subpoena, judicial warrant, or court order, and permit the issuance of standard licenses irrespective of immigration status, are preempted by federal law. He also requests an order enjoining defendants from implementing the

Act, and prohibiting the Governor and the Attorney General from removing him from office for his refusal to comply with it. A week after filing his complaint, Kearns moved for a preliminary injunction seeking the same relief as in his complaint.

## STANDARD OF REVIEW

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a complaint must be dismissed for lack of subject matter jurisdiction when the "court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000). The party seeking to invoke the jurisdiction of the court "has the burden of proving by a preponderance of the evidence that it exists." *Id.* While "the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff," *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000), "jurisdiction must be shown affirmatively," *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). When deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, the court may consider evidence outside the pleadings. *See Makarova*, 201 F.3d at 113.

To survive a Rule 12(b)(6) motion to dismiss, the pleading must contain sufficient factual allegations which state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is "plausible on its face" when it is supported by enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In the context of a Rule 12(b)(6) motion, courts must generally accept all well-pled factual allegations as true and draw all reasonable inferences in favor of the plaintiff, but need not credit conclusory statements or legal conclusions. *See Iqbal*, 556 U.S. at 678. The presumption of truth is similarly inapplicable to factual assertions that are contradicted by documents upon which the pleadings rely. *E.g., In re*

9

*Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001). In resolving a Rule 12(b)(6) motion, courts may consider documents integral to the complaint, and those relied on by plaintiff in bringing suit. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).

## ARGUMENT

### POINT I

### THE COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION AND FAILURE TO STATE A CLAIM

Premised on Kearns' allegations that the Act (1) requires him to issue driver's licenses to individuals with the knowledge that they are unlawfully present in the country, and (2) prevents him from disclosing personal information about license applicants to immigration authorities, Kearns seeks an injunction striking down provisions of the Act in all applications, and restraining the Governor and the Attorney General from removing him from office for refusing to administer the Act. For the four reasons given below, none of his claims can survive this motion to dismiss.

### A.    Kearns Lacks Capacity to Bring His Claims.

This Court should dismiss the complaint at the outset because Kearns, as a local official, lacks capacity to bring this action. Capacity "concerns a litigant's power to appear and bring its grievance before the court." *Community Bd. 7 of Borough of Manhattan v. Schaffer*, 84 N.Y.2d 148, 155 (1994). The "threshold matter" of whether a party has capacity to maintain a federal action, *see Silver v. Pataki*, 96 N.Y.2d 532, 537 (2001), is determined by state law, *see* Fed. R. Civ. P. 17(b)(3). Lack of capacity is an issue properly considered in a Rule 12(b)(6) dismissal motion. *See Klebanow v. New York Produce Exch.*, 344 F.2d 294, 296 n.1 (2d Cir. 1965).

Under New York's law of capacity, "municipal corporate bodies—counties, towns and school districts—are merely subdivisions of the State, created by the State for the convenient

carrying out of the State's governmental powers and responsibilities as its agents," and do not have capacity to challenge the actions of "their principal or creator." *City of New York v. State of New York*, 86 N.Y.2d 286, 289-90 (1995). As explained by the Court of Appeals, this rule "reflects a self-evident proposition about legislative intent: the 'manifest improbability' that the legislature would breathe constitutional rights into a public entity and then equip it with authority to police state legislation on the basis of those rights." *Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d 377, 385 (2017) (citation omitted). Absent a specific power "derived from the relevant enabling legislation or some other concrete statutory predicate," counties and their officials simply have no right to sue. *See Community Bd. 7*, 84 N.Y.2d at 156.

Here, Kearns' purported official capacity suit is barred by the longstanding rule that local officials and entities "lack the capacity to bring suit to invalidate State legislation." *City of New York*, 86 N.Y.2d at 290. As Kearns acknowledges (Compl. ¶¶ 12-13), the duties of the Clerk's Office are to register and file documents, deeds, and judgments, and to issue driver's licenses as the DMV Commissioner's agent. *See* N.Y. County Law § 525; VTL § 205(1). They do not include the power to sue to challenge the validity of a state law.

Nor do any of the four limited exceptions to the general capacity bar apply here. In order "to ensure that state-created entities are not thwarted in achieving their constitutionally- and statutorily-mandated purposes," *see Matter of World Trade Ctr.*, 30 N.Y.3d at 402 (Rivera, J., concurring), the Court of Appeals has recognized four exceptions to the general rule precluding suits by local government entities, *see id.* at 386. The only exception that Kearns purports to invoke here (*see* Compl. ¶ 9) is where the local officials "assert that if they are obliged to comply with the State statute they will by that very compliance be forced to violate a constitutional proscription." *See City of New York*, 86 N.Y.2d at 292 (quotation marks omitted).

11

Kearns' reliance on the "constitutional proscription" exception is misplaced. As the Court of Appeals has explained, this exception is "narrow," *see Matter of World Trade Ctr.*, 30 N.Y.3d at 387, and requires the local government entity to identify a specific constitutional prohibition imposing an independent obligation that directly conflicts with those imposed by the challenged statute, *see City of New York*, 86 N.Y.2d at 295; *see also People ex rel. Wogan v. Rafferty*, 208 N.Y. 451, 461-62 (1913) (statute which purported to remove powers of county clerk expressly conferred on the clerk under the State Constitution was invalid).

Kearns cannot do so here. Kearns alleges that complying with provisions of the Act would "force him to violate the proscription of the United States Constitution's Supremacy Clause." Compl. ¶ 9. But this contention fails because the Supremacy Clause does not impose any obligations on the office of the Erie County Clerk, and thus is not a "constitutional proscription" within the meaning of *City of New York*. Further, the statutes that Kearns argue displace the Act are federal immigration statutes that bear no connection to the duties and functions of the Erie County Clerk, and therefore do not create any conflicting constitutional or statutory obligation on the Clerk's Office. There is accordingly no basis for conferring capacity upon the Erie County Clerk to bring a suit because the instant suit will not further any of the "statutorily-mandated purposes" of the Clerk's Office. *See Matter of World Trade Ctr.*, 30 N.Y.3d at 402.

