UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MICHAEL P. KEARNS, in his individual capacity and
official capacity as Clerk of the County of Erie, New York,

|  |  |  |
|---|---|---|
| | Plaintiff, | No. 1:19-cv-00902-EAW |

vs.

ANDREW M. CUOMO, in his official capacity as
Governor of the State of New York,
LETITIA A. JAMES, in her official capacity as
Attorney General of the State of New York, and
MARK J.F. SCHROEDER, in his official capacity as
Commissioner of the New York State Department of
Motor Vehicles,

Defendants.

---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANTS' MOTION TO DISMISS
## AND IN RESPONSE TO THE AMICI STATES' BRIEF
## AND
## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
## OF HIS MOTION FOR A PRELIMINARY INJUNCTION

MICHAEL A. SIRAGUSA, Erie County
Attorney and Attorney for Plaintiff Michael
P. Kearns in his individual capacity and official
capacity as Clerk of the County of Erie, New York

KENNETH KIRBY, ESQ.
THOMAS J. NAVARRO, JR. ESQ.
Assistant County Attorneys, of Counsel
95 Franklin Street, Suite 1635
Buffalo, NY 14202
(716) 858-2208

## Table of Contents

Page

Preliminary Statement.................................................................................................................1

Argument ....................................................................................................................................2

I.    Kearns has capacity and standing to seek relief from the Green Light Law. ......................2

    A.    Kearns has capacity to challenge the Green Light Law.............................................2

    B.    Kearns has standing to challenge the Green Light Law. .........................................4

        1.    Kearns has alleged an injury to his office and, regardless,
                is also suing in his individual capacity. ......................................................4

        2.    Kearns faces a credible threat of prosecution. ...........................................6

            a.    The standard for harboring is broad................................................6

            b.    Kearns has the requisite knowledge for harboring. ........................8

            c.    The government has not disavowed, and has instead
                demonstrated a credible threat of, enforcement..............................9

        3.    Kearns faces the credible threat of removal from office............................12

    C.    Parties are permitted to seek relief under the Supremacy Clause...........................12

II.    The Green Light Law intrudes on a field occupied by federal legislation
    and conflicts with federal law. ..........................................................................................14

    A.    The statute's plain language and legislative history confirm it does far
        more than "regulate a matter of traditional state concern." ...................................14

    B.    The federal government occupies the field of harboring,
        which the Green Light Law also seeks to regulate. .............................................16

    C.    The Green Light Law also conflicts with the anti-harboring
        federal statute (8 U.S.C. § 1324)...........................................................................17

    D.    The Green Light Law also conflicts with federal statutes
        governing information sharing (8 U.S.C. §§ 1373, 1644). ...................................20

        1.    There is a conflict....................................................................................20

        2.    The statutes are Constitutional.................................................................22

## TABLE OF CONTENTS - cont'd

PAGE

E.    The Green Light Law also conflicts with the anti-employment federal statute (8 U.S.C. § 1324a)..........................................................................23

III.    Kearns meets the preliminary injunction criteria, most of which Defendants ignore. ...........................................................................................................25

Conclusion ...................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arizona Dream Act Coal. v. Brewer*,
    855 F.3d 957 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018) ......................................15

*Arizona v. United States*,
    567 U.S. 387 (2012) ........................................................................................14, 16, 22, 23, 24

*Armstrong v. Exceptional Child Ctr., Inc.*,
    135 S. Ct. 1378 (2015) ................................................................................................12, 13, 14

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289 (1979) ...........................................................................................................10

*Catizone v. Memry Corp.*,
    897 F. Supp. 732 (S.D.N.Y. 1995) .......................................................................................3

*Cayuga Nation v. Tanner*,
    824 F.3d 321 (2d Cir. 2016) .........................................................................................10, 11

*Chamber of Commerce of U.S. v. Whiting*,
    563 U.S. 582 (2011) ...........................................................................................................17

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999), *cert. den*, 528 U.S. 1115 (2000) ...........................................21, 22

*DeCanas v. Bica*,
    424 U.S. 351 (1976) ...........................................................................................................17

*DelRio-Mocci v. Connolly Properties Inc.*,
    672 F.3d 241 (3d Cir. 2012) ..................................................................................................7

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
    841 F.3d 133 (2d Cir. 2016) ...............................................................................................25

*Geier v. American Honda Motor Co.*,
    529 U.S. 861 (2000) ...........................................................................................................24

*Hedges v. Obama*,
    724 F.3d 170 (2d Cir. 2013) .........................................................................................10, 11

*Kentucky v. Graham*,
    473 U.S. 159 (1985) .............................................................................................................4

*Knife Rights, Inc. v. Vance,*
   802 F.3d 377 (2d Cir. 2015)...................................................................................10

*Lozano v. City of Hazleton,*
   724 F.3d 297 (3d Cir. 2013).............................................................................16, 17

*Madeira v. Affordable Hous. Found., Inc.,*
   469 F.3d 219 (2d Cir. 2006)..............................................................................17, 24

*Marsh v. Rosenbloom,*
   499 F.3d 165 (2d Cir. 2007)...................................................................................19

*McDonnell v. United States,*
   136 S. Ct. 2355 (2016).............................................................................................10

*In re MTBE Prod. Liab. Litig.,*
   725 F.3d 65 (2d Cir. 2013).......................................................................................18

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
   138 S. Ct. 1461 (2018)........................................................................................22, 23

*New York State Citizens' Coal. for Children v. Poole,*
   922 F.3d 69 (2d Cir. 2019).......................................................................................13

*New York State Rest. Ass'n v. New York City Bd. of Health,*
   545 F. Supp. 2d 363 (S.D.N.Y. 2008)....................................................................25

*Printz v. United States,*
   521 U.S. 898 (1997).................................................................................................23

*Reno v. Condon,*
   528 U.S. 141 (2000).................................................................................................22

*States of New York v. Dep't of Justice,*
   343 F. Supp. 3d 213 (S.D.N.Y. 2018), *appeal pending,* Nos. 19-267 (L),
   19-275 (2d Cir. 2019) ..............................................................................................22

*Tanvir v. Tanzin,*
   894 F.3d 449 (2d Cir. 2018)................................................................................4, 5

*Tweed-New Haven Airport Auth. v. Tong,*
   930 F.3d 65 (2d Cir. 2019)..................................................................................13, 14

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.,*
   261 F.3d 245 (2d Cir. 2001).......................................................................................3

*United States of Am. v. Sineneng-Smith,*
    910 F.3d 461 (9th Cir. 2018) ...............................................................................10

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) .................................................................19, 21, 24

*United States v. Costello,*
    666 F.3d 1040 (7th Cir. 2012) ...........................................................6, 7, 8, 10

*United States v. George,*
    779 F.3d 113 (2d Cir. 2015)..................................................................................7

*United States v. Herrera,*
    584 F.2d 1137 (2d Cir. 1978)..............................................................................19

*United States v. Joseph,*
    19-CR-10141, Dkt. 1 (D. Mass. Apr. 25, 2019) ...................................................11

*United States v. Kim,*
    193 F.3d 567 (2d Cir. 1999)..................................................................................6

*United States v. Rubio–Gonzalez,*
    674 F.2d 1067 (5th Cir. 1982) ..............................................................................7

*United States v. Vargas-Cordon,*
    733 F.3d 366 (2d Cir. 2013)..................................................................6, 7, 18, 19

*United States v. Varkonyi,*
    645 F.2d 453 (5th Cir. 1981) ................................................................................7

*Valle del Sol Inc. v. Whiting,*
    732 F.3d 1006 (9th Cir. 2013) ................................................................16, 17, 25

