# EXHIBIT A

# Nos. 19-267 (L), 19-275 (con.)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

STATE OF NEW YORK, STATE OF CONNECTICUT, STATE OF NEW JERSEY, STATE OF WASHINGTON, COMMONWEALTH OF MASSACHUSETTS, COMMONWEALTH OF VIRGINIA, STATE OF RHODE ISLAND, CITY OF NEW YORK,

Plaintiffs-Appellees,

*(Caption continued on inside cover.)*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLANTS UNITED STATES
## DEPARTMENT OF JUSTICE, WILLIAM P. BARR

JOSEPH H. HUNT
*Assistant Attorney General*

MARK B. STERN
DANIEL TENNY
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*

Case 19-267, Document 54, 03/01/2019, 2509163, Page2 of 56

v.

UNITED STATES DEPARTMENT OF JUSTICE, WILLIAM P. BARR, in his official capacity as Attorney General of the United States,

Defendants-Appellants.

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

STATEMENT OF JURISDICTION ........................................................................3

STATEMENT OF THE ISSUES............................................................................4

STATEMENT OF THE CASE................................................................................4

      A.     The Immigration and Nationality Act ........................................................4

            1.     Detention and Removal of Aliens.......................................................5

            2.     8 U.S.C. § 1373 .....................................................................................6

      B.     The Byrne JAG Program................................................................................7

            1.     The § 1373 Certification....................................................................7

            2.     The Notice and Access Conditions....................................................9

      C.     Prior Proceedings............................................................................................10

SUMMARY OF ARGUMENT................................................................................ 16

STANDARD OF REVIEW ...................................................................................... 19

ARGUMENT .............................................................................................................. 19

I.     The Notice and Access Conditions Are Statutorily Authorized......................... 19

II.    The § 1373 Certification Condition for FY 2017 Is Valid and § 1373
       Raises No Tenth Amendment Concerns................................................................ 26

      A.     The § 1373 Certification Condition Is Statutorily Authorized ................26

      B.     Section 1373 Does Not Violate the Tenth Amendment...........................30

Case 19-267, Document 54, 03/01/2019, 2509163, Page4 of 56

III.    The Conditions Neither Violate the Separation of Powers Nor Are
Arbitrary and Capricious ............................................................................. 37

CONCLUSION ................................................................................................ 40

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases:**                                                                     **Page(s)**

*Adams v. Dole,*
 927 F.2d 771 (4th Cir. 1991) ....................................................................................23

*American Sur. Co. of N.Y. v. Marotta,*
 287 U.S. 513 (1933) ....................................................................................................23

*Arizona v. United States,*
 567 U.S. 387 (2012) ................................................................................................ 4, 32

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
 548 U.S. 291 (2006) ....................................................................................................12

*Bennett v. Kentucky Dep't of Educ.,*
 470 U.S. 656 (1985) ....................................................................................................28

*City of Chicago v. Sessions,*
 321 F. Supp. 3d 855 (N.D. Ill. 2018), *appeal docketed,*
 No. 18-2885 (7th Cir. Aug. 28, 2018) ........................................................... 28, 35

*City of Chicago v. Sessions,*
 888 F.3d 272 (7th Cir.), *vacated in part,*
 2018 WL 4268817 (7th Cir. June 4, 2018) ....................................................22

*City of New York v. United States,*
 179 F.3d 29 (2d Cir. 1999) .............................................................3, 13, 18, 30, 32, 33

*City of Philadelphia v. Attorney Gen.,* __ F.3d __,
 2019 WL 638931 (3d Cir. Feb. 15, 2019) ................................................ 22, 27

*Dalton v. Specter,*
 511 U.S. 462 (1994) ....................................................................................................37

*Davis v. Monroe Cty. Bd. of Educ.,*
 526 U.S. 629 (1999) ....................................................................................................28

*Hodel v. Virginia Surface Mining & Reclamation Ass'n,*
 452 U.S. 264 (1981) ................................................................................................ 33, 34

*Jackson v. Federal Express,*
 766 F.3d 189 (2d Cir. 2014) ....................................................................................19

*Jennings v. Rodriguez,*
    138 S. Ct. 830 (2018) .................................................................................................6

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) .................................................................................................39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................................................39

*Murphy v. National Collegiate Athletic Ass'n,*
    138 S. Ct. 1461 (2018) ..............................................................13, 18, 30, 33, 34

*National Fed'n of Indep. Bus. v. Sebelius,*
    567 U.S. 519 (2012) .................................................................................................29

*New York v. United States,*
    505 U.S. 144 (1992) ........................................................................................ 30, 35

*Norfolk & W. Ry. v. American Train Dispatchers Ass'n,*
    499 U.S. 117 (1991) .................................................................................................27

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) .....................................................................................................27

*Printz v. United States,*
    521 U.S. 898 (1997) ....................................................................................29, 35, 36

*Reno v. Condon,*
    528 U.S. 141 (2000) .................................................................................................36

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ......................................................................................... 18, 29

*Stone v. INS,*
    514 U.S. 386 (1995) .................................................................................................25

*TRW Inc. v. Andrews,*
    534 U.S. 19 (2001) ...................................................................................................23

**Statutes:**

Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq.*...................................................1

    8 U.S.C. § 1226(a) ...................................................................................................5

    8 U.S.C. § 1226(c) .................................................................................................31

    8 U.S.C. § 1226(c)(1) ..............................................................................................6

    8 U.S.C. § 1231(a)(1) ..............................................................................................5

    8 U.S.C. § 1231(a)(1)(A) ................................................................................. 17, 31

    8 U.S.C. § 1231(a)(1)(B)(iii) ........................................................................5, 17, 31

    8 U.S.C. § 1231(a)(2) .................................................................................... 5, 31

    8 U.S.C. § 1231(a)(4)(A) ..............................................................................5, 16, 31

    8 U.S.C. § 1373..............................................................................2, 4, 6, 17, 26-37

    8 U.S.C. § 1373(a) ....................................................................................6, 9, 30

    8 U.S.C. § 1373(b)......................................................................................6, 9, 30

    8 U.S.C. § 1373(c) ..................................................................................... 6-7

Justice Assistance Act of 1984, Pub. L. No. 98-473, tit. II,
    ch. VI, div. I, 98 Stat. 2077.................................................................................24

Violence Against Women and Department of Justice Reauthorization
    Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006) .................................... 20, 24

Water Resources Reform and Development Act of 2014,
    Pub. L. No. 113-121, 128 Stat. 1193.......................................................................27

6 U.S.C. § 251(2) .................................................................................................5

6 U.S.C. § 552(d)....................................................................................................5

28 U.S.C. § 1292(a)(1) ...........................................................................................3

28 U.S.C. § 1331 ...................................................................................................3

34 U.S.C. § 10102 .................................................................................................2

34 U.S.C. § 10102(a)(6)...........................................................2, 9, 11, 17, 20, 22, 24, 25

34 U.S.C. § 10152(a)(1) ............................................................................. 7, 19, 22, 38

34 U.S.C. § 10152(b) ........................................................................................................7

34 U.S.C. § 10153(A) ........................................................................................................7

34 U.S.C. § 10153(A)(4) ..........................................................................................7, 20, 22

34 U.S.C. § 10153(A)(5) ...................................................................................................17

34 U.S.C. § 10153(A)(5)(C) .....................................................................................7, 20, 22

34 U.S.C. § 10153(A)(5)(D) ..............................................2, 4, 7, 12, 17, 19, 26, 27, 28, 38

34 U.S.C. § 10156 ..............................................................................................................7

34 U.S.C. § 10156(c) ..........................................................................................................7

34 U.S.C. § 10444(7) ........................................................................................................24

42 U.S.C. § 5779(a) ..........................................................................................................36

42 U.S.C. § 16154(g)(1) ..............................................................................................18, 27

49 U.S.C. app. § 1305(a)(1) (1988) ...................................................................................34

42 U.S.C. § 2000d-4a..........................................................................................................9

42 U.S.C. § 3712(a)(6) (2000)...........................................................................................24

## Legislative Materials:

H.R. Rep. No. 104-725 (1996) (Conf. Rep.) ......................................................................32

H.R. Rep. No. 109-233 (2005)...........................................................................................24

## INTRODUCTION

This case involves three conditions that the Department of Justice (Department) has placed on the receipt of FY 2017 law-enforcement grants under the Edward Byrne Memorial Justice Assistance Grant (Byrne JAG) program in order to discourage frustration of federal law enforcement in the interaction of federal and state regulatory schemes.

