

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

—————————————————————————

MICHAEL P. KEARNS, in his individual
capacity and official capacity as Clerk
of the County of Erie, New York,

                    Plaintiff,

          v.

ANDREW M. CUOMO, in his official capacity
as Governor of the State of New York,
LETITIA A. JAMES, in her official capacity as
Attorney General of the State of New York, and
MARK J.F. SCHROEDER, in his official
capacity as Commissioner of the New York
State Department of Motor Vehicles,

                    Defendants.

—————————————————————————

**DECISION AND ORDER**

1:19-CV-00902 EAW

## **INTRODUCTION**

The power of a federal court is tempered by its jurisdictional boundaries.  The

United States Constitution limits the matters federal courts can consider.  *See Gunn v.*

*Minton*, 568 U.S. 251, 256 (2013) ("Federal courts are courts of limited jurisdiction,

possessing only that power authorized by Constitution and statute." (quotation omitted)).

In particular, "the judicial power of federal courts is constitutionally restricted to 'cases'

and 'controversies'. . . .  [T]hose words limit the business of federal courts to questions

presented in an adversary context and in a form historically viewed as capable of resolution

through the judicial process." *Flast v. Cohen*, 392 U.S. 83, 94-95 (1968).  This concept

mandating federal judicial restraint is not simply a technicality, but rather serves as a

fundamental bedrock of this country's democratic system. In other words, just because an issue is hotly debated does not mean that a federal court can step in and resolve the dispute—the court must first be satisfied that it has the authority to get involved.

What this means is that the doors of the federal courthouse are not always open. Rather, federal courts assess their ability to hear a case based, in part, on the doctrine of standing. "[S]tanding is generally an inquiry about the plaintiff: is this the right person to bring this claim." *Davis v. Wells Fargo*, 824 F.3d 333, 348 (3d Cir. 2016). "[A]ny person invoking the power of a federal court must demonstrate standing to do so"—that is, he or she "must seek a remedy for a personal and tangible harm." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). Because "standing is an essential and unchanging part of the case-or-controversy requirement of Article III," it constitutes not a "mere pleading requirement[], but rather an indispensable part of the plaintiff's case. . . ." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

In this matter, plaintiff Michael P. Kearns ("Plaintiff"), the elected County Clerk for Erie County, seeks to challenge the New York State Driver's License and Privacy Act, commonly known as the "Green Light Law," contending that its provisions are preempted by federal immigration law. (*See* Dkt. 1).[1] However, as discussed in detail below, Plaintiff has failed to meet his burden to plausibly allege that he has suffered or will imminently suffer "a concrete and particularized injury that is fairly traceable" to the implementation

---

[1]     The Green Light Law was passed by the New York State Legislature and signed into law by defendant Governor Andrew M. Cuomo in June 2019, and is scheduled to take effect on December 14, 2019.

of the Green Light Law. *Hollingsworth*, 570 U.S. at 704. In other words, while Plaintiff may strenuously disagree with the Green Light Law, he is not the proper party to challenge its legitimacy because he has failed to establish an injury that is recognized under the law. Accordingly, Plaintiff does not satisfy the "irreducible constitutional minimum" of demonstrating standing. *Lujan*, 504 U.S. at 560.

The Court recognizes that Plaintiff desires to resolve the merits of his claim—*i.e.*, whether or not the Green Light Law conflicts with federal immigration law. However, the Court cannot act without jurisdiction. Monitoring government action "is not the role of the judiciary, absent actual present or immediately threatened injury. . . ." *Laird v. Tatum*, 408 U.S. 1, 15 (1972). Because Plaintiff has failed to establish standing to challenge the Green Light Law, the Court is left with no choice but to dismiss Plaintiff's lawsuit. The Court therefore grants Defendants Governor Andrew M. Cuomo's, New York Attorney General Letitia James', and Commissioner of the New York State Department of Motor Vehicles Mark J.F. Schroeder's (collectively "Defendants") motion to dismiss (Dkt. 24), and denies Plaintiff's motion for a preliminary injunction seeking to enjoin enforcement and implementation of the Green Light Law prior to its effective date (Dkt. 3).

## BACKGROUND

### I.   Factual Background

#### A.   Drivers' Licenses in New York

The licensing of drivers in New York State is governed by Article 19 of the New York Vehicle and Traffic Law ("VTL"). *See generally* N.Y. Veh. & Traf. Law Ch. 71, tit. V, art. 19. VTL § 502 provides that an application for a driver's license shall be made to

the Commissioner of the New York State Department of Motor Vehicles ("Commissioner"), and that the applicant "shall furnish such proof of identity, age, and fitness as may be required by the commissioner." N.Y. Veh. & Traf. Law § 502(1). "A 1995 amendment to section 502(1) added the more specific requirement" that an applicant provide a social security number. *Cubas v. Martinez*, 8 N.Y.3d 611, 617 (2007). In accordance with this statutory mandate, the New York State Department of Motor Vehicles ("DMV") promulgated regulations providing that "[a]n applicant for a license or a non-driver identification card or an applicant renewing such a license or such identification card must submit his or her social security number or provide proof that he/she is not eligible for a social security number." 15. N.Y.C.R.R. § 3.9(a).

In certain upstate counties, including Erie County, DMV functions are performed by county clerks. N.Y. Veh. & Traf. Law § 205(1). The county clerks and their staff are responsible for accepting and processing applications for drivers' licenses to residents in those counties. (Dkt. 24-1 at ¶¶ 4-5). They have access to DMV systems to perform these functions and may access or use DMV records or information only when necessary for official DMV business. DMV, *Protection of Department Records* 1, 3 (rev. Jan. 2019). County clerks are not authorized to accept subpoenas, court orders, or other legal documents requesting DMV records or information; any such requests must be accepted at DMV headquarters in Albany. DMV, Requests for Information from External Entities 4 (rev. July 2016); *see* Miscellaneous Notices/Hearings, 35 N.Y. Reg. 106 (Feb. 13, 2013), https://docs.dos.ny.gov/info/register/2013/feb13/pdf/misc.pdf.