**B.     Kearns Lacks Standing to Bring His Claims.**

Apart from his lack of capacity to bring his claims, Kearns lacks standing to do so. To demonstrate standing, a plaintiff must show: (1) a "concrete and particularized injury;" (2) "that is fairly traceable to the challenged conduct;" and (3) "is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

12

### 1. Kearns does not allege injury to his office.

Preliminarily, as noted above, Kearns purports to bring this action in his "official capacity as the Clerk of the County of Erie, New York." Compl. at 1. To acquire standing to sue in his official capacity, he would thus have to show injury to the *Office of the Erie County Clerk*—as opposed to Kearns as an individual. The injuries that he has alleged, however—threatened criminal prosecution, removal from office, and reputational harm (*see* Decl. of Michael P. Kearns in Supp. of Mot. for a Prelim. Inj. (Kearns Decl.) ¶¶ 6, 11-12, 17)—pertain to him as an individual. And the injunctions sought in the complaint restraining the implementation of the Act and preventing the Governor and the Attorney General from removing Kearns from his official position would not benefit the Clerk's Office. Nor can the Erie County Clerk's Office face any threat of prosecution because *the office* cannot be criminally prosecuted under 8 U.S.C. § 1324(a)(1)(A)(iii) for unlawful harboring, since the statute's prohibitions covers only "person[s]"—not government entities. *See Return Mail, Inc. v. United States Postal Serv.*, 139 S. Ct. 1853, 1861-62 (2019) (courts apply "longstanding interpretive presumption that 'person' does not include the sovereign" or governmental agencies); *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 780-82 (2000) (statute imposing liability on "persons" covered natural persons, not states). Kearns' claims purportedly brought in his official capacity must therefore be dismissed for lack of subject matter jurisdiction.[3] *See also Matter of Beaudoin v. Toia*, 45 N.Y.2d 343, 347-48 (1978) (local agent of state agency has no standing to challenge determinations made by his principal; to permit such a challenge would invite "administrative chaos").

---

[3] Kearns, in either his official or individual capacity, similarly does not have standing to assert the interests of the employees of the County Clerk's office (*see* Kearns Decl. ¶ 6). *See Warth v. Seldin*, 422 U.S. 490, 499-500 (1975).

**2.      Kearns does not face a credible threat of
prosecution for unlawful harboring.**

Although the Court has no obligation to construe Kearns' claims as having been pled in his
individual capacity, to the extent the Court does so, it should dismiss his individual capacity claims
for lack of standing. "[A] plaintiff must demonstrate standing for each claim and form of relief
sought." *Baur v. Veneman*, 352 F.3d 625, 641 n.15 (2d Cir. 2003). To pursue declaratory and
prospective injunctive relief—the only relief sought in this action—Kearns must show that he will
suffer a "certainly impending" future injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409
(2013). As the Supreme Court has explained, for purposes of the standing inquiry, "[i]t is the *reality*
of the threat of repeated injury that is relevant . . . not the plaintiff's subjective apprehensions."
*City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983) (emphasis in original).

Where, as here, the claimed injury is based on a threatened prosecution, a plaintiff must
demonstrate that he faces a "credible threat of prosecution." *Cayuga Nation v. Tanner*, 824 F.3d
321, 331-32 (2d Cir. 2016). A subjective fear of prosecution that is "imaginary or wholly
speculative" is insufficient. *Id.* at 331 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442
U.S. 289, 302 (1979)). Although a plaintiff need not wait for a criminal prosecution to commence
before bringing suit, *see Babbitt*, 442 U.S. at 298, "'a credible threat sufficient to satisfy the
imminence requirement of injury' . . . will not be found where 'plaintiffs do not claim that they
have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution
is remotely possible,'" *Cayuga Nation*, 824 F.3d at 331 (quoting *Knife Rights, Inc. v. Vance*, 802
F.3d 377, 384 (2d Cir. 2015)).

Kearns asserts that he risks prosecution because his compliance with the Act would compel
him to violate 8 U.S.C. § 1324(a)(1)(A)(iii), but he is mistaken. This provision, entitled "Bringing
in and harboring certain aliens," imposes criminal penalties on "[a]ny person who" "knowing or

in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place." 8 U.S.C. § 1324(a)(1)(A)(iii). The general federal prohibitions against harboring, shielding, and concealment contained in § 1324(a) "grew out of the prohibition of smuggling aliens into the United States." *See, e.g.*, *United States v. Costello*, 666 F.3d 1040, 1045 (7th Cir. 2012); *see also* Pub. L. No. 82-414, Ch. 477, 66 Stat. 228-29 (1952) (enacting earliest version of § 1324(a)'s prohibitions directed primarily to common carriers who were transporting noncitizens into the country). Processing driver's license applications and keeping confidential applicant information simply does not implicate alien smuggling. For the two reasons given below, Kearns does not face a credible threat of prosecution under the federal anti-harboring statute for abiding by the Act.

**a.** First, complying with the Act does not entail either the conduct or the mental state required for a violation of § 1324(a). Contrary to Kearns' assertions (*see* Compl. ¶¶ 34-44), processing standard license applications would not provide him with knowledge of an applicant's immigration status, as required for a violation the anti-harboring statute. The Act forbids DMV employees (or county clerks acting as their agents) from inquiring about immigration status. *See* VTL § 502(8)(e). And none of its provisions expanding the methods by which applicants may prove identity and age for standard licenses provide DMV employees or their agents with knowledge of an applicant's immigration status. *See* VTL § 502(8)(b)-(e). An applicant who presents a foreign passport, foreign consular documents, or a foreign driver's license is not necessarily present unlawfully in the U.S., nor is a person who has not been issued a social security number, *see Cubas*, 8 N.Y.3d at 617-18.

Kearns simply assumes that anyone who applies for a standard license under the Act must be unlawfully present, but that is not so. To the contrary, *any* state resident, regardless of citizenship

or immigration status, may opt to apply for a standard license, and there are ample reasons why persons who are lawfully present might choose to do so. Indeed, many applicants who would otherwise qualify for REAL ID licenses may opt for standard licenses to avoid the more onerous documentation requirements imposed by federal law. For example, noncitizens who are legally present in the U.S. but not authorized to work—a group that has long been eligible for driver's licenses in the State, *see id.*—may choose to apply for standard licenses because the Act has made applications by such individuals easier. Instead of having to apply to the SSA for a letter stating the applicant is not eligible to be issued a social security number, *see* 15 N.Y.C.R.R. § 3.9(a), such noncitizen applicants may instead submit a personal attestation that they have not been issued a social security number, *see* VTL § 502(1). Kearns cannot explain how he would know whether any particular license applicant is unlawfully present and thus cannot carry his burden to establish standing.