*Villas at Parkside Partners v. City of Farmers Branch, Tex.,*
    726 F.3d 524 (5th Cir. 2013) ................................................................................7

*Washington v. United States,*
    460 U.S. 536 (1983)..............................................................................................3

*Ex parte Young,*
    209 U.S. 123 (1908)......................................................................................13, 14

## State Cases

*Bd. of Ed. of Cent. Sch. Dist. No. 1, Towns of E. Greenbush Rensselaer Cty. v. Allen,*
    20 N.Y.2d 109 (1967), *aff'd,* 392 U.S. 236 (1968)......................................................4

*Cheng San Chen v. Toia,*
   67 A.D.2d 1085 (4th Dep't 1979), *aff'd*, 50 N.Y.2d 826 (1980) ...............................................3

*City of New York v. State,*
   86 N.Y.2d 286 (1995) .................................................................................................2, 22

*Patterson v. Carey,*
   83 Misc. 2d 372 (Sup. Ct. Albany Cty. 1975), *aff'd*, 52 A.D.2d 171 (3d Dep't 1976),
   *modified*, 41 N.Y.2d 714 (1977) ...................................................................................4

*In re World Trade Ctr. Lower Manhattan Disaster Site Litig.,*
   30 N.Y.3d 377 (2017) ...............................................................................................2, 3

**Statutes, Regulations, and Rules**

8 U.S.C. § 1324 ...............................................................................6, 8, 9, 14, 16, 17, 19

8 U.S.C. § 1324(a)(1)(v)(I) ..............................................................................10, 20

8 U.S.C. § 1324(a)(1)(A)(iii) ..................................................................................6

8 U.S.C. § 1324a ..............................................................................................19, 23, 24

8 U.S.C. § 1373 ..............................................................................................20, 21, 22, 23

8 U.S.C. § 1644 ..............................................................................................20, 21, 22, 23

Clean Air Act ...................................................................................................19

Driver's License Privacy Protection Act, 18 U.S.C. § 2721, *et seq.* ......................................21, 22

Green Light Law ........................................................................................ Passim

Immigration Reform and Control Act ............................................................................17, 23, 24

Immigration and Nationality Act ...............................................................................14

N.Y. Executive Law § 63(1) ...................................................................................12

N.Y. Executive Law § 63-a ...................................................................................12

Utah Code Ann. § 53-3-205.5 ...............................................................................11

**Other Authorities**

N.Y. Const., Art. 13, § 13(a) ...............................................................................12

Exec. Order No. 13768, 82 Fed. Reg. 8799 (2017) ......................................................11

## Preliminary Statement

Defendants and many of the state amici contributors dedicate much of their submissions to arguing the legality and wisdom of issuing a driver's license to individuals illegally in the United States. But the Green Light Law goes much further than that, namely, it also: (a) prohibits Mr. Kearns and his staff from disclosing evidence of a crime to federal immigration authorities and (b) requires that licensees be promptly alerted when the federal immigration authorities seek their DMV records. The state statute, by its terms, interferes with federal immigration regulation. Indeed, the statute invites the following questions:

1. If the purpose of the Green Light Law is traffic safety, then why does it also prohibit the sharing of information with federal *immigration* authorities and require state agents to promptly alert licensees when those authorities seek their records?

2. Why are these two requirements limited to federal *immigration* authorities?

3. If, as Defendants claim, a County Clerk's office would never obtain information or records regarding a licensee's immigration status, then why does the statute include these two requirements?

4. Similarly, why does the statute include no severability clause, in the event either of these requirements is struck down as unconstitutional?

5. And if the Legislature was merely trying to preserve limited State resources when it prohibited its agents and employees from sharing information with immigration authorities, then why does the statute then require the same State agents and employees to promptly alert licensees when immigration authorities seek their records?

The answers are obvious. The purpose of the Green Light Law is not only to issue licenses to individuals illegally in the United States, but also to harbor or shield them from detection, exposing Kearns and other agents of the State to the risk of criminal prosecution. Defendants pretend the second purpose does not exist. None of the other state statutes that grant licenses to undocumented immigrants goes as far as New York's. This is precisely the type of

state interference into federal immigration regulation that the Supreme Court and Courts of

Appeals have warned against.

Defendants dedicate more than half of their argument section to meritless

technical or procedural points, many of which have already been mooted by the First Amended

Complaint. They also contradict Governor Cuomo's prior request for courts to decide the

constitutionality of the Green Light Law, which requires a determination *on the merits*. And

substantively, the Green Light Law plainly goes beyond traditional areas of state control and

intrudes into an area in which the federal government already occupies the field—the harboring

of immigrants illegally in the United States. At minimum, this state statute conflicts with federal

statutes governing harboring, information sharing, and employment. As such, the Court should

deny the motion to dismiss, and grant Kearns' motion for a preliminary injunction.

<u>**Argument**</u>

I.    **Kearns has capacity and standing to seek relief from the Green Light Law.**

A.    **Kearns has capacity to challenge the Green Light Law.**

Although New York municipal officials are generally prohibited from suing the

State (or challenging State legislation), courts have identified several exceptions. *See City of

New York v. State*, 86 N.Y.2d 286, 292 (1995). Relevant here is the exception where "the

municipal challengers assert that if they are obliged to comply with the State statute they will by

that very compliance be forced to violate a constitutional proscription." *Id.* The Court of

Appeals has noted that these are common-law exceptions, adding: "[w]e have never stated that

this list is exhaustive." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 30 N.Y.3d

377, 402 (2017). The Court noted these exceptions were "derived from a line of analogous

2

federal cases," identifying potential additional exceptions within that line, including actions brought by local officials *under the Supremacy Clause*. *Id.* at 386 n.4.

Kearns' claim falls squarely within both the existing exception for Constitutional proscriptions as well as the suggested exception for Supremacy Clause challenges. If, in his capacity as Clerk, he complies with the Green Light Law, he will be forced to violate the United States Constitution's prohibition (under the Supremacy Clause) against enacting and carrying out state laws preempted by federal law. *See, e.g.*, *Washington v. United States*, 460 U.S. 536, 538 (1983) ("Supremacy Clause *prohibits* states from taxing the United States directly.") (emphasis added); *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 261 F.3d 245, 253 (2d Cir. 2001) ("Although the Supremacy Clause *prohibits* state regulation of interstate commerce in areas where Congress has spoken. . . .") (emphasis added); *Catizone v. Memry Corp.*, 897 F. Supp. 732, 737 (S.D.N.Y. 1995) (citing N.J. decision for the proposition that the "Supremacy Clause *prohibits* state law from imposing a duty to transfer in violation of federal law.") (emphasis added); *Cheng San Chen v. Toia*, 67 A.D.2d 1085, 1085–86 (4th Dep't 1979), *aff'd*, 50 N.Y.2d 826 (1980) ("The supremacy clause of the United States Constitution *prohibits* the adoption by a state of programs that are more restrictive than those defined in the Social Security Act or the regulations promulgated thereunder.") (emphasis added).

Defendants erroneously claim that Kearns fails to identify any obligations imposed on him or the office of the Clerk by the Supremacy Clause. Not so. Kearns is an agent and officer of the state, required to carry out the mandates of a statute that the Supremacy Clause prohibits. In one breath, Defendants appear to argue that because Kearns is not the State, the Supremacy Clause does not proscribe *his* conduct. But, in the next breath, they argue that Kearns cannot sue the State because he *is* the State. Defendants cannot have it both ways.