The federal government regulates aliens under the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.* The States regulate the same individuals in various ways, including regulation under their criminal laws. Under the INA, aliens in state custody cannot be removed until they are released, but prompt federal action is often required when aliens are released. The system should work—and often has worked— seamlessly. At the end of state confinement, the Department of Homeland Security (DHS), pursuant to administrative warrants, takes custody pending removal. In the absence of cooperation, however, aliens subject to removal may return to the general population at the end of their criminal sentence, creating potential risks for federal agents and the community and requiring a wholly unnecessary expenditure of scarce resources.

The three Byrne JAG conditions at issue in this appeal confirm the importance of sharing information as to these individuals to ensure that the state regulatory scheme does not impair the operation of the federal immigration laws.

The first condition, referred to as the "notice" condition, requires that grant recipients have a policy of informing DHS of the scheduled release date of an alien in criminal custody, after receiving a formal request for notification from DHS.   The second condition, referred to as the "access" condition, requires that grant recipients have a policy of allowing federal agents to meet with incarcerated aliens in order to inquire about the aliens' rights to remain in the United States.   The Acting Assistant Attorney General for the Office of Justice Programs (OJP), who administers the Byrne JAG program, imposed the notice and access conditions pursuant to his statutory powers, which "includ[e] placing special conditions on all grants, and determining priority purposes for formula grants."   34 U.S.C. § 10102(a)(6).

The third condition, referred to as the "§ 1373 certification" condition, requires Byrne JAG applicants to certify that they comply with 8 U.S.C. § 1373, which prohibits restrictions on the sharing of "information regarding . . . immigration status" with DHS.   Congress authorized this requirement when it specified that Byrne JAG applicants must certify "in a form acceptable to the Attorney General" that they "will comply with" the Byrne JAG statute "and all other applicable Federal laws."   34 U.S.C. § 10153(A)(5)(D).

Plaintiffs—a group of seven States and the City of New York—insist that they should not be required to comply with these modest conditions, which are designed to prevent States and localities from upsetting the cooperative law-enforcement framework set forth in the INA by thwarting the federal government's removal of

suspected or convicted criminals from the country. They brought these suits raising statutory and constitutional challenges to the Byrne JAG conditions. The district court granted plaintiffs' request for a permanent injunction prohibiting the Department from imposing or enforcing the conditions.

The district court mistakenly concluded that the Department lacked statutory authority to include the notice and access conditions and it likewise erred in holding that § 1373 is not an "applicable" statute on the theory that, as a standalone statute, it is facially unconstitutional, notwithstanding this Court's contrary ruling in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999). The court believed that it was protecting state and local prerogatives. But there is no right to a law enforcement grant without conditions, and frustrating the operation of the immigration laws is not a legitimate prerogative.

## STATEMENT OF JURISDICTION

Plaintiffs brought two civil actions, invoking the district court's jurisdiction under 28 U.S.C. § 1331 to adjudicate their federal statutory and constitutional claims. The district court granted partial summary judgment, mandamus relief, and a permanent injunction by a single order entered in both cases on November 30, 2018. App. 1-43. The court issued an order modifying the terms of its original order on January 4, 2019. App. 44-46. Defendants filed notices of appeal in both cases on January 28, 2019. App. 47-50; *see* Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in holding that the FY 2017 notice and access conditions exceed the Department's statutory authority.

2.  Whether the district court erred in holding that 8 U.S.C. § 1373 is not an "applicable federal law[]" with which Byrne JAG applicants must certify compliance under 34 U.S.C. § 10153(A)(5)(D).

3.  Whether the district court erred in holding that imposition of the conditions violates the separation of powers and was arbitrary and capricious under the Administrative Procedure Act.

## STATEMENT OF THE CASE

### A.     The Immigration and Nationality Act

The federal government has "broad, undoubted power over the subject of immigration and the status of aliens," and Congress has "specified which aliens may be removed from the United States and the procedures for doing so." *Arizona v. United States*, 567 U.S. 387, 394, 396 (2012).  As described below, recognizing States' strong interest in enforcing their criminal laws, Congress provided that aliens in state criminal custody generally cannot be removed until they are released.  Congress designed this system based on the premise that states and localities would not interfere with the federal government's detention and removal of aliens once state custody has ended.

4

### 1.    Detention and Removal of Aliens

In general, when the Secretary of Homeland Security issues a warrant for an alien's arrest, DHS may arrest and detain the alien "pending a decision on whether the alien is to be removed from the United States."  8 U.S.C. § 1226(a).[1]  Once an alien is subject to a final removal order, DHS shall remove the alien within 90 days and shall detain the alien during that removal period.  *Id.* § 1231(a)(1), (2).

When an alien is already in local criminal custody, however, the federal government generally cannot take custody of and remove the alien until he is released. For an alien who is already subject to a final order of removal, DHS shall remove the alien within 90 days of his release from local criminal custody, 8 U.S.C. § 1231(a)(1)(B)(iii), and "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment," *id.* § 1231(a)(4)(A).  In general, DHS "shall detain the alien" beginning on his release from local custody and throughout the 90-day removal period, and "[u]nder no circumstance" may DHS release an alien during the removal period if he has a qualifying criminal history.  *Id.* § 1231(a)(2).

When an alien who is not yet subject to a final order of removal is released from local criminal custody, the Secretary may issue a warrant for the alien's arrest and DHS may arrest and detain the alien under the Secretary's general authority in

---

[1] Section 1226(a) refers to the Attorney General, but the relevant functions have been transferred to the Secretary of Homeland Security.  *See* 6 U.S.C. §§ 251(2), 552(d).

§ 1226(a).  If the alien has a certain criminal history or has engaged in certain terrorist

activities, however, DHS "shall" take the alien into custody "when the alien is

released" from local criminal custody and may not (with a narrow exception) release

the alien for the duration of the removal proceedings.  8 U.S.C. § 1226(c)(1), (2); *see*

*Jennings v. Rodriguez*, 138 S. Ct. 830, 846-47 (2018).

## 2.    8 U.S.C. § 1373

Section 1373 seeks to ensure that no obstacles will prevent the sharing of

information between federal, state, and local governments that is crucial to operation

of the immigration laws.  Section 1373(a) provides that "State" and "local government

entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government

entity or official from sharing "information regarding the citizenship or immigration

status, lawful or unlawful, of any individual" with federal immigration authorities.

Section 1373(b) provides that "no person or agency may prohibit, or in any way

restrict, a Federal, State, or local government entity from" "[s]ending" to or

"requesting or receiving" from federal immigration authorities "information regarding

the immigration status, lawful or unlawful, of any individual," "[m]aintaining" such

information, or "[e]xchanging" such information with "any other . . . government

entity."  Section 1373(c) provides, in turn, that federal immigration authorities "shall

respond to an inquiry by a Federal, State, or local government agency, seeking to

verify or ascertain the citizenship or immigration status of any individual within the

6

jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."

### B.   The Byrne JAG Program

The Department of Justice, through OJP, administers the Byrne JAG program, which provides federal funds to States and units of local government for broad criminal-justice purposes.   34 U.S.C. § 10152(a)(1).   The grant funds are divided among grantees based on a statutory formula, largely premised on population and crime statistics.   *Id.* § 10156.   Recipients may further distribute Byrne JAG funds through subgrants to localities and community organizations, and state recipients are required to distribute a portion of their grant funds to localities within the State through a subgrant process.   *Id.* §§ 10152(b), 10156(c).