In 2005, Congress enacted the REAL ID Act, Pub. L. 109-13, 119 Stat. 231. The READ ID Act establishes minimum federal requirements for state-issued drivers' licenses and identification cards to gain entry to federal facilities and board federally regulated commercial aircrafts. 49 U.S.C. § 30301 note (Sec. 201 Definitions). To issue a REAL ID-compliant license or identification card, a state must verify an applicant's lawful presence within federal databases and maintain copies of the proofs of eligibility submitted by the applicant. *Id.* note (Sec. 202 Minimum Document Requirements and Issuance Standards for Federal Recognition). However, the REAL ID Act also permits states to issue licenses exempt from REAL ID requirements ("standard licenses"), *see id.*, although standard licenses will not be accepted as valid identification at airports beginning in October 2020.

The Green Light Law, enacted on June 17, 2019, *see* Ch. 37, 2019 N.Y. Laws, amends VTL § 502(1) by directing the Commissioner to accept various foreign-issued documents as primary proof of identification and/or age, and by providing that, for a standard license, in lieu of a social security number, an applicant may submit an affidavit attesting that he or she has not been issued a social security number. Ch. 37, 2019 N.Y. Laws, § 3. The Green Light Law further amends VTL § 502(8) to expressly state that proof of lawful presence in the United States is not required in order to obtain a standard license and to prohibit the DMV from inquiring about an applicant's citizenship or immigration status in connection with the issuance of such a license. *Id.* § 5.

The Green Light Law also has provisions related to the dissemination of information related to an applicant's citizenship status. In particular, the Green Light Law prohibits the

- 5 -

DMV from retaining either the original or copies of documents used by an applicant for a standard license to prove age or identity for any longer than "a limited period necessary to ensure the validity and authenticity of such documents." *Id.* It further provides that records and information maintained by the DMV containing "the social security number, telephone number, place of birth, country of origin, place of employment, school or educational institution attended, source of income, status as a recipient of public benefits, the customer identification number associated with a public utilities account, medical information or disability information" of an applicant for a driver's license cannot be disclosed except (1) to the applicant him- or herself, (2) where the Real ID Act expressly requires disclosure, or (3) pursuant to a court order, judicial warrant, or a state criminal or civil subpoena. *Id.* § 2. Moreover, the Commissioner and his agents are prohibited from turning over DMV records to any agencies that "primarily enforce[] immigration law" in the absence of "a lawful court order or judicial warrant signed by a judge appointed pursuant to article III of the United States constitution." *Id.* Upon receiving a request for records or information from an agency that "primarily enforces immigration law," the Commissioner is required, within three days, to notify the individual whose information was sought. *Id.*

## B.    Federal Immigration Legislation

The federal government enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009 (1996), which prohibits state and local governments from limiting their employees in the voluntary provision of information about the immigration status of aliens to federal immigration authorities. *See* 8 U.S.C. § 1373. Additionally, federal law requires that "[n]otwithstanding any other

provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to . . . [federal immigration authorities] information regarding the immigration status, lawful or unlawful, of an alien in the United States." 8 U.S.C. § 1644.

Also relevant to the instant litigation is 8 U.S.C. § 1324, a federal criminal statute entitled "Bringing in and harboring certain aliens." Subsection (a)(1)(A) of § 1324 criminalizes the following: (i) knowing that a person is an alien, bringing or attempting to bring that person into the United States other than a designated port of entry; (ii) transporting, moving, or attempting to transport or move an alien within the United States, knowing or in reckless disregard of the fact that such alien is not lawfully present in the United States; (iii) concealing, harboring, shielding from detection, or attempting to conceal, harbor, or shield from detection an alien, knowing or in reckless disregard of the fact that such alien is not lawfully present in the United States; (iv) encouraging or inducing an alien to "come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be" unlawful; and (v) aiding or abetting in the commission of any of the preceding acts, or engaging in a conspiracy to commit any of the previous acts. 8 U.S.C. § 1324(a)(1)(A)(i-v).

## II.   Procedural Background

Plaintiff filed the instant action on July 8, 2019. (Dkt. 1). Shortly after commencing this litigation, Plaintiff filed a motion for a preliminary injunction, seeking to enjoin enforcement and implementation of the Green Light Law prior to its effective date of

December 14, 2019. (Dkt. 3). On August 16, 2019, Defendants filed a motion to dismiss. (Dkt. 24).

Plaintiff filed a First Amended Complaint as of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B) on September 4, 2019. (Dkt. 41). Plaintiff's First Amended Complaint seeks a declaratory judgment that certain portions of the Green Light Law conflict with federal law and attempt to regulate a field that Congress has determined to be within its exclusive governance, and therefore are preempted under the Supremacy Clause of the United States Constitution. Plaintiff also seeks a permanent injunction enjoining the implementation and enforcement of the challenged portions of the Green Light Law, and preventing the removal of Plaintiff from office for his failure to "carry out any and all unconstitutional requirements of the Green Light Law." (Dkt. 41 at 20). With the consent of Plaintiff and Defendants, the Court agreed to consider the merits of the pending motion to dismiss in light of the First Amended Complaint. (Dkt. 51).

Plaintiff filed a memorandum of law in further support of his motion for a preliminary injunction and in opposition to Defendants' motion to dismiss on September 16, 2019. (Dkt. 60). Defendants filed a reply memorandum of law in further support of their motion to dismiss on September 27, 2019 (Dkt. 72), and Plaintiff filed an additional memorandum of law related solely to Defendants' response to the new allegations contained in the First Amended Complaint on October 1, 2019 (Dkt. 73).