Nor does complying with the Act entail the conduct of "conceal[ing], harbor[ing], or shield[ing] from detection" a person unlawfully present in the U.S., as required for a § 1324(a)(1)(A)(iii) violation. Kearns contends (Pl. Mem. of Law (Mem.) at 11-14) that providing any form of assistance to undocumented immigrants may give rise to a criminal violation. But the Court of Appeals for the Second Circuit has expressly rejected that theory, making clear that § 1324(a)(1)(A)(iii)'s prohibitions do not extend to just any conduct that arguably facilitates a noncitizen's continued unlawful presence in the country, unless that facilitation was done specifically "to help prevent the alien's detection by immigration authorities or police." *See United States v. Vargas-Cordon*, 733 F.3d 366, 382 (2d Cir. 2013) ("mere" provision of "shelter, money, or other material comfort" is not enough to violate federal statute).

Other courts of appeals have similarly concluded that § 1324(a)(1)(A)(iii) does not reach conduct which assists an undocumented individual in the incidents of daily life—such as the provision of housing or transportation—even if the assistance is provided with knowledge of the person's unlawful status (which Kearns will not even have here). *See DelRio-Mocci v. Connolly Props. Inc.*, 672 F.3d 241, 247 (3d Cir. 2012) ("We do not know of any court of appeals that has held that knowingly renting an apartment to an alien lacking lawful immigration status constitutes harboring"); *Costello*, 666 F.3d at 1042-43 (defendant who drove unlawfully present boyfriend from bus station to her home and allowed him to stay with her for several months did not violate § 1324(a)(1)(A)(iii)). These precedents establish that providing a driver's license to an undocumented immigrant pursuant to state law simply does not constitute harboring within the meaning of § 1324(a)(1)(A)(iii).

Nor do the Act's restrictions on the disclosure of information implicate the anti-harboring statute, notwithstanding Kearns' conclusory allegations (Compl. ¶¶ 31-34). As an initial matter, the anti-harboring law addresses the "conceal[ing], harbor[ing], or shield[ing] from detection" of *persons*, not maintaining the confidentiality of government records. *See* 8 U.S.C. § 1324(a)(1)(A)(iii). Additionally, even apart from the new state statute, Kearns, as an agent of DMV, is already prohibited from using or accessing information in DMV files except for "a specific [DMV] business purpose." *See* Ex. A to Scott Aff. at 1, 3. Because responding to information requests from federal immigration officials does not pertain to any DMV business, Kearns may not access DMV records for such purposes in the first place. And Kearns has identified no authority to suggest that compliance with such a generally applicable employer rule governing workplace conduct could constitute criminal harboring or concealment.

17

Kearns also fails to explain what records he or DMV would have "containing evidence of illegal immigration activity" (Compl. ¶ 34) that the Act would bar him from releasing to immigration authorities. Nor does he explain why allowing an undocumented person to drive in the State with a valid driver's license as opposed to without one permits the person to "more easily evade detection by federal law enforcement" (*id.* ¶ 35), or why protecting information about whether a particular license is federally compliant or a standard license would have any connection to concealing those unlawfully present from detection (*id.* ¶ 33).

**b.** Second, Kearns has not shown any history of criminal prosecutions under the anti-harboring statute for conduct that is remotely analogous to the issuance of driver's licenses. Nor could he: twelve other States, in addition to the District of Columbia and Puerto Rico, have been issuing driver's licenses to their residents without regard to immigration status for years,[4] and no official in any of these other jurisdictions has been prosecuted under 8 U.S.C. § 1324(a)(1)(A)(iii) in connection with the issuance of driver's licenses. And Kearns does not allege that there have been any threats of prosecution made against him or any officials in these other jurisdictions. The wholesale lack of past enforcement in any situation comparable to Kearns', coupled with the absence of any specific threats of future enforcement, precludes a finding of a "credible threat of prosecution" here. *See Cayuga Nation*, 824 F.3d at 331.

Nor does Kearns' claim that he faces a credible threat of criminal prosecution for harboring find support in President Trump's statement that federal prosecutors should "consider" charging a

---

[4] These States include: California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Nevada, New Mexico, Utah, Vermont, and Washington. *See* National Immigration Law Center, *State Laws Providing Access to Driver's Licenses or Cards, Regardless of Immigration Status* (updated Aug. 2019), *available at* https://www.nilc.org/wp-content/uploads/2015/11/drivers-license-access-table.pdf.

municipal official for obstruction based on her conduct in publicizing a planned raid by immigration authorities (*see* Kearns Decl. ¶ 7). No such prosecution ever materialized. Moreover, the hypothetical prosecution would not have been for harboring but rather for obstructing justice by publicizing a planned raid—conduct utterly unlike anything required of a clerk processing applications for driver's licenses and keeping drivers' personal information confidential. Nor does Kearns' claim find support in the prosecution of judicial officials, also for obstruction, based on lying to federal agents and assisting an undocumented individual to avoid arrest by waiting immigration agents (*see* Kearns Decl. ¶ 8).

Kearns' claim of standing similarly finds no support in *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65 (2d Cir. 2019). In that case, the Second Circuit concluded that the plaintiff airport authority had standing to challenge a statute premised on a credible threat of enforcement, based on the text of the statute alone, because the statute at issue was undisputedly enacted to prohibit precisely the action the authority sought to perform, namely the expansion of a particular runway. *Id.* at 69-71. In contrast, the anti-harboring statute, enacted decades ago, was not aimed at the issuance of driver's licenses as authorized by the Legislature just two months ago. While in *Tweed* the Circuit also found it relevant that the government failed to disavow its intent to prosecute, the Court noted that the absence of a disavowal does not confer standing where there is "another reason to conclude that no such intent existed." *Id.* at 71. Here, there is another reason to infer the absence of an intent to prosecute: the conduct directed by the Act is far beyond the reach of the criminal statute at issue. *See PeTA, People for the Ethical Treatment of Animals v. Rasmussen*, 298 F.3d 1198, 1203 (10th Cir. 2002) (no future injury established where statute did not criminalize plaintiff's conduct).