3

Further, this exception requires that Kearns "be forced to violate *a* constitutional proscription." (Emphasis added). This includes *the State's* proscription, with Kearns acting as the State's agent. *See, e.g.*; *Patterson v. Carey*, 83 Misc. 2d 372, 376 (Sup. Ct. Albany Cty. 1975), *aff'd*, 52 A.D.2d 171 (3d Dep't 1976), *modified*, 41 N.Y.2d 714 (1977) ("The individual plaintiffs as members of the Authority have the requisite standing to obtain a declaratory judgment concerning the constitutionality of Section 153—c.").[1]

Regardless, Kearns is also now suing in his individual capacity, after Defendants claimed Kearns lacks standing to sue in his official capacity as Clerk. *See* Point I(B), *infra*; First Amended Complaint ("FAC"), Dkt. 41. The above-referenced capacity limitation applies only to state entities and officers; there is no such limitation for Kearns to sue as an individual.

## B.   Kearns has standing to challenge the Green Light Law.

### 1.   Kearns has alleged an injury to his office and, regardless, is also suing in his individual capacity.

Kearns has standing to bring this lawsuit in his official capacity. Courts often discuss this issue in the context of whether local officials *being sued* are properly named in their individual or official capacities. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Tanvir v. Tanzin*, 894 F.3d 449, 458-59 (2d Cir. 2018). But the general principle of these cases is clear: government officials are properly named in their official capacities when the government entity they represent is a real party in interest to the relevant dispute. *See Graham*, 47 U.S. at

---

[1]   At the time, the courts appeared to use the term "standing" interchangeably with "capacity" in the context of whether an officer or agency of the State could sue the State. *See Bd. of Ed. of Cent. Sch. Dist. No. 1, Towns of E. Greenbush Rensselaer Cty. v. Allen*, 20 N.Y.2d 109, 115 n.1 (1967), *aff'd*, 392 U.S. 236 (1968), *rev'g*, 27 A.D.2d 69, 71 (3d Dep't 1966) (holding board of education lacked "standing" to sue the State over allegedly unconstitutional statute because of "[t]he basic principle involved is that the municipality or other agency is the creation of the State, subject to its direction and control.").

166 (explaining that in official capacity suits "the real party in interest is the entity"); *Tanvir*, 894 F.3d at 459 (explaining "in an official capacity suit, the real party in interest. . . is the governmental entity and not the named official"). Thus, to bring this case in his official capacity, Mr. Kearns need only establish that the Erie County Clerk's Office is a real party in interest to this particular dispute.

Defendants concede Kearns was required only to plead facts which, if accepted as true, demonstrate a cognizable injury to his office. *See* Defs.' Br. at *13. Kearns meets this requirement. All of the injuries identified in the First Amended Complaint are unique to the person holding the position of County Clerk. In other words, the only reason the Green Light Law creates a threat of prosecution, removal from office, and other harm to Kearns is because he holds the position of Erie County Clerk and is required—*in his official capacity*—to carry out the mandates of the Green Light Law.

Although the Clerk's Office cannot itself be prosecuted, it would undoubtedly be harmed if Kearns and others subsequently holding his position are prosecuted for a federal offense for complying with the Green Light Law. Similarly, the Clerk's Office will inevitably suffer harm if the Clerk is removed from office each time s/he chooses to comply with federal law rather than the mandates of the Green Light Law. Therefore, Kearns sufficiently alleges injury to the Office of the Clerk and has standing to bring this suit in his official capacity.

Defendants' argument is also now academic. Kearns has amended the Complaint to sue in both his official and individual capacities, and clearly has standing to bring this claim in his individual capacity. Threat of prosecution, removal from office, and the related harm are cognizable injuries sufficient to create standing for Kearns as an individual.

### 2. Kearns faces a credible threat of prosecution.

Defendants claim Kearns will not be prosecuted for violating the Green Light Law because: (1) he would never have the requisite knowledge to violate the federal anti-harboring statute (8 U.S.C. § 1324); and (2) even if he did, the federal government would never charge him. Neither argument is correct, as confirmed by controlling authority that Defendants almost entirely ignore, as well as the facts pleaded in the First Amended Complaint.

### a. The standard for harboring is broad.

Under 8 U.S.C. § 1324(a)(1)(A)(iii), a person faces imprisonment if he in "*knowing or in reckless disregard* of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or *shields from detection*, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation." *Id.* (emphasis added).

Defendants insist the statute applies only to "alien smuggling." Defs.' Br. at *15 (citing *Costello*). Not so. While that may have been an original purpose, Congress and the courts have expanded its application and reach. In the Second Circuit, which applies an "arguably [] broader conception of harboring" than others, the phrase "conceals, harbors, or shields from detection" refers to "conduct which is intended to facilitate an alien's remaining in the United States illegally and to prevent detection by the authorities of the alien's unlawful presence." *United States v. Vargas-Cordon*, 733 F.3d 366, 380-82 (2d Cir. 2013) (citing *United States v. Kim*, 193 F.3d 567, 574 (2d Cir. 1999)). "A defendant must engage in conduct that is intended both to substantially help an unlawfully present alien remain in the United States—such as by providing him with shelter, money, *or other material comfort*—and also is intended to help prevent the detection of the alien by the authorities." *Id.* (emphasis added). "[A] defendant who

6

intends to conceal an illegal alien from authorities may be guilty of harboring even though his conduct 'lack[s] the hallmarks of active, classic concealment.'" *United States v. George*, 779 F.3d 113, 119 (2d Cir. 2015) (quoting *Vargas-Cordon*, 733 F.3d at 382) (affirming a jury instruction stating: "[h]arboring means simply to afford shelter to, shield from detection, to act in a way that prevents the authorities from learning of the fact that an alien is in the United States illegally.  You need not find that . . . [the defendant] acted secretly or that the harboring of the alien was clandestine.").  There is no "smuggling" requirement in the law.

Similarly, the Fifth Circuit acknowledges the statute is "intended to broadly proscribe any knowing or willful conduct fairly within any of these terms that tends to substantially facilitate an alien's remaining in the United States illegally . . . .'" *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 529 (5th Cir. 2013) (quoting *United States v. Rubio–Gonzalez*, 674 F.2d 1067, 1073 n.5 (5th Cir. 1982); *United States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir. 1981)).

In support of their proposed "smuggling" requirement, Defendants cite *DelRio-Mocci* and *Costello*, but neither decision contradicts the Second Circuit's broad standard.  In *DelRio-Mocci v. Connolly Properties Inc.*, 672 F.3d 241, 247 (3d Cir. 2012), the court noted examples—relevant to this case—of when a person's conduct falls within the anti-harboring statute, including, among other things, when someone "attempted to warn undocumented individuals of the presence of law enforcement authorities" or "impede a law enforcement investigation."  Defendants ignore this part of the holding.  Similarly, in *United States v. Costello*, 666 F.3d 1040, 1045 (7th Cir. 2012), the court noted that the defendant, whose live-in boyfriend was in the United States illegally, "was not trying to encourage or protect or secrete illegal aliens."  Co-habitation was not enough.  Nothing of the sort is at issue here.

7

Notably, *Costello* involved a *criminal prosecution* under the anti-harboring statute, reinforcing the credible threat of prosecution Kearns faces here.  There, the defendant was convicted, with a reversal on appeal and with the court *warning that federal prosecutors enforce the anti-harboring statute too aggressively*:

> The government tells us not to worry: we judges can rely on prosecutors to avoid bringing cases at the outer margin of the government's sweeping definition of "harboring."  But this case is at the outer margin.  No doubt it was brought because the Justice Department suspects that the defendant was involved in her boyfriend's drug dealings, but cannot prove it, so the Department reaches into its deep arsenal (the 4000–plus federal crimes) and finds a crime that she doubtless never heard of that it can pin on her.  She was sentenced only to probation and to pay a fine but now has a felony record that will dog her for the rest of her life if she loses this appeal.