### 1.   The § 1373 Certification

States and localities that seek direct grant funding must submit an application "in such form as the Attorney General may require."   34 U.S.C. § 10153(A).   Among other requirements, applicants must certify that they "will comply with" the Byrne JAG statute "and all other applicable Federal laws"; that "for each fiscal year covered by an application, [they] shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require"; and that "there has been appropriate coordination with affected agencies."   *Id.* § 10153(A)(4), (5)(C), (D).

In May 2016, prompted by a congressional inquiry, the Department's Office of the Inspector General issued a report raising concerns about compliance with § 1373 by ten jurisdictions receiving Department grants, including New York City and the State of Connecticut. *See* App. 134-49. As a result, the Department specifically identified that statute as an "applicable Federal law[]" under the Byrne JAG program. App. 150-51. And, for some of the jurisdictions singled out in the report, including New York City, the Department included a condition in their fiscal year (FY) 2016 Byrne JAG awards requiring them to review their compliance with § 1373 and to submit a letter explaining the jurisdiction's basis for its belief that it complied. App. 170 (¶ 53) (New York City FY 2016 Byrne JAG award). New York City accepted its FY 2016 award subject to that condition, and no jurisdiction challenged the FY 2016 condition.

The Department subsequently published guidance explaining that "all Byrne/JAG grant applicants must certify compliance with all applicable federal laws, including Section 1373." App. 182. The guidance explained that that application requirement would not affect FY 2016 or prior year Byrne JAG grants, but that OJP expected grant recipients to "examine their policies and procedures to ensure they will be able to submit the required assurances" in their FY 2017 application. *Id.*

In accordance with this guidance, OJP specified in the FY 2017 solicitation for Byrne JAG applications that applicants would be required to certify their compliance with § 1373 in connection with their applications (the "§ 1373 certification"

condition).  App. 207-08 (state solicitation); App. 250-51 (local solicitation).  The

solicitation included a certification form in which an applicant's Chief Legal Officer

certifies that any "program or activity" funded in whole or in part by the grant

complies with 8 U.S.C. § 1373(a) and (b).  App. 224 (state solicitation); App. 266 (local

solicitation).[2]

### 2.    The Notice and Access Conditions

The statute vests various powers in the Assistant Attorney General for OJP

which "includ[e] placing special conditions on all grants, and determining priority

purposes for formula grants."  34 U.S.C. § 10102(a)(6).  This authority has previously

been used to impose conditions including information technology requirements, App.

166 (¶¶ 26-27); protections for human research subjects, *id.* ¶ 29; restrictions on the

purchase of certain military-style equipment, App. 168-69 (¶¶ 45-50); requirements

regarding body armor purchases, App. 168 (¶¶ 38-39); and training requirements,

App. 166 (¶¶ 32-33).  Congress has never objected to the practice and no jurisdiction

has ever challenged OJP's authority to include them.

The FY 2017 grant solicitations included two additional conditions. *See* App.

216 (state solicitation); App. 258 (local solicitation).  The conditions apply to any

"program or activity" funded by the grant.  The "notice condition" requires that the

---

[2] The term "program or activity" has the same meaning as that phrase under 42
U.S.C. § 2000d-4a.  App. 289.

9

grantee have a policy designed to ensure that facilities provide notice to DHS "as early as practicable" when DHS provides a formal written request for advance notice of the scheduled release date and time for a particular alien. *See, e.g.*, App. 291 (¶ 55.1.B) (New York State FY 2017 award letter).  The "access condition" requires that the grantee have a policy providing that federal agents will be "given access" to correctional facilities for the purpose of meeting with aliens and to "inquire as to such individuals' right to be or remain in the United States." *Id.* ¶ 55.1.A.  The Acting Assistant Attorney General for OJP announced that compliance with these special conditions also "will be an authorized and priority purpose of the award."  App. 216 (state solicitation); App. 258 (local solicitation).  Like the § 1373 certification condition, these two conditions are designed to ensure that the activities of federal law-enforcement grant recipients do not impair the federal government's ability to ensure public safety and the rule of law by detaining and removing aliens upon their release from local criminal custody.

### C.    Prior Proceedings

Plaintiffs filed two near-identical actions on the same day in July of 2018 challenging the FY 2017 notice, access, and § 1373 certification conditions.[3]  Both

---

[3] The suits also brought claims related to conditions on the FY 2018 Byrne JAG program.  Litigation on those claims was stayed while the parties and the court addressed the FY 2017 conditions, and those claims remain pending in district court. Only the FY 2017 conditions are at issue in these consolidated appeals.  *See* App. 9 n.7.

suits asserted that the conditions are not authorized by the Byrne JAG statute, violate

the separation of powers, and violate the Administrative Procedure Act, and also

asserted that § 1373 violates the Tenth Amendment. App. 83-88 (States complaint);

App. 121-27 (City complaint). All plaintiffs sought injunctive relief barring the

Department from enforcing the conditions and a writ of mandamus compelling the

Department to issue the FY 2017 grants to the plaintiffs. App. 92 (States complaint);

App. 132-33 (City complaint). The City of New York also sought a declaration that

§ 1373 is unconstitutional under the Tenth Amendment, or, in the alternative, that the

City complies with § 1373. App. 126, 131-32.

**1.** The district court (Ramos, J.) largely granted plaintiffs' motions for summary

judgment on their claims against the FY 2017 conditions. The court first addressed

whether the conditions are authorized by 34 U.S.C. § 10102(a)(6), which states that

the Assistant Attorney General for OJP shall "exercise such other powers and

functions as may be vested in [him] pursuant to this chapter or by delegation of the

Attorney General, including placing special conditions on all grants, and determining

priority purposes for formula grants." The court held that the term "including" in

§ 10102(a)(6) indicates that the power to place special conditions or determine priority

purposes may only be exercised if those authorities exist "elsewhere in the chapter or

have been delegated by the Attorney General, who may only delegate it to the extent

that he has such power himself." App. 14. Because no other provision grants

authority for the conditions, the court held that "§ 10102(a)(6) does not provide

11

authority for imposing any of the challenged conditions." *Id.* The court also

expressed the view that "a catch-all provision at the end of a list of explicit powers"

would be an unusual place to grant authority to the Assistant Attorney General, and

that a power to condition grants would be inconsistent with the statutory goals of

flexibility for local law enforcement and the Byrne JAG's structure as a formula grant.

*Id.*

The district court then addressed whether 34 U.S.C. § 10153(A)(5)(D), which

provides that Byrne JAG applicants must certify that "the applicant will comply with

all provisions of this part and all other applicable Federal laws," encompassed the

§ 1373 certification condition. The court recognized that each grant recipient is

independently required to comply with § 1373, and that § 10153(A)(5)(D) could

therefore be read to cover a certification with that provision. App. 18. The court

suggested that "[t]he structure of § 10153, which concerns requirements pertaining to

the grant and the application, points toward" interpreting the provision to cover only

"laws applicable to the applicant *as an applicant for federal grant funding.*" *Id.* The court

concluded, however, that "it is unclear from the statutory language whether Congress

intended to condition Byrne JAG funds on compliance with all federal laws applicable

to the State or locality or compliance with all federal laws applicable to federal grants."

*Id.* The court concluded that this ambiguity raised concerns about whether States and

localities had "clear notice" of the conditions of the grant. App. 19 (quoting *Arlington

Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006)). In light of these

12

concerns, the district court held, "the structure of § 10153" and "the parties' long history of treating 'applicable Federal laws' as encompassing laws applicable to federal grants, grant recipients, and the grant-making process" supported construing "'applicable Federal laws' as encompassing laws applicable to federal grants, grant recipients, and the grant-making process," and this narrow construction would provide "fair notice of the terms of the funding." *Id.* The court thus adopted that narrow construction of "applicable Federal laws" and concluded that DOJ "did not have statutory authority to condition Byrne JAG funding on compliance with § 1373." *Id.*

Having ruled for plaintiffs on statutory grounds, the district court had no reason to address their constitutional claims. It nevertheless proceeded to do so, and held that § 1373 violated the Tenth Amendment. App. 19. The district court concluded that it was not bound by this Court's decision in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), which rejected a Tenth Amendment challenge to § 1373, because of the Supreme Court's intervening decision in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). The district court focused on *Murphy*'s statement that "Congress cannot issue direct orders to state legislatures," and held that "Section 1373 'unequivocally dictates what a state legislature may and may not do'" in violation of the Tenth Amendment. App. 25 (quoting *Murphy*, 138 S. Ct. at 1478).