Since the filing of this lawsuit, numerous third parties have sought leave of court to become involved in various ways. The Court granted the Connecticut Attorney General's request by letter dated July 31, 2019 (Dkt. 15), for leave to file an *amicus curiae* brief in

support of Defendants (Dkt. 16); the Court granted the Immigration Reform Law Institute's request by letter dated August 14, 2019 (Dkt. 19), for leave to file an *amicus curiae* brief in support of Plaintiff (Dkt. 20); and the Court granted the New York Civil Liberties Union's ("NYCLU") request by letter dated September 6, 2019 (Dkt. 52), for leave to file an *amicus curiae* brief in support of Defendants (Dkt. 53). The Immigration Reform Law Institute filed its brief on August 14, 2019 (Dkt. 21); on August 23, 2019, the State of Connecticut joined with seven additional states and the District of Columbia and filed an *amici curiae* brief (Dkt. 35); and the NYCLU filed its brief on September 9, 2019 (Dkt. 54). On October 9, 2019, the Court issued a Decision and Order (Dkt. 79) denying all other outstanding requests from third parties to become involved in this litigation.[2]

Oral argument on Plaintiff's motion for a preliminary injunction and Defendants' motion to dismiss was held on October 23, 2019. (Dkt. 81). The Court reserved decision.

---

[2]     On August 28, 2019, the Court issued a certification to the Attorney General of the United States pursuant to Federal Rule of Civil Procedure 5.1 and 28 U.S.C. § 2403, certifying that the constitutionality of 8 U.S.C. §§ 1373 and 1644 had been challenged. (Dkt. 37). The Court ordered that if the Attorney General elected to intervene in this action to defend the constitutionality of those statutory provisions, he must do so on or before November 12, 2019. (Dkt. 76). As of the date of this Decision and Order, the Attorney General has not filed a motion to intervene. Because the Court resolves the instant matter on grounds other than the constitutionality of 8 U.S.C. §§ 1373 and 1644, it need not wait for the Attorney General's motion to intervene before issuing this Decision and Order. *See* Fed. R. Civ. P. 5.1(c) ("Before the time to intervene expires, the court may reject the constitutional challenge, but may not enter a final judgment holding the statute unconstitutional.").

## DISCUSSION

### I.      Defendants' Motion to Dismiss

The Court must resolve Defendants' pending motion to dismiss before turning to

Plaintiff's motion seeking to preliminarily enjoin enforcement of the Green Light Law.  In

other words, if Plaintiff's lawsuit does not survive Defendants' motion to dismiss, then he

is not entitled to any relief—injunctive or otherwise.

Defendants have moved for dismissal of Plaintiff's claims pursuant to Federal Rule

of Civil Procedure 12(b)(1) and (6), arguing that: (1) Plaintiff lacks capacity to bring his

claims; (2) Plaintiff lacks standing to bring his claims; (3) Plaintiff does not have a viable

claim under the Supremacy Clause; and (4) Plaintiffs' preemption claims fail on the merits.

For the reasons discussed below, the Court finds that Plaintiff lacks standing to bring his

claims in either his official or his individual capacity.  As a result, the Court agrees with

Defendants that Plaintiff's claims must be dismissed.

### A.      Legal Standard—Subject Matter Jurisdiction

"A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack

of subject matter jurisdiction if the court lacks the statutory or constitutional power to

adjudicate it, such as when . . . the plaintiff lacks constitutional standing to bring the

action." *Cortlandt St. Recovery Corp. v. Hellas Telecomms, S.á.r.l*, 790 F.3d 411, 416-17

(2d Cir. 2015) (quotation and citation omitted).  "A plaintiff asserting subject matter

jurisdiction has the burden of proving by a preponderance of the evidence that it exists."

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "When considering a motion

to dismiss for lack of subject matter jurisdiction . . ., a court must accept as true all material

factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). In addition, a court is not limited to the allegations in the complaint and can "refer to evidence outside the pleadings," *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002), but it "may not rely on conclusory or hearsay statements contained in the affidavits." *J.S. v. Attica Central Schools*, 386 F.3d 107, 110 (2d Cir. 2004). "Indeed, a challenge to the jurisdictional elements of a plaintiff's claim allows the Court to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 289 F. Supp. 2d 392, 399 (S.D.N.Y. 2003) (quotation omitted), *aff'd*, 403 F.3d 76 (2d Cir. 2005). "Where, as here, the defendant moves for dismissal under Rule 12(b)(1), Fed. R. Civ. P., as well as on other grounds, the court should consider the Rule 12(b)(1) challenge first since if it must dismiss the complaint for lack of subject matter jurisdiction, the accompanying defenses and objections become moot and do not need to be determined." *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990) (quotation omitted).

## B.   **Standing**

Defendants argue that the Court lacks subject matter jurisdiction because Plaintiff does not have standing, in either his individual or official capacity, to challenge the implementation of the Green Light Law. (*See* Dkt. 25 at 21-29). The Court agrees, for the reasons that follow.

This Court, like all courts established under Article III of the United States Constitution, has jurisdiction only over "cases and controversies." *Lujan*, 504 U.S. at 559; *see also Whitmore v. Arkansas*, 495 U.S. 149, 154-55 (1990) ("Article III, of course, gives

the federal courts jurisdiction over only 'cases and controversies. . . .'"). While the Constitution does not define "case" or "controversy," "the doctrine of standing serves to identify those disputes which are appropriately resolved through the judicial process." *Whitmore*, 495 U.S. at 155.

> The Second Circuit has explained:

> To satisfy the requirements of Article III standing, plaintiffs must demonstrate "(1) [an] injury-in-fact, which is a concrete and particularized harm to a legally protected interest; (2) causation in the form of a fairly traceable connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief."

*Hu v. City of New York*, 927 F.3d 81, 89 (2d Cir. 2019) (quoting *Selevan v. New York Thruway Auth.*, 711 F.3d 253, 257 (2d Cir. 2013)). "These elements are not mere pleading requirements but rather an indispensable part of the plaintiff's case." *Id.* (quotation and alteration omitted). Moreover, the Supreme Court has recognized that the standing inquiry must be "especially rigorous" when reaching the merits of a dispute would require a court to determine whether action taken by the political branches of government was constitutional, due to the "time-honored concern about keeping the Judiciary's power within its proper constitutional sphere." *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997). At the pleading stage, to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) based on lack of standing, a plaintiff must "allege facts that affirmatively and plausibly suggest that it has standing to sue." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011). "The presence of a disagreement, however sharp and

acrimonious it may be, is insufficient by itself to meet Art. III's requirements."
*Hollingsworth*, 570 U.S. at 704 (quotation omitted).