In sum, Kearns has failed to show a credible threat of prosecution and lacks standing to bring his claims.

### 3. Kearns lacks standing based upon his prospective removal from office.

In the absence of a credible threat of criminal prosecution, Kearns has identified no injury that could confer standing on him. And he may not manufacture standing by claiming injury in the form of his prospective removal from office should he fail to perform his official duties as mandated by the Act. Not every refusal to perform official duties results in removal from office; at this point, Kearns' claim of injury based on his prospective removal is premature and speculative. And the Governor and Attorney General's generalized assurances that they will enforce the law are insufficient to show a certain and impending threat of removal. *See Poe v. Ullman*, 367 U.S. 497, 501 (1961) (statement by attorney general that plaintiff's conduct was proscribed by statute and that he "intends to prosecute any offenses against [state] law" failed to confer standing); *see also Citizens United v. Schneiderman*, 115 F. Supp. 3d 457, 474 (S.D.N.Y. 2015) (deficiency notices issued to organizations "fall[ ] decidedly short" of establishing "a threat of specific future harm" where attorney general did not disavow his intent to take enforcement action but had articulated no current plans for enforcement, and had not taken similar enforcement actions in the past).

### C. Alternatively, Kearns Does Not Have a Viable Claim Under the Supremacy Clause.

Even if Kearns had capacity and standing to bring his claims, his complaint should be dismissed at the outset for the additional reason that he has not stated an enforceable claim. Citing alleged conflicts between the Act and various federal immigration statutes, Kearns argues that the

Act is preempted under the Supremacy Clause. As the Supreme Court has explained, however, the Supremacy Clause does not create a cause of action or confer any individual rights. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015). Rather, it is merely a "rule of decision" that "instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* The issue of whether a preemption claim may be brought turns, instead, on congressional intent as to the underlying federal laws that form the basis of the preemption claim.

Kearns' Supremacy Clause claims fail because the underlying federal immigration statutes that he relies on were not intended to be enforced either by private parties or local officials. Courts have long recognized that the federal government is the exclusive enforcer of the federal immigration laws, and have consistently held that the immigration provisions do not confer any private causes of action. *See, e.g.*, *Chavez v. Freshpict Foods, Inc.*, 456 F.2d 890, 893 (10th Cir.), *cert. denied*, 409 U.S. 1042 (1972) (plaintiffs' discontent with federal government's "grossly inadequate" enforcement of the federal immigration laws did not provide basis to "by-pass the enforcement procedures" set forth in federal law where "Congress has revealed no intention to" create private remedy in immigration statutes); *Flores v. George Braun Packing Co., Div. of Leonard & Harral Packing Co.*, 482 F.2d 279, 280 (5th Cir. 1973) (per curiam) (no private right of action exists under 8 U.S.C. § 1324); *Piscitelli v. Classic Residence by Hyatt*, 973 A.2d 948, 961 (N.J. App. Div. 2009) (same, as to § 1324a).

As to § 1324a's prohibitions against the employment of unauthorized workers, Congress created an administrative enforcement mechanism, and additionally authorized the U.S. Attorney General to enforce the statute against employers. *See* 8 U.S.C. § 1324a(e) (detailed administrative procedures for complaints, investigations, hearings, warning notices, and administrative review),

21

1324a(f) (authorizing the U.S. Attorney General to commence criminal or civil actions against employers). This enforcement mechanism confirms that Congress did not intend for § 1324a to be enforced outside this scheme through preemption lawsuits brought by local officials. And as to § 1324(a)(1)(A)(iii)'s criminal prohibitions against harboring, the U.S. Attorney General has the exclusive authority to enforce such prohibitions through criminal prosecutions.

### D.     Alternatively, Kearns' Preemption Claims Uniformly Fail on the Merits.

Even if Kearns could overcome the threshold deficiencies detailed above, his complaint should still be dismissed because Kearns' preemption claims are without merit. Kearns contends that provisions of the Act are preempted because they intrude on Congress's exclusive power to regulate in the field of immigration, including Congress's comprehensive regulation of the "harboring" of unlawfully present persons. *See* Mem. at 8-11. Kearns also alleges that the Act conflicts with particular federal immigration laws: 8 U.S.C. § 1324a, which prohibits the employment of individuals who are not legally authorized to work; 8 U.S.C. § 1324(a)(1)(A)(iii), which prohibits the harboring of those unlawfully present from federal detection; and 8 U.S.C. §§ 1373 and 1644, which prohibit restrictions on federal-state information-sharing about immigration status. He is wrong on all counts.

#### 1.     The Act is presumed valid because it regulates on matters of traditional state interest.

While Congress has the power to preempt state and local laws under the Supremacy Clause of the U.S. Constitution, art. VI, cl. 2, courts have consistently recognized that there is a general presumption against preemption. *See, e.g.*, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). This presumption "is especially strong" with

respect to state laws that implicate a state's traditional police powers. *See Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338, 356 (2006).

While Congress has narrowly preempted state laws with respect to the naturalization, entry, and removal of individuals from the U.S., States retain the ability to enact and enforce generally applicable laws addressing "essentially local problems." *DeCanas v. Bica*, 424 U.S. 351, 357 (1976). States thus are broadly permitted to legislate with respect to civil rights, consumer protection, or workplace safety for *all* persons within their borders, including undocumented immigrants. *See id.* at 355-56; *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (undocumented persons are "subject to the full range of obligations imposed by the State's civil and criminal laws"). Indeed, federal law recognizes that States are empowered to issue driver's licenses without regard to immigration status. *See* Pub. L. No. 104-208, § 502(a), 110 Stat. 3009-671 (1996) (providing States "may conduct pilot programs within their State to determine the viability, advisability, and cost-effectiveness of the State's denying driver's licenses to aliens who are not lawfully present in the United States").