*Id.* at 1048.  The prosecution in *Costello* set the Seventh Circuit's "outer margin" for defining harboring.  Even if that standard applied instead of the broader one in the Second Circuit, Kearns is well within that margin, for the reasons set forth below.

### b.   Kearns has the requisite knowledge for harboring.

Defendants incorrectly claim Kearns could *never* have the requisite knowledge of a licensee's immigration status to violate 8 U.S.C. § 1324.  *See* Defs.' Br. at *17-18.  To the contrary, he and his staff frequently obtain—unsolicited—documents and information from license applicants regarding their immigration status.  *See* FAC ¶ 34.  Erie County, as a border community, has become a hub of immigration, and applicants are often uncertain about application procedures, including what type of records are required and what type of license they can obtain.  When sorting through these issues, it is not unusual for applicants to volunteer information or records regarding their immigration status.  *Id*.  This provides Kearns and others *actual knowledge* that the person is illegally in the United States.  And if any of these records

8

were provided to the Clerk in support of a license application, the Green Light Law allows them to be retained "for a limited period necessary to ensure the validity and authenticity of such documents." FAC, Ex. A at §5(8)(d); VTL § 502(8).

Defendants' argument also crumbles under the plain text of the statute. If, as Defendants claim, a County Clerk's office would never obtain these records or information, then why does the statute expressly prohibit sharing a licensee's information and records with federal *immigration* authorities and then require the licensee to be promptly alerted when *immigration* authorities request it? The answer is simple: to shield the licensee from their detection.

Defendants create a straw-man argument, claiming Kearns is merely assuming everyone who applies for a standard license is here illegally. The universe is actually much smaller. The conversations referenced above are far more likely to occur with individuals who apply for a license but do not have a social security number. As Governor Cuomo explained, this change to the state's procedure for issuing licenses was designed to "create a driver's license for undocumented people." FAC ¶ 30. Defendants cannot credibly argue otherwise.

### c.     The government has not disavowed, and has instead demonstrated a credible threat of, enforcement.

When the Clerk's Office has actual knowledge of, or recklessly disregards, evidence of illegal immigration, and then is prohibited from sharing that information or evidence with federal immigration authorities—coupled with the requirement for the undocumented licensee to be promptly notified when federal immigration authorities request the information or evidence—the collective conduct falls within the prohibition of 8 U.S.C. § 1324. Kearns faces a credible threat of prosecution under this statute by helping to shield these individuals from the

detection of immigration authorities. [2]

A person facing a credible threat of prosecution "should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Indeed, the Second Circuit evaluates whether the plaintiff has alleged threatened prosecution, likely prosecution, or "even that a prosecution is remotely possible." *Cayuga Nation v. Tanner*, 824 F.3d 321, 331-32 (2d Cir. 2016) (quoting *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 384 (2d Cir. 2015). This standard "is quite forgiving to plaintiffs seeking such preenforcement review, as courts are *generally willing to presume that the government will enforce the law* as long as the relevant statute is recent and not moribund." *Id*. (citing *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013) (internal quotation marks omitted; emphasis added).

The Supreme Court "*presume[s] such intent in the absence of a disavowal* by the government or another reason to conclude that no such intent existed." *Hedges*, 724 F.3d at 197 (emphasis added). Courts cannot rely on the government's "*noblesse oblige*" not to prosecute. *See McDonnell v. United States*, 136 S. Ct. 2355, 2372-73 (2016); *United States of Am. v. Sineneng-Smith*, 910 F.3d 461, 478 (9th Cir. 2018). Indeed, prosecutors have demonstrated a willingness to pursue "cases at the outer margin of the government's sweeping definition of "'harboring.'" *Costello*, 666 F.3d at 1048.

---

[2]     While Defendants claim it is "highly unlikely" that Kearns himself would be notifying the licensee, in doing so they admit he could, indeed, be faced with the circumstance (which is all that is necessary for a credible threat of prosecution). They also fail to address the fact that Kearns could be charged as a conspirator under the statute—even if he is not the actual person who sends the notification. *See* 8 U.S.C. § 1324(a)(1)(v)(I). Indeed, if Kearns is instead required to forward the request to the DMV Commissioner (who then notifies the licensee), this would qualify as conspiracy.

There is no disavowal from the federal government here.  Instead, there are multiple, credible indications of possible prosecution.  The Trump Administration threatened retaliation against local officials that it believes are interfering with the enforcement of federal immigration law.  *See* Kearns Decl. ¶ 7, Ex. A.  Earlier this year, federal prosecutors obtained indictments of a Massachusetts state court judge and court officer for allegedly obstructing an immigration-removal proceeding after they let "an undocumented immigrant[] slip out the back door of Newton District Court."  *See id.* ¶ 8, Ex. B. *See United States v. Joseph*, 19-CR-10141, Dkt. 1 (D. Mass. Apr. 25, 2019).  And the Trump Administration issued an Executive Order prioritizing immigration enforcement, stating it is the policy of the executive branch to "make use of all available systems and resources to ensure the efficient and faithful execution of the immigration laws of the United States."  Exec. Order No. 13768, 82 Fed. Reg. 8799 (2017).

Defendants ignore the critical language of the holdings in *Cayuga Nation*, *Hedges*, and other cited authority and, instead, offer an incomplete and arguably misleading characterization of the standard to establish a "credible threat of prosecution."  *See* Defs.' Br. at *14.  The bar is not nearly as high as they claim.  And even if it were, Kearns clears it.

Defendants also claim Kearns is unlikely to be prosecuted because other states have issued licenses to undocumented immigrants without prosecution.  This argument fails for two reasons.  *First*, none of the statutes in those other states goes as far as New York's.  Only a small number of them prohibit the disclosure of the licensee's information (and only one appears to single out federal *immigration* enforcement).[3]  And none appears to require the licensee to be promptly notified when federal immigration authorities request their information from the DMV.

---

[3]     One of the states, Utah, even requires its DMV to notify federal immigration authorities if they learn that a licensee has committed a crime.  *See* Utah Code Ann. § 53-3-205.5.

*See* National Immigration Law Center, *State Laws Providing Access to Driver's Licenses or Cards, Regardless of Immigration Status, available at* https://www.nilc.org/wp-content/uploads/2015/11/drivers-license-access-table.pdf (last visited Sept. 16, 2019). *Second,* only recently has the federal government, under the current Administration, taken such aggressive positions on illegal immigration. Kearns is sailing into unchartered waters.

### 3.   Kearns faces the credible threat of removal from office.

Based on the standard set forth immediately above, Kearns also faces a credible threat of removal from office. Neither Governor Cuomo nor Attorney General James, who have the statutory powers and duties related to removing an official from office, have disavowed removing Kearns if he fails to follow the requirements of the Green Light Law. *See* N.Y. Const., Art. 13, § 13(a); N.Y. Executive Law §§ 63(1), 63-a. The Governor has publicly refused to rule out removal, with the Lieutenant Governor stating: "we'll certainly look at our options," adding that clerks are obligated to uphold the laws of the state. *See* Kearns Decl. ¶ 15, Exs. E-F. This comment, coupled with the other refusals to rule out removal, confirm it may happen to Kearns.