13

The court declared that § 1373 "impinges on Plaintiffs' sovereign authority and their citizens' liberty to be regulated under their preferred state and local policies," preventing States and localities from opting out of administering the federal program at issue. App. 25. The court also believed that "§ 1373 undermines political accountability" because it blurs responsibility for immigration policies "compelled by the federal government." App. 25-26. The court stated that § 1373 generates costs for States and localities by forcing them to devote time and resources to federal immigration enforcement. App. 26. And the court rejected the argument that § 1373 is valid as a preemption provision or an information-sharing requirement that raises no commandeering concerns. App. 26-28.

The district court also held that the imposition of the conditions violates the separation of powers, reasoning that because the Department lacked the statutory authority to impose the conditions on funding, the attempt to do so was necessarily a constitutional violation. App. 30-31. Finally, the district court concluded that the imposition of the conditions was arbitrary and capricious, in violation of the Administrative Procedure Act. The court held that the Department had failed to consider "the negative impacts that may result from imposing the conditions," such as potential effects on "relationships between local communities and law enforcement." App. 34-35.

In light of these conclusions, the district court granted plaintiffs summary judgment on their claims under the Administrative Procedure Act, separation of

14

powers, and the Tenth Amendment.[4]  App. 42.  This included summary judgment for

the City of New York on its request for a declaration that § 1373 violates the Tenth

Amendment.  The district court thus entered a permanent injunction barring the

Department "from imposing or enforcing" the conditions on the FY 2017 Byrne JAG

awards.  App. 43.  The district court rejected plaintiffs' request for a nationwide

injunction, but agreed to extend the injunction to all of plaintiffs' "agencies or

political subdivisions."  App. 40-42, 42 n.28, 43.  The court also granted mandamus

relief to the State plaintiffs, requiring the Department "to reissue their award letters

without the three unlawful conditions and to disburse their FY 2017 awards without

regard to those conditions."[5]  App. 39.

    **2.**  After the district court's summary judgment ruling, the Department

requested that the district court modify its mandamus order to make clear that

plaintiffs' grants could be issued with the conditions, but that those conditions could

not be enforced under the terms of the district court's injunction.  The court granted

that request, along with a request from plaintiffs that their "[a]cceptance of the FY

---

    [4] The City of New York also brought a claim that the conditions violate the Spending Clause of the Constitution.  In light of its disposition of the other claims, the district court denied summary judgment for the City on this claim.  *See* App. 31 n.23; 42.

    [5] The City of New York dropped its request for mandamus relief because it received its FY 2017 grant prior to summary judgment as a result of an injunction issued in litigation in the Northern District of Illinois.  App. 8 n.6, 36 n.26.

2017 awards shall not be construed as acceptance of the enjoined conditions." App. 45.

The Department promptly took this expedited appeal.

## SUMMARY OF ARGUMENT

The three provisions at issue are entirely proper conditions on the receipt of federal law-enforcement grants, and the district court's contrary rulings rest on a series of errors regarding the relevant statutory and constitutional provisions.

**1.** The "notice" and "access" conditions are extraordinarily modest requirements that fall within the Department's statutory authority. The notice condition requires that the grantee have a policy of notifying DHS of the scheduled release date of an alien in criminal custody, after receiving a formal request for notification from DHS. The access condition requires that the grantee have a policy of allowing federal agents to meet with incarcerated aliens in order to inquire about the aliens' rights to remain in the United States.

These conditions ensure the basic cooperation that the INA envisions when aliens are subject to simultaneous regulation by two sovereigns. The INA generally contemplates that aliens taken into criminal custody by States or localities will not, until released, be removed by the federal government. *See, e.g.*, 8 U.S.C. § 1231(a)(4)(A). Moreover, the INA often requires prompt action by DHS as soon as release takes place, providing, for example, that within 90 days of "the date the alien is released from detention or confinement," DHS "shall remove" an alien subject to a

16

final order of removal, *id.* § 1231(a)(1)(A), (a)(1)(B)(iii). The implicit but necessary premise is that States and localities will not use their priority to frustrate immigration enforcement by refusing to inform the federal government of release dates or denying federal officials access to persons who may be subject to removal.

The Assistant Attorney General for OJP imposed these conditions pursuant to his statutory authority to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). In concluding otherwise, the district court rendered this provision meaningless, finding that it provides no independent authority and misunderstanding the Assistant Attorney General's role in administering the Department's grant programs.

**2.** The Department also acted within its statutory and constitutional authority in requiring that FY 2017 grant applicants certify compliance with 8 U.S.C. § 1373. The governing statute provides that Byrne JAG applications must include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10153(A)(5), (A)(5)(D). Following a congressional inquiry and an Inspector General's report, the Attorney General in the prior Administration, through OJP, concluded that 8 U.S.C. § 1373 is an "applicable Federal law[]," and that conclusion is entirely consistent with the statutory text.

The district court erroneously read "all other applicable Federal laws" as restricted to laws that govern the grantmaking process or specifically apply by their

17

terms to grant recipients.  This reading is inconsistent with the broad language of

§ 10153(A)(5)(D), especially given that in other contexts where Congress has intended

to restrict the range of applicable laws in this fashion, it has done so expressly.  *See*,

*e.g.*, 42 U.S.C. § 16154(g)(1) ("consistent with the generally applicable Federal laws and

regulations governing awards of financial assistance, contracts, or other agreements").

The court plainly erred in declaring that the inclusion of the § 1373 certification

condition violates the Tenth Amendment.  As a threshold matter, the federal

government can condition grants on requirements that could not be imposed in a

free-standing statute, without raising Tenth Amendment concerns.  *See South Dakota v.*

*Dole*, 483 U.S. 203, 210 (1987).

Even as a freestanding statute, moreover, § 1373 raises no Tenth Amendment

concerns.  The statute does not commandeer plaintiffs to themselves regulate or

enforce a federal regulatory scheme.  Rather, it is an information-sharing requirement

that expressly preempts state and local regulations that obstruct the federal

government's enforcement of the immigration laws against individual aliens.  The

Supreme Court in *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018),

confirmed that express preemption provisions such as this are permissible under the

Tenth Amendment, and the district court misread that decision to compel the

conclusion that § 1373 is unconstitutional, even though this Court had previously

rejected a Tenth Amendment challenge to that statute in *City of New York v. United*

*States*, 179 F.3d 29 (2d Cir. 1999).

18

**3.** The court's separation-of-powers holding adds nothing to its statutory-authority holding, and the court likewise erred in finding that OJP's imposition of the conditions was arbitrary and capricious.  The determination whether § 1373 is an "applicable Federal law[]" is a purely legal question, not a factual conclusion.  And as to all three conditions, it was entirely reasonable for OJP to require that jurisdictions receiving federal law-enforcement funds not disregard federal law and otherwise hinder federal law enforcement against suspected or convicted criminals.

## STANDARD OF REVIEW

This Court reviews the district court's grant of summary judgment de novo. *Jackson v. Federal Express*, 766 F.3d 189, 194 (2d Cir. 2014).

## ARGUMENT

## I.   The Notice and Access Conditions Are Statutorily Authorized

**A.**  The Byrne JAG Program provides that the "Attorney General may . . . make grants to States and units of local government" for law enforcement and related purposes.  34 U.S.C. § 10152(a)(1).  Among other requirements set out specifically in the Byrne JAG statute, applicants must certify that they "will comply with all provisions of this part and all other applicable Federal laws," *id.* § 10153(A)(5)(D), and agree to undertake various activities to advance law-enforcement goals.  For example, applicants must provide an assurance that they will "maintain and report such data, records, and information (programmatic and financial) as the Attorney General may

reasonably require," and that "there has been appropriate coordination with affected agencies." *Id.* § 10153(A)(4), (5)(C).