Defendants contend that Plaintiff has not plausibly alleged an injury-in-fact related to the implementation of the Green Light Law, and that he therefore lacks standing to challenge its provisions. (*See* Dkt. 25 at 21-29). Plaintiff argues in opposition that (1) he has alleged an injury to his office sufficient to confer standing for his official capacity claims and (2) he has alleged that he faces a credible threat of prosecution or of removal from office, which establishes standing with respect to his individual capacity claims. (*See* Dkt. 60 at 11-19). The Court considers each of these contentions below.

### 1.   Individual Capacity Claims

The requirement that a plaintiff demonstrate an injury-in-fact "has been repeatedly described as the hard floor of Article III jurisdiction, and requires a litigant to show an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Hassan v. United States*, 441 F. App'x 10, 11 (2d Cir. 2011) (citations and quotations omitted). Here, Plaintiff claims that he has suffered an injury-in-fact in his individual capacity related to the enactment of the Green Light Law, because he, in his role as Erie County Clerk, will be required to comply with its provisions, which will expose him to federal criminal prosecution and/or removal from office by the Governor. The Court has considered Plaintiff's allegations and arguments and concludes that Plaintiff has not satisfied his burden of alleging "facts that affirmatively and plausibly suggest that [he] has standing to sue" with respect to his individual capacity claims. *Amidax Trading*, 671 F.3d at 145.

a.   **Threat of Criminal Prosecution**

Turning first to Plaintiff's claim that he will be subject to potential federal criminal prosecution if he complies with the Green Light Law's mandates, it is true that "a plaintiff has standing to make a preenforcement challenge when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative." *Hedges v. Obama*, 724 F.3d 170, 196 (2d Cir. 2013) (quotation omitted).   In other words, a plaintiff does not have to wait to be prosecuted before challenging the constitutionality of a statute. *See id.* (explaining that where a plaintiff credibly fears prosecution under an allegedly unconstitutional statute, he is "not . . . required to await and undergo a criminal prosecution as the sole means of seeking relief." (quotation omitted)).

However, the cases dealing with standing in the context of preenforcement challenges to allegedly unconstitutional laws involve challenges to the very statutes under which the plaintiff fears prosecution. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988) (finding standing for preenforcement challenge where the plaintiffs had "alleged an actual and well-founded fear that the [challenged] law [would] be enforced against them"); *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." (emphasis added and quotation omitted)); *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (finding standing where the petitioner's challenge was to "those specific provisions of state law which have provided the basis for

- 14 -

threats of criminal prosecution against him"); *Cayuga Nation v. Tanner*, 824 F.3d 321, 331 (2d Cir. 2016) ("[A] plaintiff has standing to make a preenforcement challenge when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative." (emphasis added and quotation omitted)).

By contrast, in this case, Plaintiff is not alleging that he would be subject to criminal prosecution under the Green Light Law (nor could he plausibly do so, because the Green Light Law is not a criminal statute). Instead, Plaintiff contends that if he complies with the Green Light Law, he may be criminally prosecuted under 8 U.S.C. § 1324. (*See* Dkt. 41 at ¶ 44 ("The Green Light Law places County Clerks such as [Plaintiff] . . . at risk of federal prosecution under 8 U.S.C. § 1324.")). Plaintiff has not cited any case in which preenforcement standing to challenge a particular statute has been recognized based on the potential for prosecution under a different law. Indeed, at oral argument, Plaintiff's counsel conceded that he was not aware of any such case. A plaintiff asserting standing on such grounds necessarily cannot satisfy the essential requirement identified by the Supreme Court in *Babbitt*—that the plaintiff allege an intention to engage in a course of conduct proscribed by the challenged statute. *See* 442 U.S. at 298; *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (assessing as part of the standing inquiry whether the petitioners' "intended future conduct is arguably proscribed by the statute they wish to challenge" (quotations and alterations omitted)). In other words, the Court is not persuaded that the case law Plaintiff relies upon regarding preenforcement challenges based on a credible threat of prosecution is applicable here, where the law Plaintiff is challenging is different than the law under which he allegedly fears criminal prosecution.

- 15 -

Even if Plaintiff could challenge a non-criminal state law based on a claimed fear of prosecution under a different federal law, Plaintiff's efforts to meet his burden to establish standing fall flat. Plaintiff has not plausibly alleged that he intends to engage in future conduct proscribed by § 1324. "To sufficiently allege standing on his preenforcement claim, Plaintiff must . . . allege *both* a concrete intention to violate the law and the credible threat of prosecution if he were to do so." *Adam v. Barr*, No. 18-CV-2106 (AJN), 2019 WL 1426991, at *3 (S.D.N.Y. Mar. 29, 2019) (emphasis added) (finding lack of standing to challenge laws regarding cannabis where the plaintiff made conclusory allegation that he had "an immediate intention to use cannabis for religious purposes," but had not alleged "how he would seek to obtain marijuana, how or where he intends to use it, nor how much marijuana he intends to use" (quotation omitted)); *cf. Cayuga Nation*, 824 F.3d at 331-32 (finding standing for preenforcement challenge to village anti-gambling ordinance where the plaintiffs alleged they intended to conduct bingo games, "which is clearly prohibited by the Ordinance"); *Knife Rights, Inc. v. Vance*, 802 F.3d 377, 386-87 (2d Cir. 2015) (finding standing for preenforcement challenge to statute banning certain types of knives where the plaintiffs alleged that "they have in the past carried, and wish again to carry, common folding knives"); *Unkechaug Indian Nation v. N.Y. State Dep't of Envtl. Conservation*, No. 18-CV-1132 (WFK), 2019 WL 1872952, at *6 (E.D.N.Y. Apr. 23, 2019) (finding standing where the plaintiffs had "articulated a concrete plan, including fishing in waters they consider customary under their treaty rights, which would violate the regulations in question").