The Act is entitled to the strong presumption against preemption because it regulates in an area of "traditional state concern"—that is, the issuance of driver's licenses. *See Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 973 (9th Cir. 2017). The New York Legislature determined that the State's economic and public safety interests are furthered if "all residents of New York, including undocumented immigrants," are able to secure driving privileges. *See* N.Y. Assembly, Sponsor's Mem. in Support of Legislation. In particular, the Act's supporters stressed during debates that permitting more state residents, including undocumented persons, to become licensed

drivers would generate additional tax and DMV revenues, and lower uninsured motorist insurance premiums for all drivers by reducing the number of uninsured drivers on New York's roads.[5]

Furthermore, the legislative history contains myriad references to the expected gains to public safety that the Act would generate. *See* N.Y. Assembly Debates on Bill A3675B at 69, 120, 193, 207 (June 12, 2019). By all accounts, legislators noted that there were many undocumented immigrants already in the State, many of whom were likely driving without licenses. *See id.* at 197-98, 210, 215-16. The Act's supporters stated that allowing these individuals who were already on the roads to be licensed would incentivize those persons to take road tests in order to become properly licensed, thereby enhancing overall road safety. *See id.* at 196, 210, 216. Because it is estimated that uninsured and unlicensed drivers are responsible for many hit-and-run accidents, supporters of the Act, based on data from other States that have passed similar measures, stated that the new law, by decreasing the number of such drivers, would improve public safety by decreasing hit-and-runs and other accidents.[6]

Based on these concerns, the Legislature amended the types of proof that DMV must accept as primary proofs of identity and age in licensing applications, in order to enable every state

---

[5] *See* N.Y. Assembly Debates on Bill A3675B at 113 (June 12, 2019) (citing City Comptroller report that licensing undocumented immigrants to drive will generate $9.6 million in license fees to the State, boost auto sales by nearly 3 percent, and generate $4.2 million in registration and title fees); *id.* at 115-116 (discussing anticipated reduction in insurance premiums); *id.* at 193 (referencing studies that predict lower insurance premiums); *id.* at 195-96 (citing estimates that Act will generate $50-$57 million in additional annual revenues to the State).

[6] *See* N.Y. Assembly Debates at 109 (citing reduced hit-and-runs in California and New Mexico after passing similar laws); New York State Senate, *Senate Passes Driver's License Access and Privacy Act (Green Light NY)* (June 17, 2019), *available at* https://www.nysenate.gov/newsroom/press-releases/senate-passes-drivers-license-access-and-privacy-act-green-light-ny (highlighting that in Connecticut, since enacting similar law, "there have been almost 4,000 fewer unlicensed driving convictions and hit-and-run crashes have dropped 9% between 2016 and 2018").

resident—regardless of immigration status—to obtain a driver's license, so long as they can pay a fee and demonstrate their fitness to drive. Because the Legislature deemed an applicant's immigration status to be irrelevant to his or her ability to drive safely, it prohibited DMV from inquiring about it in performing the agency's licensing function. Moreover, the Legislature directed DMV to protect the personal information of its license applicants and to refrain from using state resources for purposes unrelated to the agency's core responsibilities. These are permissible choices squarely within the State's traditional police powers. *See Mackey v. Montrym*, 443 U.S. 1, 17 (1979) (State has a "paramount interest" in "preserving the safety of its public highways" by regulating those able to drive on its roads); *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) ("States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons") (quotation marks omitted). The Act thus enjoys a strong presumption of validity.

### 2.  The Act is not subject to field preemption because it does not regulate immigration or the "harboring" of undocumented persons.

Field preemption[7] has the effect of displacing state regulation in a particular area where Congress has asserted the exclusive authority to regulate in that area. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387 (2012). Where "the field which Congress is said to have pre-empted includes areas that have been traditionally occupied by the States, congressional intent to supersede state laws must be clear and manifest." *English v. General Elec. Co.*, 496 U.S. 72, 79 (1990) (quotation marks omitted).

---

[7] There are no federal statutes that expressly preempt state laws such as the Act, and Kearns does not argue otherwise.

Congress has not expressed a "clear and manifest" intent to preempt state laws governing the issuance of standard driver's licenses. Kearns argues (Mem. at 8-11) that the Act is subject to field preemption because Congress has the exclusive power to "regulate immigration" (Compl. ¶¶ 56-61), and has comprehensively regulated in the field of "alien harboring" (Mem. at 9-10). But the challenged provisions of the Act do not regulate immigration in any way: they do not purport to confer any immigration status or seek to admit or deny admission to any class of individuals. *See DeCanas*, 424 U.S. at 355. Rather, the Act expressly states that the licenses and permits issued pursuant to its provisions are not "evidence of . . . immigration status." *See* VTL § 502(8)(e)(i). Here, the Act concerns the types of proof of identity and age that DMV must accept when issuing of driver's licenses, and the handling of driver information by the DMV, and "occup[ies] an entirely different field" from federal immigration law, *see Madeira v. Affordable Housing Found., Inc.*, 469 F.3d 219, 240 (2d Cir. 2006). It is accordingly not field-preempted. *See id.* at 240, 242 (§ 1324a's prohibitions against employment of undocumented workers did not preempt state labor law which allowed unauthorized worker to recover lost wages in tort actions).

Seizing on evidence in the legislative history that the Act was intended to benefit undocumented immigrants in going about their daily lives (including getting to and from work), Kearns argues (Mem. at 17-18) that this intent invalidates the law. He is mistaken. As noted above, Congress's exclusive authority to regulate the naturalization, entry, and removal of individuals from the U.S. does not displace States' authority to legislate on local issues. Nor does it transform "every state enactment which in any way deals with aliens" into a "regulation of immigration" that is "per se pre-empted." *DeCanas*, 424 U.S. at 355. Absent an express congressional statement to the contrary or an independent constitutional bar, States are free to enact laws, such as the Act here, addressing the impact of undocumented immigrants—whether to assist immigrants or to mitigate

their impact. *See Balbuena*, 6 N.Y.3d at 359 (federal immigration laws "'do not purport to intrude into the area of what protections a State may afford these aliens'") (quoting *Continental PET Tech., Inc. v. Palacias*, 269 Ga. App. 561, 562-63 (2004)).