### C.   Parties are permitted to seek relief under the Supremacy Clause.

Defendants claim Kearns cannot challenge the Green Light Law under the Supremacy Clause because he does not "enforce" the underlying federal statutes that preempt it. But Kearns is not attempting to "enforce" these statutes. Instead, he seeks an injunction preventing Defendants from implementing and enforcing (against him) a preempted State statute which, if he follows, puts him at risk of prosecution.

Defendants cite *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1383 (2015), for the sweeping proposition that, because the Supremacy Clause confers no individual

rights, Kearns has no recourse here.  This is not what *Armstrong* says.  In *Armstrong*, private

health care providers (paid through Medicaid) sued Idaho state health officials to force them to

comply with a federal reimbursement rate standard.  The Court held that the Supremacy Clause

did not create an implied right of action, and that the underlying federal reimbursement statute

*included an administrative remedy.  Id.* at 1385.  The Court even noted that its ruling would not

leave the providers with "no resort" because "[t]heir relief must be sought initially through the

Secretary rather than through the courts."  *Id.* at 1387.  The Court also highlighted the long and

valid history of federal courts granting injunctions against state officers who plan to violate

federal law.  *Id.* at 1384 (citing *Ex parte Young*, 209 U.S. 123, 155–156 (1908)); *id.* at 1391

(Sotomayor, J. concurring) ("that does not mean that parties may not enforce the Supremacy

Clause by bringing suit to enjoin preempted state action.").  In doing so, courts look to the

underlying statutes to see if there is an "intent to foreclose" equitable relief such as an injunction.

   This case is not *Armstrong*.  Unlike the healthcare providers there, Kearns is not

seeking to use the Supremacy Clause as the springboard for a cause of action to sue the State for

more money.  And unlike those providers, Kearns has *no administrative remedy*.  Indeed,

Defendants' position would leave Kearns with "no resort" and ultimately subject him to federal

prosecution if he follows state law.  Earlier this year, the Second Circuit highlighted such a

distinction in refusing to extend *Armstrong* to an instance when there was no administrative

remedy for foster parents challenging maintenance payments.  *See New York State Citizens'*

*Coal. for Children v. Poole*, 922 F.3d 69, 85 (2d Cir. 2019) (highlighting the distinction in the

context of a § 1983 action).  And the Second Circuit never even referenced such a prohibition in

*Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 69 (2d Cir. 2019), where local

government entities sued the state attorney general alleging a state statute was preempted by

federal legislation and, therefore, violated *the Supremacy Clause*.  They had no other recourse, as

the challengers would have been presented with the impermissible choice "between abandoning

[their] rights or risking prosecution." *Id.* at 70 (internal quotation omitted).

Also, Kearns is not trying to "enforce" the underlying immigration statutes,

particularly the anti-harboring statute.  He is bringing this case because it will be *enforced*

*against him* if he follows a state statute.  In the cases Defendants cite, workers attempted to sue

employers—for damages—for violating federal immigration statutes such as the Immigration

and Nationality Act.  The courts held there was no private right of action under them.  *See* Defs.'

Br. at *21.  But Kearns is not suing his employer (or others) for money for employing

individuals illegally in the United States.  Nor is he suing to have someone jailed or fined for

violating the federal anti-harboring statute (8 U.S.C. § 1324).  Rather, he seeks to enjoin State

officials from implementing an unconstitutional State statute—so he can avoid prosecution.  *See*

*Ex parte Young*, 209 U.S. 123, 155–56.  There is nothing in the underlying federal statutes

signaling an "intent to foreclose" this type of relief, particularly where he has no other resort.

And what, exactly, do Defendants propose Kearns do?  Wait to be prosecuted?  If

complying with a state law could land him in federal prison, then he ought to be able to enjoin

enforcement of the state law.  Nothing in *Armstrong* requires otherwise.

II.     **The Green Light Law intrudes on a field occupied by federal legislation
         and conflicts with federal law.**

   A.     **The statute's plain language and legislative history confirm it does far more
           than "regulate a matter of traditional state concern."**

No one is disputing that courts should assume that "the historic police powers of

the States are not superseded unless that was the clear and manifest purpose of Congress."

*Arizona v. United States*, 567 U.S. 387, 399 (2012).  And no one is disputing that the issuance of

driver's licenses is a traditional area of state concern. *See Arizona Dream Act Coal. v. Brewer*, 855 F.3d 957, 973 (9th Cir. 2017), *cert. denied*, 138 S. Ct. 1279 (2018). But Defendants ignore the fact that the Green Light Law does far more than issue driver's licenses.

In addition to not requiring license applicants "to prove that they are lawfully present in the United States," *see* FAC, Ex. A, § 5(8)(b), the statute prohibits the disclosure of the applicant's records and information to federal immigration authorities (absent a warrant or court order), and then requires the licensee to be notified within three days if his or her information is requested by them. *See id.* § 2. Alerting individuals illegally in the United States that federal immigration authorities are investigating them—and prohibiting the disclosure of their information and records to those authorities—are not areas of "traditional state concern."

While Defendants cite the Legislature floor debates to support their claim that the Green Light Law's purposes are road safety and generating revenue for the State, the legislative history accompanying the bill—and the comments from its sponsors—are rife with references to other purposes outside traditional areas of state concern. The Bill Sponsor's Memorandum identifies the employment of undocumented immigrants as the statute's primary purpose and even emphasizes the protection of their records:

> The need to secure driving privileges for all residents of New York, including undocumented immigrants, has been a long term effort that has reached the pinnacle of urgency. From farm labor to construction jobs, the tight labor market and lowering unemployment rates have created a lower [] supply of workers to many sectors in New York's economy. Not allowing undocumented persons to have licenses issued by DMV has had and is continuing to have a negative impact on the economy.
>
> *        *        *
>
> This legislation allows for the issuance of a driver's license, protects the data of those applying for such privilege from unwarranted release and moves New York closer to recognizing

15

>     the huge and positive economic impact undocumented residents
>     have on the economy.

*See* Kearns Decl., Ex. J. Multiple Bill Sponsors also identified employment of undocumented

immigrants as the Bill's purpose. *Id.* And Sponsor Senator Luis Sepulveda said the statute was

intended to "keep[] hardworking families together." *See* Kearns Decl., Ex. I. Protecting

undocumented aliens from immigration authorities and keeping them with their families (and

gainfully employed) are not traditional areas of state concern. These purposes are confirmed by

the plain text of the statute, as demonstrated by the five questions Kearns asks in the Preliminary

Statement. Therefore, no presumption against preemption saves the Green Light Law's

provisions at issue here.

**B.    The federal government occupies the field of harboring, which the Green Light Law also seeks to regulate.**

"[T]he federal scheme on harboring [of aliens] is comprehensive and field

preemptive." *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1025 (9th Cir. 2013) (citing

*Lozano v. City of Hazleton*, 724 F.3d 297, 316 (3d Cir. 2013)). The Green Light Law regulates

harboring. The questions Kearns poses in the Preliminary Statement dispel the notion that the

statute merely involves the issuance of licenses and regulation of road safety. The statute also

shields undocumented immigrants from the detection of federal immigration authorities by

prohibiting the disclosure of their information and records, and by requiring they be promptly

notified when federal immigration authorities request their information or records. *This is

harboring*, and the statute is, therefore, field preempted. Why else would the statute include

these provisions that specifically single out *immigration* authorities?

When viewed through this lens, the Green Light Law resembles the state statutes

that courts have determined to be preempted by Section 1324. *See, e.g., Arizona*, 567 U.S. at

16

399; *Valle del Sol Inc.*, 732 F.3d at 1023; *Lozano*, 724 F.3d at 316; *South Carolina*, 720 F.3d at

531; *Alabama*, 691 F.3d at 1288; *Georgia Latino All. for Human Rights*, 691 F.3d at 1267.