The Byrne JAG Program is also subject to the general authority of the Assistant Attorney General for OJP.  As particularly relevant here, the statute provides that he may "exercise such other powers and functions as may be vested in [him] pursuant to [Chapter 101 of Title 34, which includes the Byrne JAG Program] or by delegation of the Attorney General, *including* placing *special conditions* on all grants, and determining *priority purposes* for formula grants."  34 U.S.C. § 10102(a)(6) (emphases added).  The phrase conferring this general authority to impose special conditions and priority purposes was added in the Violence Against Women and Department of Justice Reauthorization Act of 2005, the same law that created the current version of the Byrne JAG Program.  Pub. L. No. 109-162, §§ 1111, 1152(b), 119 Stat. 2960, 3094, 3113 (2006).  Special conditions established by the Assistant Attorney General in past years have included: information technology requirements, App. 166 (¶¶ 26-27); protections for human research subjects, *id.* ¶ 29; restrictions on the purchase of certain military-style equipment, App. 168-69 (¶¶ 45-50); requirements regarding body armor purchases, App. 168 (¶¶ 38-39); and training requirements, App. 166 (¶¶ 32-33).  None of these special conditions has ever been questioned by Congress or challenged as *ultra vires* by any grant recipient, including plaintiffs here.

The Assistant Attorney General acted within his statutory authority in imposing the FY 2017 notice and access conditions, which are modest requirements designed to

ensure information sharing, appropriate law-enforcement coordination to enhance public safety, and detention of aliens in state or local criminal custody in a manner that does not pose an obstacle to the orderly enforcement of the immigration laws.

In accepting the "notice" condition, the applicant agrees that, for any "program or activity" funded by the grant, it will have a policy of informing DHS of the scheduled release date of an alien in criminal custody after receiving a formal written request from DHS.  App. 291 (¶ 55.1.B).  In accepting the "access" condition, an applicant agrees that, with respect to any "program or activity" funded by the grant, it will have a policy providing that federal agents will be "given access" to correctional facilities for the purpose of meeting with aliens and to "inquire as to such individuals' right to be or remain in the United States."  *Id.* (¶ 55.1.A).

In agreeing to these conditions, applicants simply agree that their law-enforcement activities will not impair the federal government's law-enforcement activities against suspected or convicted criminals.  As discussed, *see supra* pp. 4-6, the structure of the INA contemplates that States and localities may prosecute and incarcerate for criminal offenses aliens who may be removable and, indeed, aliens as to whom a removal order has already issued, but that federal custody of such aliens will commence upon their release.  It is crucial to this cooperative law-enforcement framework that States and localities respond to requests for release-date information and permit federal agents to engage in voluntary interviews before releasing aliens from custody.

21

The propriety of the notice and access special conditions is underscored by the provisions in the Byrne JAG statute that authorize the Attorney General to reasonably require "programmatic" information about the funded program, 34 U.S.C. § 10153(A)(4), and to demand "appropriate coordination" with "affected" agencies, *id.* § 10153(A)(5)(C). Notice of an alien's release from local custody constitutes reasonable information about the law-enforcement and corrections programs funded by the grants. *See id.* § 10152(a)(1). And access to an alien in local custody constitutes appropriate coordination with federal immigration authorities affected by those programs' custody over the alien.

**B.** The district court nevertheless held that the Assistant Attorney General lacks statutory authority to impose the notice and access conditions. App. 13-15; *see also City of Philadelphia v. Attorney Gen.*, ___ F.3d ___, 2019 WL 638931, at *7-8 (3d Cir. Feb. 15, 2019) (similar reasoning); *City of Chicago v. Sessions*, 888 F.3d 272, 283-87 (7th Cir.), *vacated in part*, 2018 WL 4268817 (7th Cir. June 4, 2018) (same). That holding effectively reads out of the statute Congress's express addition of general authority for the AAG to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).

The district court justified this anomalous result by relying on the term "including," which it held meant that the "special conditions" and "priority purposes" powers of § 10102(a)(6) have no independent force, but "must come from elsewhere in the chapter or have been delegated by the Attorney General." App. 14. The court

did not explain why Congress would have enacted a new provision in 2006 to accomplish absolutely nothing.  There would have been no need for Congress to clarify that the AAG could impose "special conditions" and determine "priority purposes" for grants if other provisions of Chapter 101 specifically vested that authority in the AAG or if the AG had delegated that authority to the AAG.  Indeed, the district court did not identify any provisions or delegations conferring those authorities for *any* grant program that § 10102(a)(6) could be addressing.

Nor is the district court correct that the term "including" means that Congress did not intend to expand the AAG's authority.  The term "including" is often "used as a word of extension or enlargement," *American Sur. Co. of N.Y. v. Marotta*, 287 U.S. 513, 517 (1933), and can mean "and" or "in addition to," *see, e.g.*, *Adams v. Dole*, 927 F.2d 771, 775-77 (4th Cir. 1991).  Moreover, § 10102(a)(6) *itself* is a provision of Chapter 101 that vests the AAG with the power to impose "special conditions" and determine "priority purposes" for grants.

Of course, it is a cardinal principle of statutory interpretation that "no clause, sentence, or word shall be [rendered] superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).  That principle has particular force here because Congress expressly added the "special conditions" and "priority purposes" authority in 2006, which would have been entirely unnecessary if it merely referred to pre-existing authority.  Confirming the statute's plain text, a report accompanying the enactment of this language stated that the provision "allows the Assistant Attorney General to place

23

special conditions on all grants and to determine priority purposes for formula grants."

H.R. Rep. No. 109-233, at 101 (2005).

The statute previously authorized the Assistant Attorney General to "exercise such other powers and functions as may be vested in [him] pursuant to [what is now Chapter 101 of Title 34] or by delegation of the Attorney General."   42 U.S.C. § 3712(a)(6) (2000); *see also* Justice Assistance Act of 1984, Pub. L. No. 98-473, tit. II, ch. VI, div. I, § 603, 98 Stat. 2077, 2077-78.  Congress later added the language at issue here, which makes clear that the Assistant Attorney General's authority "includ[es] placing special conditions on all grants, and determining priority purposes for formula grants."  34 U.S.C. § 10102(a)(6); *see* Pub. L. No. 109-162, § 1152(b), 119 Stat. at 3113. In other instances, Congress has left in place substantially the same, more limited language as previously found in the predecessor to 34 U.S.C. § 10102(a)(6).  *Compare* 42 U.S.C. § 3712(a)(6) (2000), *and* 34 U.S.C. § 10102(a)(6), *with* 34 U.S.C. § 10444(7) (providing that the Director of the Violence Against Women Office, a separate grant-making office within the Department of Justice, "[e]xercis[es] such other powers and functions as may be vested in the Director pursuant to this subchapter or by delegation of the Attorney General").

This context confirms that Congress intended the "special conditions" and "priority purposes" language to confer distinctive and meaningful power.  The district court's analysis provides no explanation for why this language was added.  "When Congress acts to amend a statute, [courts] presume it intends its amendment to have

24

real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995). This Court should

be particularly wary of interpreting the language to be a nullity because doing so would

render invalid other conditions that past Assistant Attorneys General have imposed.

*See supra* p. 20.

The district court's other justifications for ignoring the plain statutory text are

similarly unpersuasive. Contrary to the court's suggestion, App. 14, § 10102 was a

natural place for Congress to list the special-conditions and priority-purposes powers

precisely because they apply to all grant programs overseen by the Assistant Attorney

General. Similarly, the court did not attempt to reconcile its cramped reading of

"special conditions" in § 10102(a)(6) with the Assistant Attorney General's

complementary power to "determin[e] priority purposes for formula grants" like the

Byrne JAG program. *See* App. 216, 258 (announcing that compliance with the notice

and access conditions "will be an authorized and priority purpose of the award").