Here, Plaintiff has not alleged that he intends to engage in any conduct that would violate the federal criminal statute under which he purportedly fears prosecution, and particularly has not alleged that he intends to comply with the provisions of the Green Light Law. To the contrary, Plaintiff has provided the Court with no information at all regarding his intentions should the Green Light Law go into effect, opting instead to argue as to the potential legal effects of both complying and not complying with the Green Light Law's mandates. (*See* Dkt. 3-1 at ¶¶ 11-12, 15-17, 24; Dkt. 41 at ¶¶ 62-65). A fair reading of Plaintiff's allegations is that he may not comply with the Green Light Law, in which case his claimed exposure to criminal prosecution under federal law would disappear. In order to establish a threat of prosecution sufficiently imminent to satisfy the injury-in-fact requirement of standing, a plaintiff must have "concrete plans to perform, in the near future, the conduct that officials would consider illegal." *Jones v. Schneiderman*, 101 F. Supp. 3d 283, 291 (S.D.N.Y. 2015) (quotation omitted); *see also Lujan*, 504 U.S. at 564 (explaining that mere intentions, "without any description of concrete plans," are insufficient to support "a finding of the 'actual or imminent' injury" necessary to establish standing). In this case, Plaintiff has not alleged such concrete plans, and he has actually suggested just the opposite. This undercuts Plaintiff's claim that he possesses standing to challenge the Green Light Law in his individual capacity based upon a credible fear of prosecution.

In addition, the Court agrees with Defendants that Plaintiff's allegations do not support the conclusion that, even if he complied with the Green Light Law, he would open himself up for federal criminal prosecution. In particular, Plaintiff has failed to allege any

- 17 -

facts that plausibly support the claim that the Green Light Law would force him personally to engage in conduct that violates § 1324.[3]

Neither Plaintiff nor *amici* who support his position have identified a non-speculative scenario in which Plaintiff could plausibly anticipate being criminally prosecuted under § 1324 should he comply with the Green Light Law's provisions. In this regard, it is important to note that the minimum state of mind requirement in any subsection of § 1324 is that a person act in "reckless disregard" of the fact that an alien is in the United States unlawfully. *See* 8 U.S.C. § 1324(a). With respect to the provisions of the Green Light Law that eliminate the requirement that a driver's license applicant provide a social security number, as Defendants point out in their motion to dismiss, many people who are lawfully present in the United States lack social security numbers for various reasons. The mere fact that an individual does not have a social security number provides no meaningful information about that individual's immigration status, and knowledge that an individual does not have a social security number is insufficient to satisfy the *mens rea* requirement of § 1324. *See United States v. Rodriguez*, 880 F.3d 1151, 1162 (9th Cir. 2018) (explaining, in connection with § 1324, that a defendant acts with reckless disregard only if he "knew of facts which, if considered and weighed in a reasonable manner, indicate[d] a substantial and unjustifiable risk that the alleged alien . . . was in the United States

---

[3]    To the extent Plaintiff alleges that compliance with the Green Light Law would conflict with certain other provisions of federal immigration law (including 8 U.S.C. §§ 1373 and 1644), those allegations are not relevant to the standing inquiry, because those provisions are not criminal statutes under which Plaintiff could theoretically fear prosecution.

unlawfully, and the defendant knew of that risk" (emphasis omitted)).  Moreover, far from

exposing Plaintiff to information regarding an applicant's immigration status, the Green

Light Law expressly forbids Plaintiff and his staff from making any such inquiry. *See* Ch.

37, 2019 N.Y. Laws, § 5.

Plaintiff alleges in his Amended Complaint that it is "not unusual for driver's license

applicants—without being asked—to provide [Plaintiff] and his staff with information or

records regarding their immigration status." (Dkt. 41 at ¶ 34).[4]  This conclusory allegation

is insufficient to support Plaintiff's claim of individual standing.  *See Baur v. Veneman*,

352 F.3d 625, 636-37 (2d Cir. 2003) (explaining that even at the pleadings stage, "a

plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw

unwarranted inferences in order to find standing").  A fundamental problem with Plaintiff's

allegation is that he fails to explain why he would be personally interacting with an

applicant for a driver's license.  Certainly Plaintiff, the elected County Clerk, is not

working the intake counter at Erie County's DMV offices, nor has he described any other

scenario in which he would be personally responsible for reviewing the documents

---

[4]      As noted above, under the pre-Green Light Law version of the VTL, an applicant
for a driver's license was required to either provide a social security number or proof that
he or she was not eligible for the same.  As such, some level of discussion regarding
immigration status may have been expected.  However, the Green Light Law expressly
removes immigration status as a consideration in the issuance of a standard license.  As
such, even accepting the claim that driver's license applicants volunteered information
regarding their immigration status in the past, it is pure speculation to assume they would
continue to do so when such status has no bearing whatsoever on their eligibility for a
standard driver's license—and in fact, any inquiry regarding immigration status is now
expressly forbidden under the Green Light Law.

submitted by a driver's license applicant.[5]  Of course, Plaintiff cannot rely on potential injuries to his staff to establish standing.  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (explaining that an injury-in-fact must be "particularized" such that it "affect[s] the plaintiff in a personal and individual way" (quotations omitted)).   Moreover, Plaintiff has failed to allege that any driver's license applicant has ever told him personally that he or she was unlawfully present in the United States, or presented records demonstrating that this was the case.[6]

Put simply, Plaintiff has failed to plausibly allege a scenario in which he personally would be on notice of a substantial risk that an individual was in the United States unlawfully and would nonetheless be required to process that individual's driver's license application.   In other words, Plaintiff's "theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

---

[5]   At oral argument, Plaintiff's counsel suggested that members of Plaintiff's staff might come to him with questions about documents they received, and thereby put him on notice that a driver's license applicant is in the country unlawfully.   However, no such allegation is contained in the Amended Complaint, nor has Plaintiff alleged that this has ever happened in the past.  Indeed, Plaintiff has failed to allege that he has any personal involvement—past, present, or future—in the administrative tasks associated with the issuance of a driver's license.  At a minimum, in order to establish individual standing based on a credible threat of prosecution, Plaintiff would need to establish that he was personally involved in the process of issuing driver's licenses so as to expose himself to information regarding an applicant's immigration status—and he has wholly failed to plausibly allege his personal involvement.