Nor does the Act regulate the "harboring" of unlawfully present persons as Kearns erroneously contends (Mem. at 9-10). As explained above, the conduct directed by the Act does not implicate anti-harboring proscriptions in any manner. Contrary to Kearns' argument, no court has suggested that a State's rules permitting noncitizens to obtain driver's licenses intrude on Congress's alleged comprehensive regulation of the "movement" of "aliens within the United States." *See id.* at 10-11 (quoting *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1026 (9th Cir. 2013)). Rather, in *Valle del Sol Inc.*, the Ninth Circuit concluded that Arizona's statute imposing state penalties on the movement or physical transportation of unlawfully present persons was preempted by the federal prohibitions contained in § 1324(a)(1)(A)(ii). 732 F.3d at 1024-26. And the court placed the terms "movement" and "transport" in their proper context—as part of § 1324's overarching definition of "the federal crime of alien smuggling." *Id.* at 1025. The court did not suggest that federal law preempts every state regulation that might affect how undocumented immigrants travel on a State's roads, especially where such regulations implicate traditional state concerns about road safety. Nor does issuing a driver's license to a person actively "transport" or "move" that person within the meaning of § 1324(a)(1)(A)(ii) in the first place: having a license merely makes it lawful for that person to drive and makes the roads safer for everyone else.

To be sure, some courts have found the proscriptions in § 1324(a)(1)(A) to have a field-preemptive effect, but the relevant field is harboring, and is thus irrelevant here. The other cases cited by Kearns to establish field preemption are therefore similarly inapposite. *See Georgia Latino All. for Human Rights v. Governor of Georgia*, 691 F.3d 1250, 1267 (11th Cir. 2012) (Georgia

statutes criminalizing inducing unlawfully present persons to enter the State, transporting them, and harboring them within the State preempted by § 1324(a)(1)(A)(ii)-(iv)); *United States v. South Carolina*, 720 F.3d 518, 531 (4th Cir. 2013) (state statutes on harboring and transporting preempted by § 1324(a)(1)(A)(ii)-(iii)).

### 3.   The Act does not conflict with either 8 U.S.C. § 1324a (employment) or 8 U.S.C. § 1324 (harboring).

Kearns' allegations also fail to demonstrate preemption under conflict theories. Conflict preemption occurs either where it is "physically impossible" to comply with both state and federal law, *see, e.g.*, *Mutual Pharms. Co. v. Bartlett*, 570 U.S. 472, 503 (2013), or where the challenged state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *see, e.g.*, *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 373 (2000). To invalidate a state enactment on the obstacle theory of conflict preemption, "the conflict between state law and federal policy must be a 'sharp' one." *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007) (quoting *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988)). Kearns cannot carry the "heavy" burden to demonstrate conflict preemption here. *See In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013).

**a. Section 1324a (employment).** No provision of the Act interferes with 8 U.S.C. § 1324a, which makes it "unlawful for a person or other entity" to knowingly employ a person who is not legally authorized to work. *See* 8 U.S.C. § 1324a(a)(1). In crafting § 1324a, Congress chose to deal with the problems of illegal immigration and the employment of undocumented persons in a particular way—by making the "deliberate choice" to regulate only the conduct of *employers* rather

28

than workers themselves or others who facilitate the unlawful employment. *See Arizona*, 567 U.S. at 404-05 (2012). Under § 1324a, it is only a crime for employers to knowingly hire or recruit workers without lawful work authorization; it is not a crime for an undocumented worker to obtain or maintain employment, unless the employment was procured through fraudulent means. *See* 8 U.S.C. §§ 1324a, 1324c. Congress deliberately opted to omit from its "comprehensive" regulatory framework conduct that facilitates unlawful behavior, *see Arizona*, 567 U.S. at 404, and thus it cannot have intended for § 1324a to broadly displace any provision of state law that could arguably make it easier for unauthorized immigrants to find or maintain work, *see United States v. California*, 921 F.3d 865, 881-82 (9th Cir. 2019) (state law requiring employers to provide employees with advance notice of immigration inspections does not conflict with § 1324a because it does not "permit employers to hire individuals without federally defined authorization, or impose sanctions inconsistent with federal law").

Congress expressly addressed preemption in § 1324a, preempting "any State or local law imposing civil and criminal sanctions . . . upon those who employ . . . unauthorized aliens." 8 U.S.C. § 1324a(h)(2). It did not broadly preempt state laws or policies making it easier for undocumented workers to be employed. Had Congress believed that all such laws "posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision." *See Wyeth v. Levine*, 555 U.S. 555, 574-75 (2009) (Congress's non-inclusion of express preemption provision signals its intent not to broadly preempt state laws).

Here, the Act does not regulate any *employer* conduct, or permit *employers* to hire workers if not authorized under federal law. Because the Act does not confer license holders with work authorization, and because the licenses issued pursuant to the Act must state on their face "Not for Federal Purposes," *see* VTL § 502(8)(a), the statute also does not facilitate employees in deceiving

employers to obtain employment. *See also* VTL § 502(8)(e)(i) (stating that standard licenses "shall not be used as evidence of a person's citizenship or immigration status"). The mere possibility that issuing driver's licenses to undocumented workers may make it easier for the *workers* to find and maintain work therefore does not present an "irreconcilable conflict" between the Act and federal law.[8] *See Madeira*, 469 F.3d at 241-42.

**b. Section 1324(a)(1)(A)(iii) (harboring).** As explained above, complying with the challenged provisions of the Act would not implicate federal prohibitions against harboring unlawfully present noncitizens. Courts have recognized that the history of § 1324(a)'s prohibitions—a statute that was initially directed to common carriers who were bringing noncitizens into the country, *see* Ch. 477, 66 Stat. at 228-29—arose from "the prohibition of smuggling aliens into the United States." *See Costello*, 666 F.3d at 1045. The issuance of driver's licenses and the protection of driver information from disclosure at issue here are far afield from alien smuggling. The fact that "the federal and state laws serve different purposes cuts against a finding of obstacle preemption." *In re MTBE Prod. Liab. Litig.*, 725 F.3d at 101; *see also Marsh,* 499 F.3d at 180 (state law disallowing suits against dissolved corporations after three years of dissolution did not conflict with longer statute of limitations for suits under federal environmental law).

Again, under New York's statutory scheme for issuing driver's licenses, there is no opportunity for Kearns to know whether any particular applicant is unlawfully present in the country, and thus the licensing process does not implicate or conflict with § 1324(a)(1)(A)(iii). Even if Kearns had such knowledge, simply declining to report that *information* to federal authorities—

---

[8] And Kearns' argument that the Act is invalid based on a purported connection between driver's licenses and employment (Mem. at 17-18) is puzzling since DMV has long issued driver's licenses to residents who are not legally authorized to work in the U.S., *see Cubas*, 8 N.Y.3d at 617-18 (citing 15 N.Y.C.R.R. § 3.9(a)), a practice that Kearns does not challenge.

when prohibited from doing so by the Act and general DMV policies—would not constitute concealing or harboring of *persons* with the intent of helping such persons evade detection, so as to implicate § 1324(a)(1)(A)(iii). *See Vargas-Cardon*, 733 F.3d at 381-82.