Although in these cases the states had attempted to complement or even more rigorously enforce

immigration anti-harboring efforts, *that is not why they were preempted*; rather, it was because

the states had legislated within the field of harboring, which Congress had already determined to

be within its exclusive governance.   In *Valle del Sol Inc.*, the preempted statute prohibited the

"shield[ing] of an unauthorized alien."  732 F.3d at 1019.  Here, the Green Light Law requires it.

Defendants claim *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 240

(2d Cir. 2006), supports their position that the Green Light Law "occupies an entirely different

field," not harboring.  But the statute in *Madeira*, which was not preempted, involved "traditional

state tort or labor laws determining the compensatory damages recoverable for personal

injuries."  The statute was not designed to affirmatively shield undocumented immigrants from

detection.  Defendants also cite *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), which is *no longer*

*good law* because the statute at issue was superseded by the 1986 Immigration Reform and

Control Act ("IRCA"), meaning it would be preempted today.  *See Chamber of Commerce of*

*U.S. v. Whiting*, 563 U.S. 582, 588 (2011).  Field preemption applies here.

    **C.**    **The Green Light Law also conflicts with the anti-harboring**
           **federal statute (8 U.S.C. § 1324).**

At minimum, the Green Light Law conflicts with 8 U.S.C. § 1324—preventing

compliance with it and standing as an obstacle to the accomplishment and execution of its

purposes and objectives.  Defendants persist in repeating that the statute "arose from the

prohibition against smuggling."  Defs.' Br. at *30.  But they ignore that, over time, it has

expanded to cover much broader conduct, particularly within the Second Circuit, as set forth

above in Point I(B)(2).  *See United States v. Vargas-Cordon*, 733 F.3d 366, 381 (2d Cir. 2013)

("The broader structure of § 1324(a) further supports reading 'conceals, harbors, or shields from

detection' as sharing a common 'core of meaning' centered around evading detection.")

(citations omitted).  Defendants also persist in claiming that the purpose of the Green Light Law

is to issue licenses, which is "far afield" from smuggling.  But that is only *a* purpose of the

statute.  Its plain text confirms that it *also* requires Kearns and others to shield undocumented

immigrants from the detection of federal immigration authorities.

   Defendants persist in claiming that the Green Light Law merely seeks to preserve

limited State resources when it prohibits its agents and employees from sharing information with

immigration authorities.  But why, then, does the statute then require the same State agents and

employees to promptly alert licensees when immigration authorities seek their records?

Defendants persist in claiming that a County Clerk's office (or DMV) would never obtain

information or records regarding a licensee's immigration status.  But why, then, does the statute

forbid the disclosure of their records specifically to federal *immigration* authorities and require

the licensee to be promptly alerted when federal *immigration* authorities request his or her

records or information?  Defendants persist in claiming the statute is designed merely to protect

private information.  But why, then, does it specifically protect it from federal *immigration*

authorities?  Defendants also persist in claiming that the Green Light Law is not preempted

because the federal REAL ID Act permits states to issue "lesser" standard licenses not accepted

for federal purposes.  But why, then, does the Green Light Law require the Clerk's Office to do

much more than issue standard licenses to undocumented immigrants?

   The cases cited by Defendants neither answer these questions nor support

Defendants' arguments against conflict preemption.  *In re MTBE Prod. Liab. Litig.*, 725 F.3d 65

(2d Cir. 2013), addressed whether the Clean Air Act preempted New York localities from suing gasoline distributors over contamination caused by their additives. It did not. *Marsh v. Rosenbloom*, 499 F.3d 165 (2d Cir. 2007), addressed whether CERCLA's statute of limitations preempted Delaware's statute of limitations to sue a dissolved corporation. It did not because one statute addressed the capacity to be sued while the other addressed liability. The premise of these cases might have applied here *if* the State had simply decided to issue licenses to undocumented immigrants—and the mere benefits of the license alone aided the immigrants in avoiding the detection of federal authorities. But, again, that is not the case here.

Finally, Defendants cite *United States v. California*, 921 F.3d 865, 881 (9th Cir. 2019), because, there, the court did not preempt a California statute requiring employers to notify employees in advance of immigration employment inspections. Defendants fail to mention *this was not a harboring case*. The court never addressed whether notifying undocumented immigrants of impending federal immigration inspections could fall within the definition of harboring under 8 U.S.C. § 1324. The issue was whether it conflicted with § 1324a (a different statute), prohibiting the employment of undocumented individuals.

In contrast, the Second Circuit has already determined similar conduct falls within the definition of harboring. In *United States v. Herrera*, 584 F.2d 1137, 1142 (2d Cir. 1978), the defendants had installed a system designed to alert employees whenever immigration officials approached the building. In a later decision, the court cited this case in describing its "arguably [] broader conception of 'harboring.'" *Vargas-Cordon*, 733 F.3d at 380. The Green Light Law's requirement to promptly notify undocumented immigrants that federal immigration authorities are investigating them, coupled with the shielding of their records and information, serves the

19

same purpose—to alert them that authorities are coming.[4]  Thus, it is conflict preempted.

      **D.**      **The Green Light Law also conflicts with federal statutes governing information sharing (8 U.S.C. §§ 1373, 1644).**

      **1.**      **There is a conflict.**

Under 8 U.S.C. §§ 1373 and 1644, states cannot prohibit local officials or governments from sending information to federal immigration authorities regarding citizenship or immigration status.  This is precisely what the Green Light Law does when it requires that the DMV Commissioner (and any agent or employee): "shall not disclose or make accessible in any manner *records or information* that he or she maintains, to any agency that primarily enforces immigration law. . . ."  This conflicts with (and even appears to be expressly pre-empted by) federal law in an area that Congress has the plenary power to regulate.

Defendants claim the federal statutes are unconstitutional and do not actually conflict with the Green Light Law.  First, for the reasons set forth below in Point II(D)(2), the statutes are Constitutional, as the Second Circuit has already confirmed.  Second, they plainly conflict with the Green Light Law.  Although Kearns and his staff may be prohibited from inquiring about an individual's immigration status, this does not mean that they do not obtain this information.  Applicants for licenses sometimes volunteer this information, and provide supporting materials, when they come to the Clerk's Office to apply for a license, especially in a border-city like Buffalo, which has seen a significant increase in its immigrant population.  FAC

---

[4]      As explained above in footnote 2, Defendants not only acknowledge that Kearns or his office could be required to notify the licensee (although they call it "highly unlikely"), but they also fail to address the fact that Kearns would be equally susceptible to prosecution under 8 U.S.C. § 1324(a)(1)(v)(I) for conspiracy to harbor if he is instead required to notify the DMV Commissioner, whom he knows will then notify the licensee.

¶ 34.  By prohibiting Kearns from sharing this information (or documents) with federal immigration authorities, the Green Light Law expressly conflicts with Sections 1373 and 1644.

Defendants claim that this restriction is permissible under other federal information-sharing statutes and is, therefore, valid.  Not so.  Sections 1373 and 1644 expressly prohibit states from doing what New York has done.  The analysis ends here.  Defendants cite *United States v. California*, 921 F.3d 865, 891 (9th Cir. 2019), for the proposition that states have a general "right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts."  Perhaps they do.  But that general "right" applies only if the state's "refusal" statute is not otherwise preempted.  Notably, the *California* court—after identifying this general right—*then analyzed whether the state statute conflicted with § 1373*.  There, it did not, but only because the state statute did not restrict the sharing of any specific documents or information referenced in Section 1373 (*i.e.*, "information regarding the citizenship or immigration status, lawful or unlawful, of any individual.")  *Id.* at 891-92.  That is not the case here.