And the court's statement that the authority to impose special conditions is

inconsistent with formula grants is plainly inconsistent with the statutory text, which,

unlike for "priority purposes," authorizes "special conditions on *all* grants" (not just

non-formula grants). 34 U.S.C. § 10102(a)(6) (emphasis added).

In sum, none of the district court's reasons refutes the plain-text conclusion

that the Assistant Attorney General had statutory authority to impose the conditions.

II.    **The § 1373 Certification Condition for FY 2017 Is Valid and § 1373 Raises No Tenth Amendment Concerns**

A.    **The § 1373 Certification Condition Is Statutorily Authorized**

**1.**  Byrne JAG applications must include "[a] certification, made in a form acceptable to the Attorney General" that "the applicant will comply with all provisions of [the Byrne JAG Program] and all other applicable Federal laws."  34 U.S.C. § 10153(A)(5)(D).  In accordance with the prior Administration's determination that 8 U.S.C. § 1373 is an "applicable Federal law[]" for purposes of the statutorily required certification, *see* App. 150-51 (July 7, 2016 mem.); App. 182 (Oct. 6, 2016 guidance), beginning in FY 2017 OJP required that grant applicants explicitly certify compliance with § 1373 as part of their Byrne JAG applications. *See, e.g.*, App. 207-08 (FY 2017 state solicitation); App. 224 (FY 2017 certification form).

The § 1373 certification condition is consistent with the statutory text.  In the context of the Byrne JAG statute, the phrase "applicable Federal laws" covers laws that apply to Byrne JAG applicants and are constitutionally applied as grant conditions.  Section 1373 indisputably applies to plaintiffs—subsection (a) applies to any "State" or "local government entity or official," and subsection (b) applies to any "person or agency."  Indeed, New York City accepted a similar condition in its FY 2016 grant, without objection.  *See* App. 170 (¶ 53).

The district court erroneously concluded that the phrase "all other applicable Federal laws" is limited to "laws applicable to federal grants, grant recipients, and the

26

grant-making process." App. 19; *see also City of Philadelphia*, 2019 WL 638931, at *8-10

(similar reasoning). The statute's plain text does not support the court's restrictive

interpretation because it refers to "*all other* applicable Federal laws." 34 U.S.C.

§ 10153(A)(5)(D) (emphasis added). If Congress had intended to limit the

certification to "all laws applicable to Federal grantees," it could have done so

expressly, as Congress has previously done. *See, e.g.*, 42 U.S.C. § 16154(g)(1)

("consistent with the generally applicable Federal laws and regulations governing

awards of financial assistance, contracts, or other agreements"); Water Resources

Reform and Development Act of 2014, Pub. L. No. 113-121, § 1043(a)(3)(C)(ii)(II),

128 Stat. 1193, 1246 ("will comply with all applicable Federal laws (including

regulations) relating to the use of those funds"). As the Supreme Court has

recognized, "[b]y itself, the phrase 'all other law' indicates no limitation." *Norfolk &*

*W. Ry. v. American Train Dispatchers Ass'n*, 499 U.S. 117, 129 (1991).

The district court declared that an atextual reading of the statute was necessary

because grantees would not have clear notice of the condition. App. 18-19. But it did

not explain why Byrne JAG applicants would be unable "to exercise their choice [to

accept the funds] knowingly, cognizant of the consequences of their participation."

*Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). The FY 2017 grant

materials make perfectly clear that an applicant must comply with § 1373—a statute

applicable to all Byrne JAG applicants in any event—in order to receive the funds.

*See* App. 207-08 (FY 2017 state solicitation); App. 250-51 (local solicitation). And

Congress itself need not enumerate every "applicable Federal law"; the Supreme

Court has explained that there is no Spending Clause claim of "insufficient notice . . .

where [the] statute made clear that there were some conditions placed on receipt of

federal funds," and that "Congress need not 'specifically identif[y] and proscrib[e]'

each condition in the legislation" where the administering agency supplies any

clarification that is needed.  *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)

(third and fourth alterations in original); *see Bennett v. Kentucky Dep't of Educ.*, 470 U.S.

656, 669, 672 (1985) (stating that "the Federal Government simply could not

prospectively resolve every possible ambiguity" in a grant program and advising

recipients to seek "clarification" from the administering agency).

    **2.**  The district court further erred in holding that § 1373 is not an "applicable

Federal law[]" within the meaning of 34 U.S.C. § 10153(A)(5)(D) on the theory that it

violates the Tenth Amendment.  As an initial matter, the court was mistaken in

concluding that if § 1373 is unconstitutional as a stand-alone regulation, it

"automatically drops out of the possible pool of 'applicable Federal laws' described in

the Byrne JAG statute."  App. 29 (quoting *City of Chicago v. Sessions*, 321 F. Supp. 3d

855, 875 (N.D. Ill. 2018), *appeal docketed*, No. 18-2885 (7th Cir. Aug. 28, 2018).  The

statutory question is whether Congress intended to make Byrne JAG applicants certify

compliance with § 1373 as an "applicable Federal law[]."  The answer to that question

is yes.  Even if the court were correct that the Tenth Amendment bars § 1373 from

being applied directly to States and localities as a stand-alone regulation, that would in

28

no way undermine Congress's choice to include § 1373 as an "applicable Federal law[]" where it is constitutionally applied as a funding condition on Byrne JAG applicants.

Indeed, the district court correctly recognized that "Congress may offer funds conditioned on compliance with specified conditions to 'induce the States to adopt policies that the Federal Government itself could not impose.'" App. 29 (quoting *National Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012)). For example, in *South Dakota v. Dole*, 483 U.S. 203 (1987), the Supreme Court rejected a challenge to a condition that required States to raise their minimum age for consuming alcohol or face the loss of five percent of federal highway funds. *Id.* at 211. The Court emphasized that "a perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Id.* at 210; *see Printz v. United States*, 521 U.S. 898, 936 (1997) (O'Connor, J., concurring) (noting that a Tenth Amendment issue could be resolved by turning the same requirements into conditions of receiving federal funds). Even under the district court's reasoning, when § 1373 is applied as a condition on federal funds, it is an "applicable Federal law[]" because that application of the statute is constitutional.

Relatedly, even accepting the incorrect premise that § 1373 could implicate the Tenth Amendment in some applications, the district court did not explain how the statute is unconstitutional on its face. Section 1373 does not have an independent

29

enforcement mechanism, and it is entirely constitutional to enforce it as a condition on federal funds. Even accepting the court's Tenth Amendment analysis, § 1373 would not cease to be a "Federal law[]" merely because some of its applications are unconstitutional, and, indeed, it would remain "applicable" in precisely these circumstances.

### B.   Section 1373 Does Not Violate the Tenth Amendment

**1.** At the outset, for the reasons discussed above, there was no need for the district court to decide whether § 1373 is consistent with the Tenth Amendment as a stand-alone statute, both because its restrictive reading of "applicable Federal laws" made this inquiry unnecessary and because the constitutionality of the § 1373 certification condition is governed by the Spending Clause (which it plainly satisfies).

**2.** In any event, as this Court held in *City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999), § 1373 is entirely consistent with the Tenth Amendment. As noted, the statute provides that "State" and "local government entit[ies] or official[s]" "may not prohibit, or in any way restrict," any government entity or official from sharing with federal immigration authorities "information regarding the citizenship or immigration status" of any individual. 8 U.S.C. § 1373(a); *see also id.* § 1373(b) (similar). The statute does not require jurisdictions to regulate in a particular area, as in *New York v. United States*, 505 U.S. 144 (1992), and *Murphy v. National Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). Nor does it require jurisdictions to enforce a federal regulatory scheme, as in *Printz*. Rather, § 1373 is a permissible information-

30

sharing requirement that preempts State and local governments from hindering the

federal government's enforcement of the immigration laws against individual aliens.

As applied here, § 1373 addresses the effects of state and local criminal custody

on the INA's regulatory scheme concerning the removal and detention of individual

aliens. The INA provides that DHS "may not remove an alien who is sentenced to

imprisonment until the alien is released from imprisonment." 8 U.S.C.