[6]   Plaintiff has also failed to explain what kind of records applicants could produce that would even arguably put him on notice that they were in the United States unlawfully. As with not having a social security number, the mere possession of foreign documents is not evidence of an unlawful immigration status.

The Court further agrees with Defendants that, even in the implausible scenario where Plaintiff is made aware that someone is in the United States unlawfully, merely processing that individual's application for a driver's license[7] would not constitute a violation of § 1324. Plaintiff argues that the Second Circuit has adopted a broad definition of harboring under § 1324, which could encompass processing driver's license applications. However, recent Second Circuit case law is clear that "to constitute harboring [under § 1324], a defendant's action must be intended (1) substantially to facilitate an illegal alien's remaining in the United States, and (2) to prevent the alien's detection by immigration authorities." *United States v. George*, 779 F.3d 113, 117-18 (2d Cir. 2015). Plaintiff has not offered any plausible construction of this intentionality requirement that would encompass merely processing the paperwork for a driver's license application, even if Plaintiff himself was the individual working the counter at the Erie County DMV (which, again, he has not alleged). *Cf. Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000) (finding standing in preenforcement context because the plaintiff had

---

[7]     It is relevant to note that Plaintiff's role in the issuance of drivers' licenses is purely ministerial—it is the State of New York, acting via the DMV Commissioner, and not Plaintiff, that is the ultimate decisionmaker as to who is issued a driver's license. *See* VTL § 508 ("The commissioner shall appoint agents to act *in his behalf* with respect to the acceptance of applications and the issuance of licenses and permits prescribed in this article, and he may prescribe the internal procedures to be followed by such agents with respect to such matters." (emphasis added)). Plaintiff, whether in his individual or official capacity, has no independent power or authority to grant or deny driving privileges to any person; all such actions are performed on behalf of New York State. Accordingly, the Immigration Reform Law Institutes' argument that the Green Light Law requires Plaintiff to commit inducement, shielding, and human trafficking under § 1324 (*see* Dkt. 21 at 6-9) are specious, because they are based on the faulty premise that it is Plaintiff himself who is "providing in-state driving privileges to aliens who lack registration" (*id.* at 7).

- 21 -

plausibly alleged that its intended conduct would violate a reasonable interpretation of the challenged statute).

Plaintiff's claim that he may be criminally prosecuted merely for processing driver's license applications for aliens who are unlawfully present in the United States is also belied by the fact that numerous states and territories have laws that do not condition the issuance of a driver's license (or comparable driving credential) on proof of lawful immigration status, and the federal government has never prosecuted anyone for compliance therewith. Indeed, as the *Amici* States point out, "as recently as 2002 half of all states did not require applicants to produce documentation of lawful immigration status before obtaining permission to drive." (*Id.* at 11). Moreover, it was more than 25 years ago (in 1993) that "Washington State enacted legislation explicitly allowing the issuance of driving credentials without proof of legal immigration status." (*Id.* at 13). The Second Circuit has acknowledged that when a plaintiff asserts standing based on a claimed threat of prosecution, it is relevant whether the statute proscribing his conduct is "recent and not moribund." *Hedges*, 724 F.3d at 197 (quoting *Doe v. Bolton*, 410 U.S. 179, 188 (1973)). In this case, § 1324 is not a recently enacted statute, and individuals who have been engaging in the precise conduct mandated by the Green Light Law (that is, processing driver's license applications without regard to the applicant's immigration status) have faced no threat of prosecution thereunder. While this fact is not alone dispositive, it

supports the conclusion that Plaintiff's claimed fear of prosecution is illusory and he has failed to plausibly allege standing.[8]

In his papers, Plaintiff argues that his claimed fear of prosecution is plausible because "[t]he Trump Administration [has] threatened retaliation against local officials that it believes are interfering with the enforcement of federal immigration law." (Dkt. 60 at 18). Plaintiff offers two examples in favor of this contention, neither of which is remotely factually analogous to the current matter. First, Plaintiff refers to an incident in 2018 where President Trump publicly urged the United States Attorney General to consider prosecuting the Mayor of Oakland, California, for obstruction of justice after she alerted individuals who were not legally present in the Untied States of a pending law enforcement raid. (Dkt. 3-1 at ¶ 7). Second, Plaintiff refers to *United States v. Joseph*, Crim. Action No. 19-cr-10141, Dkt. 1 (D. Mass. Apr. 25, 2019), a case in which a Massachusetts state court judge and a court officer were criminally prosecuted for obstruction of justice after having allegedly allowed an individual whom they knew was subject to a final order of removal to exit the court through a back door in order to evade being taken into custody by United States Immigration and Customs Enforcement ("ICE"). (*Id.* at ¶ 8).

---

[8] Plaintiff argues that the federal government has not disavowed any intention to prosecute him under § 1324 should he comply with the Green Light Law. (*See* Dkt. 60 at 16-17). However, an express disavowal is not necessary where there is "another reason to conclude" that such a prosecution is not plausible. *Hedges*, 724 F.3d at 197. Indeed, the Second Circuit has indicated that the presence or absence of an express disavowal should not play a determinative role in the standing inquiry, because such a disavowal is not legally binding. *See Vt. Right to Life*, 221 F.3d at 383.