Kearns' preemption challenge to the notification provision in VTL § 201(12)(a)—which requires DMV to notify the subjects of subpoena, judicial warrant, or court order requests for information from immigration authorities—similarly fails. As explained above, it is highly unlikely that the notification requirement will ever implicate Kearns directly since local DMV offices are not authorized to accept such requests, nor is there any basis to assume that the subjects of the requests are unlawfully present. Contrary to Kearns' suggestion (Mem. at 13), no court has held that merely notifying the subject of a request for information by immigration authorities constitutes unlawful harboring or concealment. *Cf. United States v. Herrera*, 584 F.2d 1137, 1141-42 (2d Cir. 1978) (to hide undocumented workers employed in their club, defendants installed cameras and alarm system to warn workers, and instructed workers to escape from club or disguise themselves if immigration authorities appeared); *see also California*, 921 F.3d at 881-82 (rejecting claim that state law mandating advance notice of immigration inspections by employers was preempted simply because state law made federal inspections more difficult).

In sum, because it is not "physically impossible" to comply with the Act without violating § 1324(a)(1)(A)(iii), the Act is not preempted. *See Madeira*, 469 F.3d at 242; *California*, 921 F.3d at 882.

### 4.   The Act's restrictions on information-sharing with federal immigration authorities do not conflict with federal law.

There is no conflict between federal law and the Act's confidentiality provisions generally restricting the disclosure of driver information for purposes unrelated to licensing, absent a court

order, judicial warrant, or subpoena. To the contrary, these provisions of the Act are consistent with the federal policies concerning the protection of driver information embodied in the federal Drivers Privacy Protection Act (DPPA). *See generally* 18 U.S.C. § 2721 *et seq*. Originally enacted in 1994, *see* Pub. L. No. 103-322, § 300002(a), 108 Stat. 2099 (1994), the DPPA generally protects against the disclosure of driver personal information, but requires States to report such information in certain circumstances, for instance in matters of motor vehicle or driver safety and theft. By contrast, the DPPA gives a state DMV the choice as to whether to report otherwise protected personal information to other state and federal agencies in carrying out agency functions: it provides that States "may"—but are not obligated to—disclose such information to these agencies. *See* 18 U.S.C. § 2721(b)(1). By passing the Act, the New York Legislature exercised its prerogative under the DPPA to decide when such permissive disclosures are appropriate. *See also California*, 921 F.3d at 890 (noting States' Tenth Amendment "right of refusal" with regards to immigration enforcement).

Here, the Legislature has decided that DMV should not be involved with immigration-related matters. Accordingly, the Act prohibits DMV from inquiring about an applicant's citizenship or immigration status during the application process, recording such information, and responding to federal immigration requests for personal information about licensees and applicants. *See* VTL §§ 502(8)(c), (e)(ii), 201(8)-(12). The Legislature was entitled to make these choices concerning the use of state resources and the manner in which state officials carry out their duties.

The Legislature's determinations do not conflict with federal law. To the contrary, Congress has acknowledged that States may issue licenses to drivers who are unlawfully present. *See* § 502(a), 110 Stat. 3009-671 (providing States *may* deny licenses to undocumented immigrants under optional pilot programs). And no federal law requires that States verify an applicant's lawful

presence before they may extend driving privileges. *See* REAL ID Act, § 202(d)(11); 6 C.F.R. § 37.71(a). Nor could federal law impose such a requirement without impermissibly conscripting state officials in violation of the Tenth Amendment. *See Printz v. United States*, 521 U.S. 898, 935 (1997). As the Ninth Circuit has explained, "the choice of a state to refrain from participation [in federal immigration enforcement] cannot be invalid under the doctrine of obstacle preemption where . . . it retains the right of refusal" under the Tenth Amendment. *California*, 921 F.3d at 890; *see also City of Chicago v. Sessions*, 888 F.3d 272, 281-82 (7th Cir.) (policies of non-cooperation with federal immigration enforcement "do[] not interfere in any way with the federal government's lawful pursuit of its civil immigration activities"), *vacated in part on unrelated grounds*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018); *New York v. Department of Justice*, 343 F. Supp. 3d 213, 221 n.2 (S.D.N.Y. 2018) ("Standing aside does not equate to standing in the way") (quoting *United States v. California*, 314 F. Supp. 3d 1077, 1105 (E.D. Cal. 2018)), *appeal docketed,* No. 19-267, *and argued* June 18, 2019 (2d Cir.). The Legislature's decision for DMV to refrain from assisting in federal immigration enforcement is not preempted even if it may make federal efforts more burdensome. *See California*, 921 F.3d at 887-91.

Finally, there is no merit to Kearns' passing contention (Mem. at 2-3, 18-19) that the Act's confidentiality provisions conflict with the restrictions on information-sharing between state and local governments and federal immigration authorities contained in 8 U.S.C. §§ 1373 and 1644.[9] Sections 1373 and 1644 prohibit state and local governments from establishing any rules or policies that restrict information-sharing between state and local entities and their officials, on the one hand,

---

[9] These statutes are not referenced in the complaint as bases for preemption, and the Court may decline to consider Kearns' argument in this regard for this reason. *See , e.g.*, *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (party cannot amend complaint by way of statements made in briefs).

and federal immigration authorities, on the other. *See* 8 U.S.C. §§ 1373(a), 1644.[10] These statutes

"prohibit state and local governments from limiting their employees in the *voluntary* provision of

information about the immigration status" to federal officials, but do not create any affirmative

disclosure obligations. *See City of New York v. United States*, 179 F.3d 29, 30, 35 (2d Cir. 1999)

(emphasis added); *see also* H.R. Conf. Rep. No. 104-725 at 383 (1995-1996) (explaining that § 1644

"does not require, in and of itself, any government agency or law enforcement official to communi-

cate with" immigration officials).