Further, *California* conflicts with the holding in *City of New York* v. *United States*, 179 F.3d 29, 35 (2d Cir. 1999), *cert. den*, 528 U.S. 1115 (2000), in which the Second Circuit held, with regard to Section 1373, that "states do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs."  Otherwise, "states will at times have the power to frustrate effectuation of some [federal] programs."  *Id.*  This is precisely what the Green Light Law does—frustrates the objectives and programs of the federal government.

Defendants also claim that the above-referenced provision in the Green Light Law is valid because certain information sharing is voluntary under the Driver's License Privacy Protection Act  ("DPPA"), 18 U.S.C. § 2721, *et seq*.  This argument fails for two reasons.  *First*,

it disregards the direct conflict with Sections 1373 and 1644. *Second*, the purpose of the DPPA was to prevent that personal information from being sold. *See Reno v. Condon*, 528 U.S. 141, 143-44 (2000). It had nothing to do with interfering with federal immigration enforcement.

## 2. The statutes are Constitutional.

The Second Circuit has already determined 8 U.S.C. § 1373 is Constitutional and does not violate the Tenth Amendment's prohibition against commandeering. *City of New York*, 179 F.3d at 35. The same principle applies to 8 U.S.C. § 1644. Although the Southern District recently held the Supreme Court's decision in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018), invalidates *City of New York*, that issue is now pending before the Second Circuit. *See States of New York v. Dep't of Justice*, 343 F. Supp. 3d 213 (S.D.N.Y. 2018), *appeal pending*, Nos. 19-267 (L), 19-275 (con.) (2d Cir. 2019). This Court is required to follow the Second Circuit's precedent unless and until it changes, as *Murphy* does not require a different result. For a detailed explanation, Kearns refers to the Department of Justice's ("DOJ's") briefs to the Second Circuit in *States of New York*, which are appended to this Memorandum as **Exhibits A** and **B**, and he summarizes three of the main arguments here.

*First*, the purpose of Section 1373 is not to commandeer, but to *preempt* states from interfering in an area that Congress has the plenary power to legislate (immigration), and the DOJ cites its legislative history in support of this. Unlike the statute at issue in *Murphy*, Section 1373 does not require states to regulate a particular area or enforce a particular scheme. Instead, Section 1373 simply preempts states from hindering the federal government's enforcement of the immigration laws against individual aliens. As the DOJ points out, "[e]ven if Congress had not enacted Section 1373, that would follow from basic principles of obstacle preemption." *See Arizona*, 567 U.S. at 399. And *Murphy* "expressly did not did not disturb the

22

bedrock principle that state and local laws that obstruct federal laws 'regulat[ing] private actors'
are 'preempt[ed].'" *See* Ex. A at \*33 (quoting 138 S. Ct. at 1479).

   *Second*, as the Supreme Court warned in *Murphy*, preemption language can often
be misconstrued as commandeering, as it was here, even when it is not commandeering. *See* Ex.
A at \*34 ("language might appear to operate directly on the States"—even in a targeted way—
but in substance merely prevent the States from obstructing federal regulation of private
parties.") (quoting 138 S. Ct. at 1480).

   *Third*, requiring states and localities not to interfere with federal inquiries and
schemes is not "commandeering." The Southern District ignored the ruling in *Printz v. United
States*, 521 U.S. 898, 918 (1997), which distinguished statutes that "require only the provision of
information to the Federal Government," as they "do not involve . . . the forced participation of
the States' executive in the actual administration of a federal program." *See* Ex. A at \*36. As
the DOJ explains, "the fact that § 1373 prohibits restrictions on information sharing rather than
affirmatively mandating information sharing makes the statute *less intrusive* because it allows
local and state officials to individually refuse to provide information to DHS." *Id.* at \*37.
Indeed, Section 1373 does not require Kearns and others to take any action to enforce federal
immigration law. Therefore, Section 1373 (and by extension Section 1644) is Constitutional.

  **E.**  **The Green Light Law also conflicts with the anti-employment
    federal statute (8 U.S.C. § 1324a).**

   It is difficult to see how the Green Light Law does not stand as an "obstacle to the
accomplishment of" Congress' objective in passing IRCA. *See Arizona*, 567 U.S. at 399. The
IRCA "makes it illegal for employers to knowingly hire, recruit, refer, or continue to employ
unauthorized workers . . . ." *Arizona*, 567 U.S. at 404 (citing 8 U.S.C. § 1324a.). Its purpose is

to "combat the employment of illegal aliens." *Id.* (citing *Hoffman Plastic Compounds*, 535 U.S. at 147).  As set forth in Kearns' opening memorandum, the Green Light Law was intended to do the opposite—assist undocumented immigrants with gaining and maintaining employment.

Defendants claim there can be no such conflict because Section 1324a only punishes *employers*, and prohibits no other conduct, meaning Congress did not intend to preempt any other state conduct.  Not so.  As the Supreme Court held in *Arizona*, Congress also intended—without saying so—to preempt states from punishing the *employees*.  In doing so, the Court held that state regulations regarding the employment of undocumented immigrants —aside from those expressly preempted in Section 1324a—could, indeed, be preempted.  *Id.* at 406 ("But the existence of an 'express preemption provisio[n] does not bar the ordinary working of conflict preemption principles' or impose a 'special burden' that would make it more difficult to establish the preemption of laws falling outside the clause.") (quoting *Geier v. American Honda Motor Co.*, 529 U.S. 861, 869–872 (2000)).  If states are preempted from *punishing* employees, the same prohibition naturally extends to *assisting* them, which is precisely what the Legislature intended Green Light Law to do.

Finally, Defendants' citations to *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 242 (2d Cir. 2006), and *California*, 921 F.3d at 881, miss the mark.  In *Madeira*, the issue was whether undocumented workers injured in construction accidents could recover damages (or whether recovery under state labor law was preempted by the IRCA).  And in *California*, the issue was whether a state employee-notice law for federal government inspections was preempted.  Neither state law directly conflicted with the goal of IRCA to "combat the employment of illegal aliens" to the extent the Green Light Law does.  They are

24

workplace safety and protection statutes, not statutes expressly intended to lead to the hiring and employment of undocumented workers, as the Green Light Law is.

III.     **Kearns meets the preliminary injunction criteria, most of which Defendants ignore.**

Defendants' opposition to Kearns' preliminary injunction motion is largely confined to the argument that Kearns is unlikely to succeed on the merits of his claim. For the reasons set forth above, their argument is without merit. And the balance of equities tips decidedly in Kearns' favor because he risks prosecution unless the status quo remains in place. *See Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016) (a "party is not required to pursue arguably illegal activity . . . or expose itself to criminal liability before bringing suit to challenge a statute alleged to violate federal law.").

With regard to public interest, Defendants rely on *New York State Rest. Ass'n v. New York City Bd. of Health*, 545 F. Supp. 2d 363, 368 (S.D.N.Y. 2008), which involved "laws enacted for the purpose of advancing *public health*," particularly "to address serious health issues." That is not the case here. Instead, the Ninth Circuit's decision in *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013), which involved an injunction against enforcement of an immigration-related state statute, is directly on point. In granting the injunction, the court held: "it is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Id.* The same is true here.

## Conclusion

For the foregoing reasons, the Court should deny Defendants' motion to dismiss and grant Kearns' motion for a preliminary injunction.