§ 1231(a)(4)(A). But within 90 days of "the date the alien is released from detention

or confinement," DHS "shall remove" an alien subject to a final order of removal. *Id.*

§ 1231(a)(1)(A), (B)(iii). During this removal period, DHS "shall detain" the alien,

and, if the alien has a qualifying criminal history, "[u]nder no circumstance[s]" shall

DHS release the alien during the removal period. *Id.* § 1231(a)(2). Similarly, when an

alien is not yet subject to a final order of removal, DHS may execute a warrant to

arrest and detain the alien under § 1226(a) when he is released from local criminal

custody and, if the alien has a qualifying criminal history, DHS "shall" take the alien

into custody "when the alien is released," *id.* § 1226(c).

In this context, a requirement that localities provide DHS with information

regarding immigration status (such as an alien prisoner's release date, which is

essential to determining when and how the alien can be removed)—or § 1373's

narrower requirement that localities *may not restrict* their officers from sharing such

information with DHS—merely prevents localities from using the criminal-law

authority over aliens that Congress has allowed them to retain in a manner that

frustrates the operation of the parallel federal regulatory scheme for potential removal

or detention upon aliens' release from local custody. *See City of New York*, 179 F.3d at

35 (observing, in rejecting Tenth Amendment challenge to § 1373, that "the

Supremacy Clause . . . bars states from taking actions that frustrate federal laws and

regulatory schemes"). Even if Congress had not enacted § 1373, that would follow

from basic principles of obstacle preemption. *See Arizona v. United States*, 567 U.S.

387, 399 (2012). Congress did not create a scheme in which the federal government

shall take custody of aliens upon their release from state criminal custody without

having any mechanism for ascertaining when the alien would be released. The INA's

allowance for state criminal custody to be completed before removal is premised on

the assumption that the federal government will be able to learn such aliens' release

dates and seamlessly take them into federal custody in a safe and orderly manner.

The legislative history of § 1373 confirms this understanding. Congress first

prohibited restrictions on the sharing of "information regarding" an alien's

"immigration status" as a response, in part, to laws enacted by "[v]arious localities"

that "prevent[ed] local officials from disclosing the immigration status of individuals

to INS." H.R. Rep. No. 104-725, at 391 (1996) (Conf. Rep.). The House Conference

Report explained that the statute was intended to "give State and local officials the

authority to communicate with the INS regarding the presence, whereabouts, or

activities of illegal aliens." *Id.* at 383; *see id.* (the provision "is designed to prevent any

State or local" prohibition or restriction on "any communication between State and local officials and the INS").

The district court concluded that it was free to disregard this Court's decision in *City of New York* because of the Supreme Court's recent decision in *Murphy*. But *Murphy* expressly did not disturb the bedrock principle that state and local laws that obstruct federal laws "regulat[ing] private actors" are "preempt[ed]." 138 S. Ct. at 1479. That principle could not save the statute at issue in *Murphy*, which did not "impose any federal restrictions on private actors," but instead sought to prohibit States from authorizing sports gambling schemes. *Id.* at 1481. By contrast, where, as here, both sovereigns regulate private individuals, the issue is not whether the federal government has commandeered a State, but whether the state's scheme is preempted insofar as it poses an obstacle to the effectuation of the federal scheme. *See Hodel v. Virginia Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 289-90 (1981) (It "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities affecting interstate commerce.").

Indeed, especially given its "plenary power to legislate on the subject of aliens," *City of New York*, 179 F.3d at 34, Congress could have provided for immediate removal of aliens regardless of pending local criminal prosecutions. Allowing local criminal custody to continue while requiring that localities facilitate the effectuation of—or at least not interfere with—an orderly transfer to federal officers at the end of such custody does not in any sense "commandeer" the locality into enforcing federal

33

law, but merely places conditions on the locality's exercise of its own regulatory authority.  *See Hodel*, 452 U.S. at 290-91 ("We fail to see why the Surface Mining Act should become constitutionally suspect simply because Congress chose to allow the States a regulatory role.").  In sum, so long as Congress is expressly (or implicitly) preempting a locality from interfering with federal regulation of private parties, it is not impermissibly regulating the locality directly.

**3.**  The district court misunderstood the relevant analysis when it concluded that § 1373 was unconstitutional because, like the statute at issue in *Murphy*, it purportedly amounts to a "'direct order[]' to states and localities" and does not "regulate[] private actors."  App. 25, 27 (first alteration in original) (quoting *Murphy*, 138 S. Ct. at 1478, 1479).  As the Supreme Court admonished in *Murphy*, "it is a mistake to be confused by the way in which a preemption provision is phrased," because "language might appear to operate directly on the States"—even in a targeted way—but in substance merely prevent the States from obstructing federal regulation of private parties.  138 S. Ct. at 1480; *see id.* (discussing 49 U.S.C. app. § 1305(a)(1) (1988)).  That is exactly what § 1373 does:  it preempts States and localities from hindering the INA's regulation of aliens.

Plaintiffs assert that they may affirmatively restrict the ability of otherwise-willing local officials to provide the minimal cooperation needed for federal officials to exercise their duties.  Indeed, they believe that they may refuse to help with the problems created by their own exercise of regulatory authority over persons who are

Case 19-267, Document 54, 03/01/2019, 2509163, Page43 of 56

also subject to federal regulatory authority.  The district court thus got matters backwards in asserting that § 1373 "'prevents [Plaintiffs] from extricating [themselves] from federal immigration enforcement'" and "denies plaintiffs the 'critical alternative' required by the Tenth Amendment to 'decline to administer the federal program.'" App. 25 (alterations in original) (quoting *City of Chicago*, 321 F. Supp. 3d at 870, and *New York*, 505 U.S. at 176-77).  By affirmatively asserting criminal custody over aliens whom the federal government seeks to detain and remove, plaintiffs' scheme will impair the exercise of the parallel federal scheme unless plaintiffs terminates custody in a manner that does not hinder the federal government in assuming custody.  It is precisely when two regulatory schemes collide in this fashion that the Supremacy Clause authorizes Congress to prohibit a locality from using its authority to create an obstacle to the functioning of the federal scheme.

The district court was fundamentally mistaken to object that § 1373 reduces "political accountability" on immigration matters by preventing citizens from "properly credit[ing] or blam[ing] their state or local officials when their policies are compelled by the federal government." App. 25-26.  The federal government is not requiring plaintiffs to enforce federal law by arresting particular individuals or extending their custody.  *See Printz*, 521 U.S. at 926 (citing *New York*, 505 U.S. at 188).  Instead, it is the federal government that seeks to assume custody, and only of those aliens whom plaintiffs have already decided, for their own reasons, to take into custody pursuant to state criminal law.  The federal government bears sole

35

responsibility for the actions it takes with respect to private persons pursuant to its

regulatory authority.

4. Moreover, even if § 1373 could properly be analyzed apart from the INA's

general regulatory scheme, a requirement to respond to, or not interfere with, a

federal inquiry about an alien's release date or other information regarding

immigration status would in no sense be "commandeering" local officials to execute

federal law.  In *Printz*, although the Supreme Court held that local law-enforcement

officers could not be required to perform background checks to validate the legality of

gun sales under federal law, it distinguished statutes that "require only the provision

of information to the Federal Government," as they "do not involve . . . the forced

participation of the States' executive in the actual administration of a federal

program."  521 U.S. at 918.  The Supreme Court's Tenth Amendment cases are not

properly read to invalidate reporting requirements, such as the requirement for "state

and local law enforcement agencies to report cases of missing children to the

Department of Justice."  *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C.

§ 5779(a)); *see Reno v. Condon*, 528 U.S. 141, 151 (2000) (Constitution does not prohibit

federal enactments that "do[] not require the States in their sovereign capacity to

regulate their own citizens," but instead "regulate[] the States as the owners of data

bases").