Far from supporting Plaintiff's claimed fear of prosecution under § 1324, these examples underscore the speculative nature of his claims.  With respect to the mayor of Oakland, it is undisputed that she was not criminally prosecuted, despite having allegedly deliberately aided unlawfully present aliens in evading law enforcement detection. Similarly, the defendants in *Joseph* were allegedly on notice that the individual was subject to a final order of removal and nonetheless took active and affirmative steps to prevent ICE from taking him into custody.  Both these scenarios are a far cry from the issue in this case, involving the processing of driver's license applications for individuals whose immigration status is unknown.   Moreover, in both of Plaintiff's examples, the prosecution (or threatened prosecution) was for obstruction of justice, not for violation of § 1324.  *See United States v. Joseph*, Crim. Action No. 19-cr-10141, Dkt. 1 at 15-16 (D. Mass. Apr. 25, 2019); (Dkt. 3-1 at ¶ 7).  Plaintiff has not identified a single instance of even a threatened prosecution of a local official pursuant to § 1324.

Plaintiff's claim of standing based on potential prosecution under § 1324 fares no better with respect to the provisions of the Green Light Law that govern the dissemination of records and information.  Plaintiff has not alleged that he has ever been asked for records or information by federal immigration authorities in the past, nor has he alleged that such a scenario is likely to occur in the future.  Moreover, Plaintiff does not dispute that under longstanding DMV policy, only the DMV's central office in Albany is authorized to accept service of court orders, subpoenas, and judicial warrants.  Again, Plaintiff's theory of standing "relies on a highly attenuated chain of possibilities," *Clapper*, 568 U.S. at 410— namely, that a driver's license applicant would produce some unspecified record

suggesting that he or she was in this country unlawfully, that federal immigration authorities would request that record from Plaintiff personally (as opposed to properly submitting the request to the DMV's central office), that Plaintiff would accept the request despite having no authority to do so, that Plaintiff would be able to glean from the face of the request that there was a substantial risk it pertained to an individual who was in this country unlawfully, and that Plaintiff would then either refuse to turn the record over (which he has not stated he intends to do) or conspire with the DMV's central office to refuse to produce the information. This sort of speculation about a series of implausible events is insufficient to demonstrate a credible fear of prosecution so as to afford Plaintiff standing.

Plaintiff's arguments regarding the notification provisions of the Green Light Law fail for similar reasons. The Green Light Law requires that in the event the DMV receives a request for records from an immigration enforcement agency, "the commissioner shall . . . notify the individual about whom such information was requested. . . ." Ch. 37, 2019 N.Y. Laws, § 2 (emphasis added). Agents of the Commissioner are not authorized by the Green Light Law to provide that notification. In other words, Plaintiff has not alleged a plausible scenario where he personally would be required to notify an individual about a record request received from immigration officials.

In sum, it is apparent Plaintiff disagrees with the Green Light Law. But the mere disagreement with a duly-enacted state statute does not entitle anyone—even an elected official—to seek intervention from a federal court. Rather, Plaintiff must have suffered a legally cognizable injury. To the extent Plaintiff bases his theory of injury on a credible

threat of prosecution against him individually, he fails to meet his burden to establish standing.

### b.      Threat of Removal from Office

Plaintiff has also argued that there is an imminent threat that he will be removed from office should he refuse to comply with the Green Light Law's provisions. Again, the Court finds Plaintiff's contentions speculative and insufficient to support a finding of injury-in-fact.

Plaintiff's claim that he faces removal from office arises not from any provision of the Green Light Law itself, but from a wholly separate provision of the New York State Constitution. In particular, Article 13, § 13(a) of the New York State Constitution ("Article 13, § 13(a)") grants the Governor of New York the ability to remove from office "any elective sheriff, county clerk, district attorney or register," so long as the official in question is provided "a copy of the charges against him or her and an opportunity of being heard in his or her defense." N.Y. Const. art. XIII, § 13(a).

Plaintiff's theory of standing based on his fear of removal from office suffers from similar infirmities as his theory of standing based on his fear of criminal prosecution. First, there is simply no relation between the Green Light Law and Article 13, § 13(a)—that is, the sanction Plaintiff claims to fear does not arise from the statute he is seeking to challenge. Plaintiff also has not, as set forth above, alleged in his Amended Complaint that he definitely intends to disobey the Green Light Law, which is what he contends would be the impetus for the Governor to initiate removal proceedings. Moreover, Plaintiff has not

cited a single instance in which a county clerk has been removed pursuant to Article 13, §

13(a) for having refused to comply with a statute.

In addition, the Court notes that nothing on the face of Article 13, § 13(a) limits its

applicability to scenarios in which an elected official refuses to perform a statutory duty.

To the contrary, it appears to be left to the discretion of the Governor to determine what

constitutes a basis for removal. *Cf. Mulroy v. Carey*, 43 N.Y.2d 819, 822-23 (1977)

(Cooke, J., concurring) (explaining, in context of the Governor's authority to supersede an

elected district attorney, that the "Governor of the State is immune from interference by

judicial process and free from judicial control in his performance of executive powers,"

and that "[t]he separation of powers doctrine contemplates that the voters or their elected

representatives will check any abuse by the Executive through the political process—by

means of elective change, constitutional amendment or corrective legislation." (quotations

omitted)). According to Plaintiff's logic, if the mere theoretical possibility of removal

under Article 13, § 13(a) was sufficient to confer standing, any elected official covered by

Article 13, § 13(a) would be able to automatically create Article III standing simply by

declaring his or her intention not to comply with a law with which he or she personally

disagreed. Such a conclusion is wholly inconsistent with the fundamental standing

requirement of, at a minimum, an imminent injury-in-fact. *See Hollingsworth*, 570 U.S. at

704 ("The presence of a disagreement, however sharp and acrimonious it may be, is

insufficient by itself to meet Art. III's requirements." (quotation omitted)).