    Kearns is wrong when he argues that the Act conflicts with these statutes' prohibitions on

the voluntary "sharing [of] information on the immigration status of aliens with federal immigra-

tion authorities" (Mem. at 19). These laws do not conflict because, as explained above, the Act

does not require applicants for standard licenses to submit information about immigration

classification,[11] nor is there any opportunity for DMV officials to learn such information in the course

of performing their duties. *See* VTL § 502(8)(c)(iii), (e)(ii) (prohibiting DMV from collecting or

retaining information about immigration status). Because DMV is not authorized to collect

---

[10] Section 1373 provides, in relevant part: "Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Section 1644 is virtually identical to § 1373, except it concerns the exchange of information between state and local governments and the federal authorities "regarding the immigration status, lawful or unlawful, of an alien in the United States." *Id.* § 1644.

[11] Courts have consistently interpreted "information regarding . . . immigration status" to refer only to a person's *category* of immigration status (*i.e.*, undocumented, visa-holder, lawful permanent resident)—and not other personal information that may be relevant to immigration authorities. *See, e.g.*, *California*, 921 F.3d at 891; *Steinle v. City and County of San Francisco*, 919 F.3d 1154, 1164 (9th Cir. 2019) (interpreting term in §§ 1373 and 1644); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 332 (E.D. Pa. 2018), *aff'd in part and vacated in part on unrelated grounds*, 916 F.3d 276 (3d Cir. 2019); *City and County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 967 (N.D. Cal. 2018), *appeals pending* Nos. 18-17308, 18-17311 (9th Cir.).

immigration-status information from applicants to begin with, *see id.* § 201(12)(a), the Act's provisions which prohibit disclosure of such information to federal authorities do not conflict with § 1373(a).

Even if Act's nondisclosure provisions did conflict with §§ 1373 and 1644, these federal laws cannot preempt state law because they are unconstitutional. As several district courts have found in the wake of the Supreme Court's decision in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1478 (2018), § 1373 violates the Tenth Amendment's anti-commandeering principle by impermissibly telling state and local legislatures that they may not enact laws or rules governing how state and local government employees handle immigration-status information acquired in the course of official duties. *See, e.g.*, *New York*, 343 F. Supp. 3d at 233-37 (finding § 1373 to be unconstitutional under *Murphy*); *City and County of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 949-53 (N.D. Cal. 2018) (same); *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 872 (N.D. Ill. 2018) (same); *City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 329-31 (E.D. Pa.) (same), *aff'd in part, vacated in part on unrelated grounds,* 916 F.3d 276 (3d Cir. 2019).[12]

Contrary to Kearns' suggestion (Mem. at 19 n.4), *City of New York* does not compel a different conclusion. In *City of New York*, the Second Circuit upheld §§ 1373 and 1644 against a *facial* Tenth Amendment challenge relying on the perceived distinction "between invalid federal measures that seek to impress state and local governments into the administration of federal programs and valid federal measures that prohibit states from compelling passive resistance to particular federal programs." 179 F.3d at 35. But the Supreme Court has since rejected this distinction as "empty" in *Murphy.* 138 S. Ct. at 1478. And in any event, the Second Circuit expressly left open

---

[12] These cases only addressed the constitutionality of § 1373. However, because the prohibitions contained in § 1644 are very similar to those in § 1373, as Kearns acknowledges (Mem. at 18), § 1644 is also unconstitutional under *Murphy*.

in *City of New York* the question of whether §§ 1373 and 1644 "would survive a constitutional challenge in the context of generalized confidentiality policies that are necessary to the performance of legitimate [governmental] functions," *see City of New York*, 179 F.3d at 37, like the confidentiality provisions challenged here.

## POINT II

### PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION IN ANY EVENT

Even if this Court declines to dismiss the complaint, it should deny Kearns' request for the "extraordinary remedy" of a preliminary injunction. *See  Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A motion for "a preliminary injunction against government action taken in the public interest pursuant to a statutory scheme" will be denied unless the movant can make a clear showing that: (1) he will suffer irreparable harm without the injunction; (2) a likelihood of success on the merits of the underlying claim; (3) an injunction would be in the public interest; and (4) the balance of equities weighs in favor of granting the injunction. *See Pope v. County of Albany*, 687 F.3d 565, 570 & n.3 (2d Cir. 2012); *Winter*, 555 U.S. at 22.

For the reasons discussed in Point I, Kearns has not shown a likelihood of success on the merits, and the purported harms that he asserts are illusory and speculative. Nor can Kearns establish that a preliminary injunction would serve the public interest and is favored by the equities: to the contrary, the equities and public interest counsel strongly against a preliminary injunction. *See New York State Rest. Ass'n v. New York City Bd. of Health*, 545 F. Supp. 2d 363, 368 (S.D.N.Y. 2008) ("The public interest . . . in enforcement of legislation enacted in the public interest, weigh[s] heavily against granting a stay of enforcement.").

Kearns is not entitled to an order enjoining the implementation of the Act in all of its applications, and restraining the Governor and the Attorney General from discharging their statutory and constitutional obligations to ensure that the State's laws are carried out by officials charged with doing so. Such relief would deprive New York residents of increased tax and licensing revenues, reduced insurance premiums, and improved road safety. Balanced against Kearns' unfounded belief that his compliance with the Act would cause him to violate federal law, it would be against the public interest to grant the broad injunctive relief that he seeks. *See Maryland v. King*, 567 U.S. 1301, *3 (2012) (Roberts, C.J., in chambers) ("'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" (citation omitted)).

## CONCLUSION

The Court should grant defendants' motion to dismiss and dismiss the complaint, or alternatively, deny plaintiff's motion for a preliminary injunction.

Dated:      New York, New York
            August 16, 2019

                                        Respectfully submitted,

                                        LETITIA JAMES
                                          *Attorney General*
                                          *State of New York*
                                        Attorney for Defendants


                            By:    /s/ Linda Fang
                                        Linda Fang
                                        Assistant Solicitor General
                                        28 Liberty Street
BARBARA D. UNDERWOOD                     New York, New York 10005
  *Solicitor General*                    (212) 416-8656
JEFFREY W. LANG
  *Deputy Solicitor General*
VICTOR PALADINO
  *Senior Assistant Solicitor General*
LINDA FANG
  *Assistant Solicitor General*
JOEL J. TERRAGNOLI
  *Assistant Attorney General*
        *of Counsel*

38