25

Dated:      September 16, 2019
            Buffalo, New York

                              MICHAEL A. SIRAGUSA
                              Erie County Attorney and Attorney for
                              Plaintiff Michael P. Kearns in his individual
                              capacity and official capacity as Clerk of the
                              County of Erie, New York

                              By:  s/ Kenneth R. Kirby
                              KENNETH R. KIRBY, ESQ.
                              Assistant County Attorney, of Counsel
                              95 Franklin Street, Suite 1635
                              Buffalo, NY  14202
                              Tel:  (716) 858-2208
                              Email: kenneth.kirby@erie.gov

                              By:  s/ Thomas J. Navarro
                              THOMAS J. NAVARRO, JR.
                              Assistant County Attorney, of Counsel
                              95 Franklin Street, Suite 1635
                              Buffalo, NY  14202
                              Tel:  (716) 858-2208
                              Email:  thomas.navarro@erie.gov

## CERTIFICATE OF SERVICE

We hereby certify that on September 16, 2019, we electronically filed the foregoing with the clerk of the District Court using its CM/ECF system, and on the same date we mailed a true copy of the foregoing, via the United States Postal Service, to the following non-CM/ECF participant at the following address, by depositing into a United States Postal Service receptacle/depository provided for the same, a true copy of the foregoing, sealed in a postage prepaid, properly addressed wrapper, addressed to Proposed Intervenor Daniel T. Warren, as follows:

Daniel T. Warren
836 Indian Church Road
West Seneca, NY 14224
Email: d.warren@roadrunner.com

AND, we hereby certify that on September 16, 2019, we electronically filed with the clerk of District Court using its CM/ECF system, and on the same date the court's CM/ECF system caused to be (electronically) served the foregoing to the following CM/ECF participant at the following (email) addresses:

George M. Zimmerman, Esq.
New York State Office of the Attorney General
Attorney for the Defendant(s) Governor Andrew M. Cuomo, Attorney General Letitia A. James, and Commissioner of the New York State Department of Motor Vehicles Mark J.F. Schroeder.
**Office & P. O. Address:**
Main Place Tower
Suite 300A
350 Main Street
Buffalo, New York 14202
Phone: (716) 853-8400
Email: George.Zimmerman@ag.ny.gov

Joel J. Terragnoli, Esq.
New York State Office of the Attorney General
Attorney for the Defendant(s) Governor Andrew M. Cuomo, Attorney General Letitia A. James, and Commissioner of the New York State Department of Motor Vehicles Mark J.F. Schroeder.
**Office & P. O. Address:**
Main Place Tower
Suite 300A
350 Main Street
Buffalo, New York 14202
Phone: (716) 853-8400
Email: Joel.Terragnoli@ag.ny.gov

Linda Fang, Esq.
New York State Office of the Attorney General
Attorney for the Defendant(s) Governor Andrew M. Cuomo, Attorney General Letitia A. James, and Commissioner of the New York State Department of Motor Vehicles Mark J.F. Schroeder.

27

**Office & P. O. Address:**
28 Liberty Street, 23rd Floor
New York, New York 10005
Phone: (212) 416-8656
Email: Linda.Fang@ag.ny.gov

AND, we hereby certify that on September 16, 2019, we electronically filed with the clerk of
District Court using its CM/ECF system, and on the same date the court's CM/ECF system
caused to be (electronically) served the foregoing to the following counsel for each of the
"amicus curiae" and Proposed Intervenor at the following (email) addresses:

Christopher T. Dunn, Esq.
Attorney for the N.Y. Civil Liberties Union, appearing "*amicus curiae*"
**Office & P. O. Address:**
Christopher T. Dunn, Esq.
NY Civil Liberties Union
125 Broad Street
17th Floor
New York, NY 10004
212-344-3005
Email: cdunn@nyclu.org

Antony Philip Falcomer Gemmell, Esq.
Attorney for the N.Y. Civil Liberties Union, appearing "*amicus curiae*"
**Office & P. O. Address:**
Antony Philip Falcomer Gemmell
NY Civil Liberties Union
125 Broad Street
19th Floor
New York, NY 10004
212-607-3320
Email: agemmell@nyclu.org

Amy Louise Belsher, Esq.
Attorney for the N.Y. Civil Liberties Union, appearing "*amicus curiae*"
**Office & P.O. Address:**
New York Civil Liberties Union Foundation
Amy Louise Belsher
125 Broad Street
19th Floor
New York, NY 10004
212-607-3342
Email: abelsher@nyclu.org

28

Christopher J. Hajec, Esq.
Attorney for Immigration Reform Law Institute, appearing "*amicus curiae*"
**Office & P. O. Address:**
Christopher J. Hajec, Esq.
Immigration Law Reform Institute
25 Massachusetts Ave. NW
Suite 335
Washington, DC 20001
Phone: (202) 232-5590
Email: chajec@irli.org


Joshua Perry, Esq.
Special Counsel for Civil Rights for the Attorney General of the State of Connecticut, appearing
"*amicus curiae*"
**Office & P. O. Address:**
Office of the Attorney General of the State of Connecticut
Joshua Perry, Esq.
Special Counsel for Civil Rights
P.O.Box 120
55 Elm Street
Hartford, CT 06106
Phone: (860) 808-5372
Email: Joshua.perry@ct.gov


Francisca D. Fajana, Esq.
Attorney for Rural and Migrant Ministry, *et al.*, Proposed Intervenor
**Office & P. O. Address:**
Francisca D. Fajana
Latino Justice PRLDEF
475 Riverside Drive
Suite 1901
New York, NY 10115
212-739-7576
Email: ffajana@latinojustice.org


Jackson Chin, Esq.
Attorney for Rural and Migrant Ministry, *et al.*, Proposed Intervenor
**Office & P. O. Address:**
Jackson Chin
Latino Justice PRLDEF
475 Riverside Drive
Suite 1901
New York, NY 10115
212 739-7572
Email: jchin@latinojustice.org

29

Jorge Luis Vasquez , Jr., Esq
Attorney for Rural and Migrant Ministry, *et al.*, Proposed Intervenor
**Office & P. O. Address:**
Jorge Luis Vasquez , Jr.
LatinoJustice PRLDEF
475 Riverside Drive
Suite 1903
New York, NY 10115
212-739-7590
Email: jvasquez@latinojustice.org


Kathleen A. Reilly, Esq
Attorney for Rural and Migrant Ministry, *et al.*, Proposed Intervenor
**Office & P. O. Address:**
Kathleen A. Reilly
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
212-836-7450
Email: kathleen.reilly@arnoldporter.com


Maurice Weathers Sayeh, Esq
Attorney for Rural and Migrant Ministry, *et al.*, Proposed Intervenor
**Office & P. O. Address:**
Maurice Weathers Sayeh
Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, NY 10019-9710
212-836-7864
Email: maurice.sayeh@arnoldporter.com

Dated:   Buffalo, New York
       September 16, 2019

MICHAEL A. SIRAGUSA
Erie County Attorney and Attorney for
Plaintiff Michael P. Kearns in his individual
capacity and official capacity as Clerk of the
County of Erie, New York

By:  s/ Kenneth R. Kirby
KENNETH R. KIRBY, ESQ.
Assistant County Attorney, of Counsel
95 Franklin Street, Suite 1635
Buffalo, NY  14202
Tel:  (716) 858-2208
Email: kenneth.kirby@erie.gov

By:  s/ Thomas J. Navarro
THOMAS J. NAVARRO, JR.
Assistant County Attorney, of Counsel
95 Franklin Street, Suite 1635
Buffalo, NY  14202
Tel:  (716) 858-2208
Email:  thomas.navarro@erie.gov