The district court dismissed these passages from *Printz* as dicta, but it provided

no explanation for why they are incorrect.  App. 27.  And while the court asserted that

36

§ 1373 requires more than information sharing because it "prevents state and local policymakers from enacting a wide range of information-governance rules," App. 28, the fact that § 1373 prohibits restrictions on information sharing rather than affirmatively mandating information sharing makes the statute *less intrusive* because it allows local and state officials to individually refuse to provide information to DHS.

In sum, § 1373 is valid under the Tenth Amendment both because it is a valid preemption provision and because it is limited to information sharing.

## III.   The Conditions Neither Violate the Separation of Powers Nor Are Arbitrary and Capricious

**A.** The district court erroneously invested its statutory holding with constitutional significance, finding that the conditions violated the separation of powers simply because they were not authorized by the statute. App. 30-31. Even setting aside that imposition of the conditions did not exceed the Assistant Attorney General's statutory authority, any such error in grant administration would not further constitute a violation of the structural limitations on the three branches of government. As the Supreme Court has made clear, there is no support for the "proposition that every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). Rather, the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is . . . well established." *Id.* at 474.

**B.** The district court likewise erred in concluding that the Department's imposition of the conditions was arbitrary and capricious. App. 31-36. At the outset, the court's holding that imposition of the certification condition was arbitrary and capricious collapses because of the nature of the statutory authorization. Congress specified that Byrne JAG applicants must certify their compliance with "applicable Federal laws." 34 U.S.C. § 10153(A)(5)(D). Thus, the only question for the agency was whether § 1373 is an "applicable Federal law[]" for purposes of the Byrne JAG statute. It is, *see supra* pp. 26-30, and that purely legal determination resolves the arbitrary-and-capricious analysis.

In any case, there is no basis for concluding that the Attorney General's imposition of the conditions was unreasonable. The Byrne JAG program provides funds to further "criminal justice" in various programs, including "[l]aw enforcement" and "[c]orrections" programs. *See* 34 U.S.C. § 10152(a)(1). The conditions relate to how grantees exercise an integral aspect of those programs—*i.e.*, their policies concerning access to and release of prisoners in criminal custody. Moreover, the conditions ensure that any "program or activity" funded by the federal law-enforcement grants does not thwart the federal government's ability to remove aliens whom the grantee itself arrested for criminal conduct.

It is reasonable for the Department to condition law enforcement grants on an undertaking not to pursue a deliberate policy of refusing to provide basic information necessary to enforcement of the immigration laws. Those judgments do not depend

38

on a factual determination of the sort that the district court appeared to demand.  *See* App. 34-35.  They simply require asking whether the Department should blind itself to the degree of cooperation provided by localities to federal law-enforcement efforts when distributing federal grants, as well as to the public-safety threats caused by that lack of cooperation.  Thus, even assuming that the Department's imposition of the conditions is subject to arbitrary-and-capricious review, notwithstanding the absence of any statutory standards governing the choice of special conditions and priority purposes adopted, *but cf. Lincoln v. Vigil*, 508 U.S. 182, 192-94 (1993), the conditions are "rational" and the district court erred in "substitut[ing] its judgment" for the Department's.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983).

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be

reversed.

Respectfully submitted,

JOSEPH H. HUNT
*Assistant Attorney General*

MARK B. STERN
DANIEL TENNY

*s/ Brad Hinshelwood*
BRAD HINSHELWOOD
*Attorneys, Appellate Staff*
*Civil Division, Room 7256*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-7823*
*bradley.a.hinshelwood@usdoj.gov*

March 2019

40

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 9,646 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Brad Hinshelwood*
Brad Hinshelwood

## CERTIFICATE OF SERVICE

I hereby certify that on March 1, 2019, I electronically filed the foregoing brief

with the Clerk of the Court for the United States Court of Appeals for the Second

Circuit by using the appellate CM/ECF system.  Participants in the case are registered

CM/ECF users, and service will be accomplished by the appellate CM/ECF system.


*s/ Brad Hinshelwood*
Brad Hinshelwood

# ADDENDUM

Case 19-267, Document 54, 03/01/2019, 2509163, Page52 of 56

## TABLE OF CONTENTS

8 U.S.C. § 1373.........................................................................................................................A1

34 U.S.C. § 10102 ...................................................................................................................A2

34 U.S.C. § 10153 ...................................................................................................................A3

8 U.S.C. § 1373

## § 1373. Communication between government agencies and the Immigration and Naturalization Service

### (a) In general

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

### (b) Additional authority of government entities

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

**(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

**(2)** Maintaining such information.

**(3)** Exchanging such information with any other Federal, State, or local government entity.

### (c) Obligation to respond to inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**34 U.S.C. § 10102**

**§ 10102. Duties and functions of Assistant Attorney General**

**(a) Specific, general and delegated powers**

The Assistant Attorney General shall--

> **(1)** publish and disseminate information on the conditions and progress of the criminal justice systems;

> **(2)** maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice;

> **(3)** provide information to the President, the Congress, the judiciary, State and local governments, and the general public relating to criminal justice;

> **(4)** maintain liaison with public and private educational and research institutions, State and local governments, and governments of other nations relating to criminal justice;

> **(5)** coordinate and provide staff support to coordinate the activities of the Office and the Bureau of Justice Assistance, the National Institute of Justice, the Bureau of Justice Statistics, the Office for Victims of Crime, and the Office of Juvenile Justice and Delinquency Prevention; and

> **(6)** exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

**(b) Annual report to President and Congress**

The Assistant Attorney General shall submit an annual report to the President and to the Congress not later than March 31 of each year.

A2

**34 U.S.C. § 10153(A)**

**§ 10153. Applications**

**(A) In general**

To request a grant under this part, the chief executive officer of a State or unit of local government shall submit an application to the Attorney General within 120 days after the date on which funds to carry out this part are appropriated for a fiscal year, in such form as the Attorney General may require. Such application shall include the following:

(1) A certification that Federal funds made available under this part will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the absence of Federal funds, be made available for law enforcement activities.

(2) An assurance that, not fewer than 30 days before the application (or any amendment to the application) was submitted to the Attorney General, the application (or amendment) was submitted for review to the governing body of the State or unit of local government (or to an organization designated by that governing body).

(3) An assurance that, before the application (or any amendment to the application) was submitted to the Attorney General--

(A) the application (or amendment) was made public; and

(B) an opportunity to comment on the application (or amendment) was provided to citizens and to neighborhood or community-based organizations, to the extent applicable law or established procedure makes such an opportunity available.

(4) An assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require.

(5) A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), that--

(A) the programs to be funded by the grant meet all the requirements of this part;

(B) all the information contained in the application is correct;

(C) there has been appropriate coordination with affected agencies; and

A3

Case 19-267, Document 54, 03/01/2019, 2509163, Page56 of 56

**(D)** the applicant will comply with all provisions of this part and all other applicable Federal laws.

**(6)** A comprehensive Statewide plan detailing how grants received under this section will be used to improve the administration of the criminal justice system, which shall--

**(A)** be designed in consultation with local governments, and representatives of all segments of the criminal justice system, including judges, prosecutors, law enforcement personnel, corrections personnel, and providers of indigent defense services, victim services, juvenile justice delinquency prevention programs, community corrections, and reentry services;

**(B)** include a description of how the State will allocate funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title;

**(C)** describe the process used by the State for gathering evidence-based data and developing and using evidence-based and evidence-gathering approaches in support of funding decisions;

**(D)** describe the barriers at the State and local level for accessing data and implementing evidence-based approaches to preventing and reducing crime and recidivism; and

**(E)** be updated every 5 years, with annual progress reports that--

**(i)** address changing circumstances in the State, if any;

**(ii)** describe how the State plans to adjust funding within and among each of the uses described in subparagraphs (A) through (G) of section 10152(a)(1) of this title;

**(iii)** provide an ongoing assessment of need;

**(iv)** discuss the accomplishment of goals identified in any plan previously prepared under this paragraph; and

**(v)** reflect how the plan influenced funding decisions in the previous year.

A4