Moreover, Plaintiff's allegation that Governor Cuomo "has publicly refused to

assure" New York's county clerks that he would not exercise his removal powers is not

sufficient to raise Plaintiff's claimed injury above a speculative level. (*See* Dkt. 3-1 at

¶ 15). A government official's refusal to take a position on what future action he will

pursue is a far cry from the concrete and particularized injury necessary to establish

standing, especially when the State could respond to Plaintiff's theoretical non-compliance

with the Green Light Law in several ways. *See Clapper*, 568 U.S. at 412 (holding

respondents' alleged injury was insufficient for standing purposes because the statute at

issue "at most *authorizes*—but does not *mandate* or *direct*" the conduct respondents feared,

making their allegations "necessarily conjectural"). For example, VTL § 205 expressly

provides for the possibility that the Commissioner could direct someone other than the

County Clerk to serve as his agent "in the issuance of non-driver identification cards and

drivers' licenses," N.Y. Veh. & Traf. Law § 205(1), which means that even if Plaintiff

refused to comply with the Green Light Law, the Commissioner could direct someone else

to issue drivers' licenses in Plaintiff's stead. In short, an allegation regarding Governor

Cuomo's indecisiveness, especially when combined with Plaintiff's own refusal to plead

with definiteness as to what his future action will be, is too speculative to allege an injury-

in-fact based on Plaintiff's claimed prospective removal from office.

Finally, the fact that Defendants have publicly stated that they intend to enforce the

Green Light Law and defend it from constitutional challenge does not establish an intent

to remove Plaintiff from office should he refuse to comply with the Green Light Law's

terms. *See Poe v. Ullman*, 367 U.S. 497, 501-02 (1961) (state attorney's statement that he

intended "to prosecute any offenses against Connecticut law, and that he claims that use of

and advice concerning contraceptives would constitute offenses" insufficient to confer

standing on doctor who sought to challenge statute prohibiting him from giving contraceptive advice to patient, particularly in light of "[t]he undeviating policy of nullification by Connecticut of its anti-contraceptive laws throughout all the long years that they have been on the statute"). Plaintiff has not alleged that any county clerk in New York's history has been removed from office under Article 13, § 13(a) or that Defendants have indicated any plans to seek such a removal should he refuse to comply with the Green Light Law's mandates. On these facts, Plaintiff has not established a credible fear of removal from office sufficient to confer standing upon him.

### 2.   Official Capacity Claims

Having determined that Plaintiff lacks standing to bring his individual capacity claims, the Court considers whether Plaintiff has standing to bring his claims in his official capacity, and easily concludes that he does not.

In assessing the standing of a state subdivision to challenge a state law under the Supremacy Clause, the Second Circuit has applied the traditional test for Article III standing, including the requirement that the state subdivision demonstrate an "injury-in-fact." *See Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019). The parties agree that in order to establish standing with respect to his official capacity claims, Plaintiff is required to plead a "cognizable injury to his office." (Dkt. 60 at 12; *see* Dkt. 25 at 22). Plaintiff claims that he has done so because "[a]lthough the Clerk's Office cannot itself be prosecuted, it would undoubtedly be harmed if [Plaintiff] and others subsequently holding his position are prosecuted for a federal offense for complying with the Green Light Law" and because "the Clerk's Office will inevitably suffer harm if the Clerk is

removed from office each time s/he chooses to comply with federal law rather than the mandates of the Green Light Law." (Dkt. 60 at 12). These arguments lack merit.

First, Plaintiff has not explained what harm would come to the Erie County Clerk's Office merely from having the county clerk replaced, as happens on a regular basis due to elections, resignations, etc., but has merely asserted in a conclusory fashion that such harm is "inevitable." (*Id.*). Similarly, Plaintiff has not explained why it would harm the Erie County Clerk's Office if he were personally criminally prosecuted, but has simply stated as fact that this is the case. (*Id.*). As the Court has already explained, even at this early stage of the proceedings, Plaintiff "cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing." *Baur*, 352 F.3d at 636-37.

Second, the purported harms to the Erie County Clerk's Office identified by Plaintiff depend on Plaintiff being either criminally prosecuted under federal law or removed from office under Article 13, § 13(a).[9] However, the Court has already found, for the reasons discussed at length above, that Plaintiff has not plausibly alleged a credible threat of either of those situations occurring. It necessarily follows that these scenarios are too speculative to support a finding of standing as to Plaintiff's official capacity claims.

---

[9] At oral argument, Plaintiff argued that the Green Light Law would force county clerks and their staff to sort through documents they are not trained to review, such as foreign passports and drivers' licenses, and that this more difficult work is part of the damage to the Office of the Erie County Clerk. Plaintiff alleges this nowhere in his Complaint or Amended Complaint, and Plaintiff's counsel conceded that he raised this issue not for standing purposes but to explain how the system presently works in response to a question raised by the Court.

For all these reasons, the Court finds that Plaintiff has not "allege[d] facts that affirmatively and plausibly suggest that [he] has standing to sue" in either his individual or official capacities. *Amidax Trading*, 671 F.3d at 145. This is so even in light of the additional allegations included in Plaintiff's Amended Complaint. Accordingly, Plaintiff's claims must be dismissed for lack of subject matter jurisdiction. *See Cortlandt St. Recovery Corp.*, 790 F.3d at 416-17 ("A district court properly dismisses an action under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if the court lacks the statutory or constitutional power to adjudicate it, such as when (as in the case at bar) the plaintiff lacks constitutional standing to bring the action." (quotation and citation omitted)).

## C.   **Defendants' Remaining Arguments**

In addition to their standing arguments, Defendants have also argued that Plaintiff lacks capacity to bring his claims and have sought dismissal of Plaintiff's claims on the merits. However, because the Court has found that Plaintiff lacks standing and that the Court therefore lacks jurisdiction over his claims, the Court does not reach these arguments. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("Article III generally requires a federal court to satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case.").

## II.   **Plaintiff's Motion for a Preliminary Injunction**

Plaintiff has asked the Court for a preliminary injunction. (Dkt. 3). The Court's determination that it lacks subject matter jurisdiction over Plaintiff's claims eliminates any possibility that the Court could grant Plaintiff's request for preliminary injunctive relief. Accordingly, Plaintiff's motion for a preliminary injunction is denied as moot.

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion to dismiss (Dkt. 24) and denies Plaintiff's motion for a preliminary injunction (Dkt. 3) as moot.  The Clerk of Court is instructed to enter judgment in favor of Defendants and close the case.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated:  November 8, 2019
       Buffalo, New York